UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
(FOLEY SQUARE)

| SWEIGERT | CIVIL CASE #: |
|---|---|
| V. | 1:18-CV-08653-VEC |
| GOODMAN | JUDGE VALERIE E. CAPRONI |

## AFFIDAVIT FOR THE DISQUALIFICATION OF PRESIDING JUDGE

### Certification

This document is submitted in good faith and NOT submitted for the purposes of causing unnecessary delay with this instant litigation, which has been delayed six (6) months already. The enclosed presents information that is accurate and truthful as best the undersigned can ascertain. Therefore, the undersigned believes this pleading is truthful and not submitted for an improper purpose. This affidavit relies on 28 U.S.C. § 455(a) generally and 28 U.S.C. § 144 specifically . Section 144 is triggered by a party's affidavit such as this. This document should not be construed as a section 455(a) motion, such a motion will be filed at a later date.

Dated this **5** th day of August, 2019

_D. Sort_

D. G. Sweigert, c/o
GENERAL DELIVERY
ROUGH AND READY, CA 95975

8·5·19

## TABLE OF CONTENTS

Contents

INTRODUCTION.................................................................................................................4

LEGAL BASIS FOR THIS AFFADAVITT .....................................................................8

UNDISPUTED FACTS......................................................................................................9

SUMMARY .....................................................................................................................12

## TABLE OF AUTHORITIES

**Cases**

*In re Martinez-Catala*, 129 F.3d 213, 218 (1st Cir. 1997)................................................ 9

*Pashaian v. Eccelston Properties, Ltd.,* 88 F.3d 77, 85 (2d Cir. 1996)........................... 9

*Pesnell v. Arsenault*, 543 F.3d 1038, 1043 (9th Cir. 2008) .......................................... 8

*United States v. Conforte*, 457 F.Supp. 641, 656 (D.Nev.1978) .................................... 9

*United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997)................................. 8

*United States v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990).................................... 8

**Statutes**

28 U.S.C. § 455(a) ....................................................................................................... 8

28 U.S.C. § 455(a) and 28 U.S.C. § 144............................................................... 1, 12

**Rules**

Canon 3C of the Code of Judicial Conduct ................................................................... 9

**SWEIGERT VS. GOODMAN, AFFADAVITT OF DISQUALIFICATION**

# INTRODUCTION

*Pro Se Prejudicial Bias*

1.      This Court should accept the right of the self-represented to have equal access to the courts without fear of judicial predisposition against this type of racketeering case filed by a *pro se* litigant.

2.      As Judge Richard Posner, retired chief judge for the U.S. Court of Appeals for the Seventh Circuit, cited, "[t]he basic thing is that most judges regard these people (*pro se*) as kind of trash not worth the time of a federal judge," Posner said.  (Internet URL: http://www.abajournal.com/news/article/posner_most_judges_regard_pro_se_litigants_as_kind_of_trash_nor_worth_the_t ).

3.      *Pro Se* litigants must deal with the general disdain accorded to them by lawyers and judges.  As the deeply insulting bromide, so popular with lawyers suggests: "*he who represents himself has a fool for a client*."  This insulting attitude is further amplified when a *pro se* litigant dares to apply the label *private attorney general* to himself in the case of racketeering law, as in this case.

4.      Entering a complaint of racketeering before a presiding judge who has acted as a U.S. attorney specializing in racketeering litigation (U.S. Eastern District of New York) can be perilous, especially if such a jurist is prejudiced against such a *pro se* novice and perhaps harbors skepticism as to his abilities.

5.      Nonetheless, such bias or prejudice (judicial predisposition) is wrongful and inappropriate.

*U.S. Government employee created pervasive bias*

6.      Years spent (nearly a decade) by the presiding judge shepherding the immense legal

resources of the F.B.I. (as general counsel between 2003 and 2011) could understandably

saturate such a person with a legalistic perfectionist prosecutorial attitude that disfavors the

novice.  Practicing law in an environment with almost unlimited legal resources (such as the

F.B.I.) could foster an extra-judicial preferential bias that reinforces disdain for *pro se private*

*attorney generals* like the Plaintiff (undersigned).

7.      It is instructive to note the job description for the F.B.I.'s General Counsel:

> The General Counsel of the FBI is ultimately responsible for all of the legal affairs of
> the FBI. He supervises the Office of General Counsel, which has 300 employees and
> handles the entire range of legal matters involving the FBI, including national security,
> criminal, science and technology, cyber, privacy and civil liberties, fiscal and contract
> law, civil litigation, and eDiscovery. The General Counsel also oversees the Chief
> Division Counsel (CDC) Program. The CDCs provide comprehensive legal advice and
> services for all of the FBI's field offices across the country. The General Counsel
> interacts regularly with all of the elements of the FBI, the Justice Department, the U.S.
> Intelligence Community, a range of other government agencies, foreign partners, the
> private sector, and civil society groups.
>
> Internet URL:  https://www.justice.gov/legal-careers/job/assistant-general-counsel-5

8.      Add to this mix the issues associated with this lawsuit that are intertwined with the

operations of the F.B.I., the very agency that the presiding judge acted as general counsel (for

almost a decade), and it is reasonable to assume that a certain level of pervasive bias may exist.

9.      For instance, the allegations articulated in the operative Amended Complaint (ECF Doc.

No. 5 [Dkt. 5]) state that agents of the New York F.B.I. field office may have engaged as state

actors to cooperate with the defendant to misuse and abuse the official Criminal Justice

Information System (CJIS) resources that denied Plaintiff (undersigned) of his civil rights.

10.     Taken as true, these allegations (Dkt. 5) indicate the potential government liability for federal F.B.I agents allegedly assisting the defendant in his marketing of criminal cases against the plaintiff (and others).  The defendant's years-long lobbying efforts of F.B.I. personnel encouraging prosecution of the plaintiff, and others, for something called the "*distributed decentralized defamation campaign*" is a troubling indication of this allegation of F.B.I. interference in the civil rights of the Plaintiff (undersigned) and others like him (Dkt. 5). Further, the Defendant identified that Special Agent Brittany Custer had made a determination that the Plaintiff (undersigned) had broken the law.  Note: it has yet to be determined if the presiding judge has personal friendships or personal knowledge of F.B.I. agents in the NYC field office.

11.     Meanwhile, there is the thorny issue of the contract F.B.I. informant known as Okey Marshall Richards, Jr. (*OMR*).  Taken as true, as with other allegations in the operative complaint (Dkt. 5), OMR is at the heart of a potentially very embarrassing scandal for the F.B.I., as this F.B.I. contract informant (OMR) was directly responsible for the closure of the Port of Charleston in South Carolina on June 14th, 2017.  OMR was directly responsible for pushing information that a uranium based dirty bomb was aboard the container ship the MEMPHIS MAERSK.  A presiding judge with favoritism towards the F.B.I. would wish for this potential scandal to be diffused and covered up and would exercise pervasive bias to "bury" the case.

12.     Not only was this F.B.I. informant (OMR) the source of the dirty bomb hoax information that was eagerly broadcast to 2,000 livestream viewers on the *Crowdsource The Truth* (CSTT) podcast show, he remained on the CSTT show for another nine (9) months.

13.     Even after the Defendant knew that this F.B.I. (OMR) informant had caused the closure of the Port of Charleston, the defendant engaged OMR in approximately 30 (thirty) one (1) hour

6
**SWEIGERT VS. GOODMAN, AFFADAVITT OF DISQUALIFICATION**

podcast shows on the CSTT platforms.  Using the false moniker "Rock Hudson",  OMR distributed intelligence reports on the CSTT platforms supposedly created by a five (5) person intelligence team.  All a lie.

14.    It is a temptation to "bury" such litigation to protect the former employer (F.B.I.) by a presiding judge who has developed an extra-judicial bias against the Plaintiff (undersigned). This is especially true if the presiding judge had personal knowledge of OMR or his activities while general counsel at the F.B.I.

15.    The defendant and his *Crowdsource The Truth (CSTT)* side-kicks (Larry Klayman, esq. and "Dr." Jerome Corsi) have recently been engaged in a multi-year social media smear campaign to viciously attack the former boss of the presiding judge, Robert S. Mueller, III (former special counsel and former director of the F.B.I.).  It is only natural to assume that a former subordinate would have a collegiate emotional attachment to her former boss of eight (8) years.  This could serve as the root for personal bias that grows into the fruit of judicial prejudicial bias.

*Cumulative factors that indicate pervasive bias*

16.    It is reasonable to assume that the foregoing supporting rationale explains why the presiding judge has held this lawsuit hostage for the last six (6) months.  There is folklore that suggests the F.B.I. litigation department believed in the mantra, "*delay, delay, hope they go away*".  The presiding judge would have operated within this environment of favoring the unnecessary delay of cases.

17.    In sum, there appears to be evidence which would lead a reasonable person to believe they could be prevented or hindered from receiving full, fair, impartial hearings or the full, fair, impartial administration of justice in this Court due to the extra-judicial bias that may be present.

## LEGAL BASIS FOR THIS AFFADAVITT

18.    This affidavit relies on 28 U.S.C. § 455(a) and 28 U.S.C. § 144.

19.    Section 455(a) provides that any judge "*shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.*" Section 455(a) does not require that a disqualification motion be accompanied by an affidavit or declaration.

20.    Section 144 requires a sworn statement by the person seeking disqualification.  The statute states:

>    Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

>    The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for the failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith. (28 U.S.C. section 144)

21.    Section 144 requires the party seeking disqualification only to file an affidavit. 28 U.S.C.A. § 144 (West 2006); *United States v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990).''

22.    Under both recusal statutes, the substantive standard is "whether a reasonable person with knowledge of all facts would conclude that the judge's impartiality might reasonably be question." *Pesnell v. Arsenault*, 543 F.3d 1038, 1043 (9th Cir. 2008) (citing *United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997)).

23.    The principle difference between the two sections is thus that the procedural requirements for § 144 are much more demanding. Recusal is mandatory pursuant to §144 "whenever a party

to any proceeding in a district court makes and files a timely and sufficient affidavit . . . ." 28

U.S.C. § 144. As a result, § 144 is "unusual because it requires that the district judge accept the

affidavit as true even though it may contain averments that are false and may be known to be so

to the judge." *In re Martinez-Catala*, 129 F.3d 213, 218 (1st Cir. 1997).

24.     Canon 3C of the Code of Judicial Conduct also provides some illumination into this

matter, even though ("the disqualification provisions of the Code of Conduct can only be

construed as establishing a standard for judicial behavior rather than as imposing a mandatory

duty enforceable after the fact by the reversal of otherwise proper judicial decisions."). *United*

*States v. Conforte*, 457 F.Supp. 641, 656 (D.Nev.1978), cited in *Pashaian v. Eccelston*

*Properties, Ltd.,* 88 F.3d 77, 85 (2d Cir. 1996).

## UNDISPUTED FACTS

25.     The operative ORDER that has been pending for six (6) months is ECF Doc. No. 65

[11/16/18] "ORDER TO SHOW CAUSE" (Dkt. 65).  This ORDER stayed all pending motions,

thereby denying ANY equal access to justice by the undersigned (see below).

> "WHEREAS the parties have collectively filed over twenty motions in the last five
> months; IT IS HEREBY ORDERED that all pending motions and deadlines are
> STAYED pending the resolution of the Order to Show Cause.  Furthermore, until further
> order from this Court, **neither party is permitted to file any further motions or**
> **pleadings** except in response to this Order to Show Cause."  [emphasis NOT added]

26.     This ORDER (Dkt. 65) was issued *sua sponte*, which is an exceptional action that

deviates from the to two basic principles of our judicial system: 1) that the parties will direct the

litigation, and 2) that the decision maker will remain neutral and passive.  In the context of

judicial decision making, a court deviates from this passive role when it considers an issue not

raised by the parties but which it nevertheless deems relevant to the controversy.

27.     It is well-established under New York law that there is no right to appeal a *sua sponte* order. This rule follows from Civil Practice Law and Rules (CPLR) § 5701(a)(2) which indicates that a party has a right to appeal from an order "where the motion it decided was made upon notice." Accordingly, because a *sua sponte* order is not the result of a motion made on notice there is no right to appeal the order, and because there is no appeal as of right from an order made *sua sponte*, such an order is subject to dismissal.

28.     With this ORDER (Dkt. 65), the presiding judge has cleverly held this entire lawsuit hostage and has denied the undersigned equal access to the courts.

29.     The ORDER then burdened the Plaintiff with six (6) complex questions that required an answer. The Plaintiff answered the questions within the time allowed (all responses were due by 1/30/2019). The Defendant was not required to provide any response to these six (6) questions – only the Plaintiff. This six (6) question stipulation of the ORDER is appears to favor the Defendant, who is in the middle of several entangling relationships involving active and retired members of the F.B.I.

30.     Publishing the *sua sponta* ORDER can be likened to a Fed. R. Civ. Proc. Rule 12(b) motion to dismiss. Such motions should be acted upon promptly. It is instructive to note that the ORDER (Dkt. 65) occurred at the very early stages of litigation and purportedly served as a device to address jurisdictional issues of the litigations. Jurisdictional issues should be answered promptly so as not to delay justice.

31.     It can be argued that the presiding judge relied upon her judicial discretionary ability to create the ORDER (Dkt. 65). However, once the ORDER was docketed, and properly responded to by the Plaintiff (undersigned), a non-discretionary ministerial duty was created -- that of adjudicating the show cause. The completion of this ministerial duty (adjudication) is owed to

the undersigned; e.g., the presiding judge's decision on the issues in the ORDER (Dkt. 65) is not a courtesy or favor – it is a mandatory ministerial act left unfilled for six (6) months.

32.     Traditionally jurisdictional issues (motion to dismiss) are decided early in litigation.  It is not justice to allow a party to unnecessarily wait six (6) months for a decision concerning a *sua sponte* motion to dismiss, especially if the pending adjudication is a ministerial duty placed upon the presiding judge.

33.     Six (6) months has now passed since the 1/30/2019 deadline imposed by Dkt. 65.  While the Court has taken this matter under advisement, the Defendant has continued a multi-platform social media smear campaign via *Crowdsource the Truth* to destroy the Plaintiff's technical, business and professional reputation.  Undoubtedly, the Defendant was emboldened by the apparent lack of action or adjudication by the Court.

34.     The Defendant's reputation destruction campaign (which began anew after the 1/30/2019 deadline for Dkt. 65) has been meticulously documented by the undersigned in other court documents appearing in case 3:17-cv-00601-MHL, *Steele et al v. Goodman et al*, M. Hannah Lauck, U.S.D.C. for the Eastern District of Virginia (the undersigned attempted to intervene in that case to impede, slow down, halt or cease the comprehensive smear campaign; intervention was not approved by the presiding judge in that case).  Virginia court's ORDER attached as a courtesy.

35.     The Plaintiff (undersigned) has discussed these issues in the following letters to the Defendant.  ECF Doc. Nos. 80, 81, 83, 84, 85.  The Defendant has not responded to any of these letters.

## **SUMMARY**

36.     For the foregoing reasons, the presiding judge should recuse herself from this instant

lawsuit.

### **Certification**

This document is submitted in good faith and NOT submitted for the purposes of causing

unnecessary delay with this instant litigation, which has been delayed six (6) months already.

The enclosed presents information that is accurate and truthful as best the undersigned can

ascertain.  Therefore, the undersigned believes this pleading is truthful and not submitted for an

improper purpose.  This affidavit relies on 28 U.S.C. § 455(a) generally and 28 U.S.C. § 144

specifically .  Section 144 is triggered by a party's affidavit such as this.  This document should

not be construed as a section 455(a) motion, such a motion will be filed at a later date.

Dated this _**5**_ day of August, 2019

------------------------------------------------/
                                     D. G. Sweigert, c/o
                                     GENERAL DELIVERY
                                     ROUGH AND READY, CA 95975

## EXHIBIT ONE

I certify that the attached is a true and accurate copy of the original source document.  Sworn

under the penalties of perjury.

Dated this *5* ___ day of August, 2019

-----------------------------------------------------/
D. G. Sweigert, c/o
GENERAL DELIVERY
ROUGH AND READY, CA 95975

8.5.19

**SWEIGERT VS. GOODMAN, AFFADAVITT OF DISQUALIFICATION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

ROBERT DAVID STEELE, *et al.*,

      **Plaintiffs,**

v.

                                     Civil Action No. 3:17cv601

JASON GOODMAN, *et al.*,

      **Defendants.**

*EXHIBIT ONE*

## MEMORANDUM OPINION

This matter comes before the Court on non-party David George Sweigert's Second Amended Motion to Intervene (the "Motion to Intervene").[1] (ECF No. 93.)

The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not

---

[1] On February 19, 2019, Sweigert filed a Motion to Intervene. (ECF No. 73.) On March 18, 2019, Sweigert filed a "Notice of Intent to File an Amended Motion." (ECF No. 81.) On March 29, 2019, Sweigert filed an Amended Motion to Intervene. (ECF No. 88.) On April 11, 2019, Sweigert filed a Second Amended Motion to Intervene, which the Court considers operative. (ECF No. 93.)

aid the decisional process.  The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332.[2]  For

the reasons that follow, the Court will deny Sweigert's Second Amended Motion to Intervene.[3]

## I.  Procedural and Factual Background[4]

### A.      Relevant Procedural Background

On September 1, 2017, Plaintiffs filed their original Complaint (the "Original

Complaint") against Jason Goodman, Patricia A. Negron, and "Queen Tut, a woman believed to

be known as Carla A. Howell."  (Original Compl. 1, ECF No. 1.)  Goodman, proceeding *pro se*,

filed an Answer (the "Original Answer"), (ECF No. 14), and Negron, by counsel, filed a Motion

---

[2] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  28 U.S.C. § 1332(a)(1).  Plaintiff Steele is a Virginia citizen and Plaintiff Earth Intelligence Network ("EIN" and, collectively with Steele, "Plaintiffs") is a Virginia not-for-profit 501(c)(3) corporation.  (Am. Compl. 6, 9, ECF No. 39.)  Goodman is a New York citizen; Negron is a Massachusetts citizen; and Lutzke is a Colorado citizen.  (*Id.* 10, 12, 16.)  Sweigert's address of record is a P.O. box in Arizona.  The Court cannot determine on the record before it whether Sweigert's intervention would destroy diversity between the parties.  Because the parties do not raise the issue, and because the Court will deny the Motion to Intervene on other grounds, the Court declines to consider the issue further.

[3] Sweigert has also filed two Motions Requesting Leave of Court to File Motion for Injunctive Relief, (ECF Nos. 102, 124), to which no party has responded, and a Proposed Request for Judicial Notice, (ECF No. 108), to which no party has responded.  Because it will deny the Motion to Intervene, the Court will deny these motions as moot.
       The following motions also pend:  Goodman's Motion for a Protective Order and Motion to Stay Discovery, (ECF No. 109), to which Plaintiffs have responded, (ECF No. 115); Plaintiffs' Motion for Sanctions against Goodman, (ECF No. 121), to which Goodman responded twice, (ECF Nos. 134, 139); Plaintiffs' Motion to Compel Discovery from Goodman, (ECF No. 126), to which no party has responded; and, Plaintiffs' Motion for a Protective Order, (ECF No. 127), which Negron did not oppose and to which Goodman and Lutzke did not respond.  The Court will address these motions by separate Memorandum Opinion and Order.

[4] The Court assumes familiarity with its March 31, 2019 Memorandum Opinion and Order.  (ECF Nos. 85, 86.)  It offers only a summary here.

to Dismiss (the "Original Motion to Dismiss"), (ECF No. 21).  Plaintiffs opposed the Original

Motion to Dismiss, (ECF No. 24), and Negron replied, (ECF No. 29).

On January 23, 2018, Plaintiffs requested entry of default as to "Queen Tut a/k/a Susan

A. Lutzke."  (ECF No. 30.)  Because the Original Complaint did not name "Susan A. Lutzke" as

a defendant, the Court denied Plaintiffs' request for entry of default.  (*See* Mar. 9, 2018 Order,

ECF No. 35.)  On March 25, 2018, Plaintiffs moved to amend their Original Complaint, (ECF

No. 36), and on April 11, 2018, the Court granted the motion, (ECF No. 38).

The Amended Complaint names three defendants:  Jason Goodman, Patricia A. Negron,

and "Susan A. Lutzke a/k/a/ 'Queen Tut'" (collectively, "Defendants").  (Am. Compl. 1, ECF

No. 39.)  Plaintiffs stated eight counts against each defendant as follows:

| | |
|---|---|
| **Count I:** | Defamation *per se* (the defamation claim); |
| **Count II:** | Insulting words, in violation of Virginia Code § 8.01-45[5] (the insulting words claim); |
| **Count III:** | Business conspiracy, in violation of Virginia Code § 18.2-499[6] and Virginia Code § 18.2-500[7] (the statutory conspiracy claim); |

---

[5] "All words shall be actionable which from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace."  VA. CODE ANN. § 8.01-45.

[6] This criminal and civil business conspiracy section provides, in relevant part:

Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in [her or] his reputation, trade, business or profession by any means whatever . . . shall be jointly and severally guilty of a Class 1 misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2-500.

VA. CODE ANN. § 18.2-499(A).

[7] This damages provision allows a plaintiff to recover treble damages, attorney fees, and costs from defendants who violate Virginia Code § 18.2-499.  VA. CODE ANN. § 18.2-500(A).

| **Count IV:** | Common law conspiracy; |
| **Count V:** | Tortious interference; |
| **Count VI:** | Intentional Infliction of Emotional Distress; |
| **Count VII:** | Personal trespass by computer in violation of Virginia Code § 18.2-152.7[8] and computer harassment in violation of Virginia Code § 18.2-152.7:1[9] (the computer claim); |
| **Count VIII:** | Unauthorized use of name and picture in violation of Virginia Code § 8.01-40[10] (the unauthorized use claim); and, |
| **Count IX:** | Permanent injunction. |

Plaintiffs seek $6,000,000 in compensatory damages; $18,000,000 as "[t]hree-fold [d]amages in accordance with § 18.2-500" of the Virginia Code; $350,000 in punitive damages; prejudgment and postjudgment interest; and attorney's fees and costs. (Am. Compl. 96.)

In response to the Amended Complaint, Goodman filed his Motion to Dismiss. (ECF No. 45.) Negron filed a Motion to Dismiss. (ECF No. 47.) Lutzke did not respond to the Amended

---

[8] "A person is guilty of the crime of personal trespass by computer when [she or] he uses a computer or computer network to cause physical injury to an individual." VA. CODE ANN. § 18.2-152.7(A).

[9] This provision criminalizes using a computer to threaten illegal acts or make improper sexual communications to a person with the intent to coerce, intimidate, or harass that person. VA. CODE ANN. § 18.2-152.7:1.

[10] This unauthorized use section provides, in relevant part:

Any person whose name, portrait, or picture is used without having first obtained the written consent of such person . . . for advertising purposes or for the purposes of trade, such persons may maintain a suit in equity against the person, firm, or corporation so using such person's name, portrait, or picture to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use.

VA. CODE ANN. § 8.01-40(A).

Complaint and has not made an appearance of any kind.[11]  On March 31, 2019, the Court granted

in part and denied in part Negron's Motion to Dismiss.  (ECF No. 86.)  The following claims

survive against Negron:  Count I (defamation); Count III (business conspiracy); Count IV

(common law conspiracy); Count V (tortious interference); and, Count VI (intentional infliction

of emotional distress).[12]  (Mar. 31, 2019 Mem. Op. 38.)  The Court also denied Goodman's

Motion to Dismiss, meaning that all nine original claims survive against Goodman.  (*Id.* 39.)

**B.      Sweigert's Filings in This Case**

Between May 22, 2018 and June 13, 2018, George D. Sweigert, a non-party proceeding

*pro se*, filed seven declarations.[13]  (ECF Nos. 51, 54, 55, 56, 58, 59, 60.)  The Amended

Complaint makes no allegations about Sweigert, referencing him only once in a footnote that

identifies him as one of several other people in a photo of Steele that allegedly defames Steele.

---

[11] Plaintiffs returned the Lutzke summons as executed.  (ECF No. 62.)  Plaintiffs requested entry of default as to Lutzke.  (ECF No. 65.)  The Clerk entered default as to Lutzke. (ECF No. 66.)

[12] The Court dismissed the following counts as to Negron:  Count II (the insulting words claim); Count VII (the computer claim); Count VIII (the unauthorized use claim); and, Count IX (permanent injunction).

[13] Various non-parties filed declarations and other documents in this case.  (ECF Nos. 79, 80, 82, 83.)  The Court struck these filings and stated it would not consider future filings by these parties.  (*See* Mar. 31, 2019 Mem. Op.)  Accordingly, the Court will not consider Kevin Marsden's submission to the Court, which the Clerk properly did not file.  (ECF No. 91.)
As with the previous non-parties' filings, the Court will strike Sweigert's declarations from the record, and will not consider future filings from Sweigert.  *See Kimberlin v. Nat'l Bloggers Club*, 2014 WL 12680738, at *1, No. PWG-13-3059 (D. Md. Feb. 21, 2014) (striking a filing when the party has not obtained court authority to do so); *see also, e.g., Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016) (concluding that the Supreme Court of the United States "has long recognized that a district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" (quoting *Link v. Wabash R.R.*, 370 U.S. 626, 630–31 (1962))).

(Am. Compl. 65 n.14.)  Sweigert also filed two Notices of Change of Address, (ECF No. 63, 67),

and a Notice of Related Litigation, (ECF No. 68).[14]

On February 19, 2019, Sweigert filed a "Notice of Motion to Intervene," (ECF No. 72),

and his first Motion to Intervene, (ECF No. 73).  Sweigert subsequently filed copies of several

letters with the Clerk's Office.[15]  (ECF Nos. 75, 77.)  On March 18, 2019, Sweigert filed a

"Notice of Intent to File an Amended Motion."  (ECF No. 81.)  On March 28, 2019, Sweigert

filed a document titled "Preliminary Notification to the Government of Canada."[16]  (ECF No.

84.)  On March 29, 2019, Sweigert filed an Amended Motion to Intervene.  (ECF No. 88.)  On

April 11, 2019, Sweigert filed the Motion to Intervene now before the Court.[17]  (ECF Nos.

---

[14] This two-page document states that "a complaint has been filed with the U.S. Federal Trade Commission concerning activities of the defendant. A true and accurate copy is attached." (Notice of Related Litig. 1, ECF No. 68.)  The filing lacks any attachments.

[15] One letter claims that Goodman listed false information on one of the 83.1 "Ghostwriting" Certifications submitted to this Court.  (ECF No. 75.)  The other letter purports to describe the "Misuse of NSF Acquired Technologies to Facilitate the High-Speed Transfer of Snuff Films via the UIC Electronic Visualization Laboratory (EVL)."  (ECF No. 77.)  The letters have no bearing on the current analysis.  The Court will strike these filings.  *See Kimberlin*, 2014 WL 12680738 at *1; *Dietz*, 136 S. Ct. at 1891.

[16] Sweigert fails to identify the relevance of this document to this litigation.  The Court will strike these filings.  *See Kimberlin*, 2014 WL 12680738 at *1; *Dietz*, 136 S. Ct. at 1891.

[17] The multiple filings created the risk of confusion and potentially undue delays.  The Court issued various orders addressing them.  (ECF Nos. 86, 90, 97.)  The Court's April 18, 2019 Order established the Motion to Intervene, filed April 11, 2019, as controlling.  (ECF No. 97.)  Plaintiffs, Goodman, and Negron responded in opposition to this April 11, 2019 version. (ECF Nos. 107, 106, 104.)
More than two weeks after filing the Motion to Intervene and accompanying memorandum in support, Sweigert filed a second memorandum in support of the Motion to Intervene without leave of this Court.  (ECF No. 103.)  The Court considers only the memorandum filed contemporaneously with the Motion.  (ECF No. 94.)  *See* E.D. Va. Loc. Civ. R. 7(F)(1) ("No further briefs or written communications may be filed without first obtaining leave of Court.").  The Court will strike the second memorandum.  (ECF No. 103.)  Even were the Court to consider the second memorandum, the Court's analysis would not change.

93, 94.)  Plaintiffs, Goodman, and Negron all oppose the Motion to Intervene.  Sweigert has

replied to each response.[18]  (ECF Nos. 110, 111, 116.)

### C.   Summary of Allegations in the Amended Complaint

This action arises out of a series of allegedly defamatory statements that Defendants

made about Plaintiffs beginning on June 15, 2017.  (Am. Compl. 20.)  The Court first provides

context about the relevant parties to the action, followed by a summary of Defendants' actions

and statements.

### 1.   Plaintiffs:  Steele and the Earth Intelligence Network

Steele describes a long list of professional accomplishments, presenting himself as a

former Central Intelligence Agency ("CIA") operations officer, a former civil servant, and the

recipient of various advanced degrees.  (Am. Compl. 6.)  Steele works to "redirect[] the craft of

intelligence away from spies and secrecy enabling war and waste towards open sources and

methods favorable to peace and prosperity."  (*Id.* 8.)  Plaintiffs assert, without elaboration, that

"[f]or over twenty (20) years, [Steele] has dedicated himself to teaching individuals and

organizations about the value of holistic analytics, true cost economics, and Open Source

---

[18] Sweigert has also filed other miscellaneous documents:  a document supplementing his
prior motion for leave to seek injunctive relief, (ECF No. 119); a copy of a letter to Goodman
which accuses Goodman of "consistently restat[ing] falsehood[s]," among other things, (ECF
No. 120); a "supplemental motion" for leave to seek injunctive relief, (ECF No. 124); eight
letters addressed to the Court and Goodman further alleging "attempted fraud on the Court " by
Goodman, (ECF Nos. 129, 137, 138, 140, 142, 145, 147, 149, 150); and, a "Praecipe for the
Clerk" advising the Clerk of Court that Sweigert will file a Petition for Write of Mandamus with
the United States Court of Appeals for the Fourth Circuit addressing the Court's delay in
addressing his filings, (ECF No. 148), and a "Corrected" Praecipe for the Clerk, (ECF No. 151).
    Because the Court will deny Sweigert's Motion to Intervene, the Court will deny his
motion as moot.  (ECF No. 124.)  The Court concludes that Sweigert's filings will not assist the
Court in resolving this matter, and will therefore strike the filings.  *See Kimberlin*, 2014 WL
12680738 at *1; *Dietz*, 136 S. Ct. at 1891.

Everything Engineering." (*Id.* 7.)  Steele "was nominated for a Nobel Peace Prize" for this work. (*Id.* 8.)

In 2006, Steele founded Earth Intelligence Network ("EIN"), a Virginia 501(c)(3) not-for-profit corporation, and a plaintiff in this action.  (*Id.* 9.)  "The original purpose and long-term focus of Earth Intelligence Network is to teach citizens the urgency of demanding holistic analytics, true cost economics, and Open Source Everything Engineering (OSEE) as the foundation for enlightened self-governance." (*Id.* 9.)  In order to fulfill this purpose, EIN started the #UNRIG (sometimes UNRIG) project, "an educational campaign to communicate to all citizens the possibility of an ethical, legal, non-violent restoration of integrity to the United States Government." (*Id.*)  In support of this mission, Plaintiffs "acquired and professionally wrapped an RV, and began a national tour of the [c]ountry in furtherance of the 'Summer of Peace' campaign."[19] (*Id.* 87.)

Public donations fund the #UNRIG campaign, and EIN "is fully transparent and accountable to its donors." (*Id.* 9.)  Plaintiffs aver they "account[] for every penny spent in a budget that was posted online." (*Id.* 86 (providing a weblink).)  Using the donations, Plaintiffs "actively promote[] the mission of #UNRIG and communicate[] with all donors." (*Id.*)

---

[19] The "Summer of Peace" campaign sought to "nurture a national conversation about #UNRIG." (Am. Compl. 10.)

8

## 2.   **Defendants:  Goodman, Negron, and Lutzke**

According to Plaintiffs, Goodman operates "various social media properties" under the name "Crowdsource The Truth" or "CSTT."[20]  (Am. Compl. 11.)  Plaintiffs quote Goodman, without attribution, describing CSTT as "an independent news organization dedicated to truth in media and integrity in government.  Our process is driven by a unique, open source fact checking 'truth engine' that has been described as a combination of investigative journalism, social media[,] and reality television."  (*Id.*)  Goodman creates and uploads videos through the various CSTT media accounts, which have thousands of followers.[21]  "Goodman solicits donations, advertises products and derives revenue from" these videos.  (*Id.*)  Goodman often hosts guest speakers in these videos, including Negron and Lutzke.

Plaintiffs aver that Negron "co-produced numerous videos uploaded to the CSTT YouTube channel."  (*Id.* 12.)  She "appeared and actively participated in virtually every video at issue in this action, one of which was even filmed at her home."  (*Id.*)  Negron allegedly has over 24,000 followers on Twitter, where she allegedly republished defamatory statements made by Lutzke about Plaintiffs.  (*Id.* at 13.)

---

[20] The Amended Complaint appears to identify links to CSTT's YouTube channel, a Facebook page, a Twitter account, a Patreon account, and a Google Plus account.  (Am. Compl. 11.)

[21] The Amended Complaint states:

As of September 1, 2017, 14,526 people subscribed to Goodman's YouTube channel, 1,925 people followed Goodman on Facebook, and Goodman had 8,886 followers on Twitter.  As of March 23, 2018, 53,447 people subscribed to Goodman's YouTube channel, 4,189 people followed Goodman on Facebook, and Goodman had 21,700 followers on Twitter.

(Am. Compl. 11.)

According to Plaintiffs, Lutzke adopted the pseudonym "Queen Tut" as her online persona, using an image of an Egyptian bust to represent herself. (*Id.* 16.) Lutzke participated in numerous CSTT videos speaking as Queen Tut. In the videos, Defendants refer to Lutzke as Queen Tut and display a picture of the Egyptian bust to represent Lutzke. (*Id.*)

### 3. Defendants' Alleged Actions Before September 1, 2017

Steele planned to appear in a CSTT live-stream broadcast on June 15, 2017, in which Goodman and Negron would interview Steele. (Am. Compl. 18.) The day before the scheduled interview, on June 14, 2017, Goodman and Negron posted a video that reported, seemingly falsely, that a dirty bomb was present on a ship.[22] (*Id.* 18–19.) As a result of this event, and the ensuing FBI investigation, Steele "immediately canceled the planned interview" and informed Goodman via email that he no longer wished to associate with Goodman. (*Id.* 19.) According to Plaintiffs, "in retaliation and reprisal for [Steele's] decision to no longer have anything to do with Goodman and CSTT, Goodman, Negron[,] and Lutzke began an unprecedented smear campaign against Plaintiffs." (*Id.* 20.)

Between June 15, 2017 and September 1, 2017, Goodman, Negron, and Lutzke allegedly produced and published at least a dozen videos as part of this "smear campaign." (Am. Compl. *passim.*) In a June 20, 2017 video, Goodman and Negron appear together in a London hotel room, and Goodman accuses Steele of stealing from the CSTT audience at least three times. (*Id.* 23.)

---

[22] In the video, Goodman and Negron claimed a ship at the Port of Charleston, South Carolina, carried a "dirty bomb." (Am. Compl. 19.) Goodman and Negron encouraged viewers to alert the United States Coast Guard about the threat, causing a shutdown of the terminal. (*Id.*) The Federal Bureau of Investigation investigated the "false report of a dirty bomb aboard the" vessel. (*Id.*)

On June 26, 2017, Lutzke appeared in a CSTT video as Queen Tut, accusing Steele and his UNRIG campaign of fraud. (*Id.* 24.) From then through September 1, 2017, Goodman, Negron, and Lutzke posted dozens of similar videos.[23] Steele contends that Defendants' exact statements vary over the course of the videos, sometimes focusing on personal insults against Steele[24] and sometimes making accusations against Steele and his organizations, including Plaintiff EIN.[25]

In addition to these videos, the Amended Complaint describes several other online platforms through which Defendants allegedly publish disparaging comments regarding Plaintiffs, including Twitter and email. In essence, Plaintiffs claim that Defendants persistently accuse them of perpetuating a scam and defrauding CSTT viewers who donated to EIN's

---

[23] The Amended Complaint provides great detail, including links, screenshots, and direct quotations excerpted from these videos. (Am. Compl. *passim.*) Steele alleges that Goodman appears in all of the videos as the primary speaker. (*Id.*) Plaintiffs allege that Negron co-produced most of the videos, also appearing in many of them, thereby contributing to the insults against Steele and #UNRIG. (*See id.* 12.) Lutzke makes guest appearances in many videos, insulting Steele directly. (*Id. passim.*) Lutzke also allegedly published derogatory claims about Steele on her Twitter account. (*Id.*)

[24] In one video, Goodman states that he "find[s] it really difficult to believe that he was ever in the CIA because he just seems so f---ing stupid." (Am. Compl. 36 (quoting an August 7, 2017 video).) Negron describes Steele as "predatory in nature." (*Id.* 40 (quoting an August 13, 2017 video).) Goodman calls Steele a "fraudster," and states that "[Steele]'s lying." (Am. Compl. 28, 45, 55 (quoting various videos).)

[25] Goodman claims "that the objective of the UNRIG campaign is to 'get money' for [Steele]." (Am. Compl. 41 (quoting an August 13, 2017 video).) Lutzke calls EIN's #UNRIG campaign "a total scam," stating that "Robert David Steele and UNRIG are trying to raise money, as much money as they possibly can to fund their little scam." (*Id.* 40, 46 (quoting multiple videos).) Negron calls Steele "a serious con man." (*Id.* 45 (quoting an August 26, 2017 video).) Negron further states: "this is a serious fraud. I mean that it is a fraud. No question." (*Id.* 46 (quoting an August 26, 2017 video).) Defendants refer to "the Electoral Reform Act"[25] and describe it as part of Plaintiffs' scam. (*See, e.g., id.* 45 (quoting an August 26, 2017 video).)

#UNRIG campaign by stealing donors' money to personally enrich Steele or his allies rather than using the funds for the #UNRIG mission.

### 4. Defendants' Alleged Actions After September 1, 2017

Plaintiffs allege that a shift occurred after the filing of this action.  While Goodman and Lutzke intensified their attacks against Plaintiffs, Negron ceased to participate in any subsequent video productions or appearances (with one exception).  (*Id.* 48.)  Although Plaintiffs concede Negron ceased her improper activities regarding video production with Goodman, Plaintiffs maintain that Negron and Lutzke continued to conspire to defame Plaintiffs through Twitter publications.  Negron limited her role to reposting some of Lutzke's statements.  (*Id.* 13.)

Plaintiffs allege that, between September 1, 2017 and December 2017,[26] Goodman and Lutzke produced and published about ten videos containing defamatory statements about Plaintiffs.  Many of the videos reiterate the same kinds of statements made in previous videos. Defendants apparently acknowledge and discuss the ongoing litigation in these videos. Goodman describes himself as "happy" about the lawsuit because it will expose "charity fraud and tax fraud," of which he claims to have "very solid evidence."  (*Id.* 60, 62 (quoting September 30, 2017 and October 7, 2017 videos).)

Plaintiffs contend that some of the videos incite violence against Steele.  In one video featuring Goodman and Lutzke, Lutzke directly addresses Steele:  "you're a person who needs to be put down."  (*Id.* 57 (quoting a September 23, 2017 video).)  According to Plaintiffs, Goodman interjects to say "legally speaking," and Lutzke then says:  "legally speaking[,] absolutely legally

---

[26] Around December 2017, according to Plaintiffs, Goodman and Lutzke had some kind of falling out and did not produce any more videos together.  (Am. Compl. 67, 74–75, 83.) Plaintiffs allege that Goodman and Lutzke, acting individually, continued their defamatory actions.  (*Id.* 70–73, 78.)

speaking[,] that you need to be put in a place where you can no longer affect human beings."
(*Id.* (quoting a September 23, 2017 video).)  Goodman and Lutzke posted a different video
displaying an image of an RV exploding.  (*Id.* 59 (displaying an apparent screenshot of a
September 30, 2017 video).)  The side of the flaming RV displays a picture of Steele and
McKinney.  Plaintiffs aver that Goodman and Lutzke "disclosed [Steele's] home address to their
viewers and subscribers, and used Google Maps to show a photo of [Steele]'s home." (*Id.*)

Since December 2017, Goodman, acting alone, has continued to make allegedly
defamatory statements against Plaintiffs.[27]  Lutzke has also disseminated, through Twitter and
videos, negative commentary about Plaintiffs since December 2017.[28]  Negron has neither
produced nor appeared in any more videos since December 2017.[29]

### D.    Sweigert's Allegations and Motion to Intervene

As is evident from the summary above, none of the allegations in the Amended
Complaint pertain to non-party David George Sweigert.  Sweigert alleges that in 2017, Goodman
began "an unrelenting social media smear campaign"[30] against Sweigert that includes calls to

---

[27] Plaintiffs claim that Goodman posted at least four videos between February 2018 and
April 13, 2018, the date of the filing of the Amended Complaint.  (Am. Compl. 70–73.)
Goodman repeats accusations similar to those in earlier videos.  (*Id.* 73.)

[28] In one Twitter post, Lutzke apparently calls Steele "the greatest plagiarizer and liar on
the internet." (Am. Compl. 78.)  And according to Plaintiffs, Lutzke "has now escalated the
falsehoods to and [sic] include accusations that [Steele] protects pedophiles, defends child
traffickers, wants JIHAD in the United States, has committed 'espionage' and 'treason', and [sic]
etc." (*Id.* 75.)

[29] Though not creating content, Plaintiffs aver that Negron continued to conspire with
Lutzke to defame Plaintiffs, and that Negron retweeted some of Lutzke's Twitter comments as
part of this conspiracy.  (Am. Compl. 13.)

[30] Goodman undertook this putative campaign after Sweigert published a "technical
report" about the Charleston "dirty bomb hoax . . . from the perspective of Critical Infrastructure

violence against him.  (Mot. Intervene, ¶¶ 1, 16–19, ECF No. 93.)  Sweigert further argues that

this smear campaign has caused him severe emotional distress, prompting him to take preventive

measures "to deter would-be stalkers."  (*Id.* ¶ 140.)  Sweigert also moves the Court to join as a

defendant David Charles Hawkins,[31] who Sweigert claims has "become inextricably intertwined"

in Goodman's "damaging civil torts."  (*Id.* ¶ 21.)  Sweigert asserts the following claims against

Goodman and Hawkins:

| | |
|---|---|
| **Count I:** | Witness retaliation, in violation of 42 U.S.C. § 1985(2);[32] |
| **Count II:** | Conspiracy to commit witness retaliation, in violation of 42 U.S.C. § 1985(2); |
| **Count III:** | Civil contempt; |
| **Count IV:** | Defamation *per se*; |
| **Count V:** | Business conspiracy, in violation of Virginia Code § 18.2-499 and Virginia Code § 18.2-500; |

---

Protection (CIP), the career field practiced by [Sweigert]."  (Mot. Intervene ¶¶ 4–5, ECF No. 93.)
Sweigert committed to sending "dozens of copies of these technical reports to committees of
Congress and law enforcement agencies."  (*Id.* ¶ 5.)

[31] The Amended Complaint lacks any reference to Hawkins, whom Sweigert describes as
"a newly identified co-conspirator" of Goodman's.  (Mot. Intervene ¶ 15.)

[32] This civil rights conspiracy provision states, in relevant part:

> If two or more persons in any State or Territory conspire to deter, by force,
> intimidation, or threat, any party or witness in any court of the United States from
> attending such court, or from testifying to any matter pending therein, freely, fully,
> and truthfully, or to injure such party or witness in [her or] his person or property
> on account of [her or] his having so attended or testified . . . the party so injured or
> deprived may have an action for the recovery of damages, occasioned by such
> injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(2)–(3).

**Count VI:**    Intentional infliction of emotional distress; and,

**Count VII:**    Unauthorized use of name and picture.

(*Id.* ¶¶ 52–144.)  For relief on each count, Sweigert seeks a permanent injunction[33] and treble

damages of $3 million.  (*Id.* ¶¶ 147, 150.)

In his Motion to Intervene, Sweigert asserts that Goodman's defamation and retaliation

against him entitles him to join this action as a plaintiff.  Neither document is a model of

clarity.[34]  Sweigert admits that on June 14, 2018, he filed a separate lawsuit against Goodman on

"these and related claims."[35]  (Mot. Intervene ¶¶ 7–8.)  Neither the Motion nor supporting

memorandum mentions Defendants Negron or Lutzke, and the discussion centers on the actions

of only Goodman and Hawkins, a non-party.

---

[33] The requested injunction would "direct social media platform providers to remove the accounts of the co-conspirators," including the offending posts and videos described in Sweigert's filings.  (Mot. Intervene ¶¶ 147–48.)

[34] For example, his memorandum discusses the issue of Article III standing at length before moving to the merits of Sweigert's claims.  (See Mem. Supp. ¶¶ 11–31, ECF No. 94.)  Under Article III of the U.S. Constitution, one may sue another in federal court only if there exists between them a "case or controversy" consisting of (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  No party seeks dismissal of Sweigert based on standing.

[35] Sweigert filed suit in the District of South Carolina, which transferred the action to the Southern District of New York.  In his South Carolina action, Sweigert alleges RICO and other criminal violations arising from the Charleston incident. (*See* Compl., ECF No. 1, *Sweigert v. Goodman*, No. 2:18-cv-1633 (D.S.C.); 1:18-cv-08653 (S.D.N.Y.))  In November 2018, that court ordered that Sweigert show cause "why his amended complaint should not be dismissed," staying proceedings generally.  (Order to Show Cause, *Sweigert v. Goodman*, No. 1:18-cv-08653, ECF No. 65 (S.D.N.Y. Nov. 16, 2018)).  Sweigert responded to the court's order.  The case pends as of the date of this Memorandum Opinion.

## II. Analysis

Non-party Sweigert moves to intervene as a plaintiff under Federal Rule of Procedure 24.

Rule 24 provides two mechanisms of intervention: Rule 24(a), intervention by right, in which

the court must add the movant as a party in certain circumstances; and, Rule 24(b), intervention

by permission, in which the court exercises discretion to allow or bar intervention on the basis of

a "common question of law or fact."[36] Fed. R. Civ. P. 24.

In his Motion to Intervene, Sweigert bases his argument on intervention as of right under

Rule 24(a). However, conscious of its duty to construe *pro se* pleadings liberally,[37] the Court

liberally construes Sweigert's request as also seeking permissive intervention. Under either

standard, Sweigert's argument fails to meet the burden required of intervenors. The Court will

deny the Motion to Intervene.

---

[36] Under either mechanism of intervention, as a threshold matter, the Court must
determine whether the movant timely filed her or his motion to intervene. *See* Fed. R. Civ. P.
24(a)(1), 24(b)(1). The trial court has sound discretion in deciding timeliness under Rule 24.
*See Alt v. EPA,* 758 F.3d 588, 591 (4th Cir. 2014). When evaluating timeliness, the Court must
consider three factors: "first, how far the underlying suit has progressed; second, the prejudice
any resulting delay might cause the other parties; and third, why the movant was tardy in filing
its motion." *Alt,* 758 F.3d at 591; *see also Hill Phoenix, Inc. v. Systematic Refrigeration, Inc.*
117 F. Supp. 2d 508, 514 (E.D.Va. 2000). The most important factor in ascertaining whether a
movant timely filed his or her motion to intervene is "whether the delay has prejudiced other
parties." *Spring Constr. Co. v. Harris,* 614 F.2d 374, 377 (4th Cir. 1980); *see also Hill Phoenix,
Inc.,* 117 F. Supp. 2d at 514.

[37] District courts have a duty to construe *pro se* pleadings liberally. *Bracey v. Buchanan,*
55 F. Supp. 2d 416, 421 (E.D. Va. 1999). A *pro se* plaintiff must nevertheless allege facts
sufficient to state a cause of action. *Id.* (citation omitted). The Court cannot act as a *pro se*
litigant's "advocate and develop, *sua sponte,* statutory and constitutional claims that the [litigant]
failed to clearly raise on the face of [the] complaint." *Newkirk v. Cir. Ct. of Hampton,* No.
3:14cv372, 2014 WL 4072212, at *1 (E.D. Va. Aug. 14, 2014).

### A.     Sweigert May Not Intervene as of Right

Sweigert's Motion to Intervene as of right under Rule 24(a)(2) falters because his claims

of defamatory and conspiratorial harm establish only that he may have similar claims to Steele's,

not that he has an interest in Steele's claims.  *See* Fed. R. Civ. P. 24(a)(2) (stating that the

movant must "claim[ ] an interest relating to . . . the subject of the action, and [she or he must be]

so situated that disposing of the action may as a practical matter impair or impede the movant's

ability to protect [her or his] interest.")  Sweigert lacks the right to intervene here.

### 1.     Legal Standard:  Intervention as of Right

In order to demonstrate a right to intervene in an action, the movant must show:  1) a

"significantly protectable interest" in the subject matter of the action; 2) that the protection of

this interest would be impaired without the movant's intervention; and, 3) that the movant's

interest is not adequately represented by the existing parties.  *Teague v. Bakker*, 931 F.2d 259,

260–61 (4th Cir. 1991) (quoting *Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th

Cir. 1976)).  An interest qualifies as "significantly protectable" when "the intervenor stands 'to

gain or lose by the direct legal operation of the district court's judgment' on the plaintiff's

complaint." *Cooper Techs., Co. v. Dudas*, 247 F.R.D. 510, 515 (E.D. Va. 2007) (quoting

*Teague*, 931 F.2d at 261) (internal quotation marks omitted).  Though the movant's burden for

proving inadequate representation "should be treated as minimal," *Teague*, 931 F.2d at 262

(quotation omitted), when the movant "has the same ultimate objective as a party to the suit, a

presumption arises that its interests are adequately represented, against which the petitioner must

demonstrate adversity of interest, collusion, or nonfeasance," *Westinghouse*, 542 F.2d at 216.

Indeed, "representation is considered adequate even though the applicant might have a slightly

different motive for litigating the issues." *Dairy Maid Dairy, Inc. v. United States*, 147 F.R.D.

109, 112 (E.D. Va. 1993) (citing 3B *Moore's Federal Practice* ¶ 24.07[4]).

### 2.   Sweigert May Not Intervene as of Right Because He Fails to <u>Demonstrate an Interest in the Subject of the Instant Lawsuit</u>

Somewhat surprisingly, no party addresses whether Sweigert's Motion to Intervene is or

is not timely.[38]   *See Spring Constr. Co.*, 614 F.2d at 377.   Because Sweigert fails to satisfy the

first element of the intervention as of right analysis—a "significantly protectable interest"—

Sweigert cannot intervene as of right.   *See Cooper*, 247 F.R.D. at 514–15.   Even reading the

Motion to Intervene liberally, as the Court must, Sweigert alleges no direct connection between

Defendants' conduct concerning Plaintiffs and Goodman's conduct concerning Sweigert.   The

---

[38] Had any party raised the issue, the Court would have evaluated it carefully.   The Court considers three factors: "first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." *Alt*, 758 F.3d at 591.   The first factor weighs against Sweigert because the suit has progressed to discovery.   Plaintiffs filed their Original Complaint nearly two years ago.   Sweigert first filed as a non-party over a year ago.   (ECF No. 51.)   Seventeen months after the filing of this action, and nine months after his first filing in the case, Sweigert moved to intervene.   (ECF No. 73.)   During that time, this Court ruled on five motions, including two motions to dismiss.   (ECF No. 86.)   Counsel for Negron and Steele have conducted at least one discovery planning conference without Sweigert.   (ECF No. 112.)   Even considering Sweigert's *pro se* status, the first factor weighs against intervention.

The second timeliness factor evaluates prejudice to the existing parties.   *See Spring Constr. Co.*, 614 F.2d at 377.   This factor also weighs against intervention because, notwithstanding their failure to raise timeliness, the existing parties likely would suffer prejudice in the delay resulting from Sweigert's intervention.   Given the extent of pretrial briefing completed, this case is ready for discovery and trial.   Sweigert's intervention would add new parties, new factual allegations, and new legal claims, thereby ensuring significant delay.   The second factor weighs against Sweigert.

The third timeliness factor, the rationale behind the movant's tardiness in filing its motion to intervene, does not weigh in favor of or against timeliness.   *See Alt*, 758 F.3d at 591.   Although Sweigert does not justify the extended delay in bringing the Motion to Intervene, Sweigert has no benefit of counsel and no party challenges timeliness.

None of the three timeliness factors weighs clearly in favor of intervention.   But because the Court will deny the Motion to Intervene on other grounds, the Court assumes, without deciding, that the Motion to Intervene is timely.

Court accordingly finds that Sweigert lacks a "significantly protectable" interest in this litigation sufficient to merit intervention.

Sweigert makes no reference to the specific, numerous allegations contained in the Amended Complaint. The references to Steele in Sweigert's briefings come only in passing and do not seek to establish a connection between the harm Plaintiffs allege and the harm Sweigert alleges. (*See* Mem. Supp. Mot. Intervene ¶¶ 2, 14, 47.) To the extent that Sweigert's claims seem "identical" to Steele's, the claims relate to two distinct sets of conduct or statements: those directed at Plaintiffs and those directed at Sweigert. For example, Sweigert seeks to bring a business conspiracy claim against Goodman pursuant to Virginia Code § 18.2-499 and -500, which the Amended Complaint also asserts. But the allegations that support Count III in the Amended Complaint pertain only to Plaintiffs:

> Goodman, Negron and Lutzke . . . acted in concert . . . for the express purpose of *injuring the Earth Intelligence Network* and *#UNRIG* in its business and reputation through the publication and republication of false and defamatory statements . . . [Defendants] orchestrated a scheme the unlawful purpose of which was to defame *Robert and #UNRIG* and destroy their reputations and business.

(Am. Compl. 90) (emphases added). Sweigert alleges that Goodman and non-party Hawkins injured his business as a "Critical Infrastructure Protection" professional, (Mot. Intervene ¶ 4), by means of a similar smear campaign executed through a different set of YouTube videos, (*id.* ¶¶ 1, 4). Sweigert fails to refer to the existing allegations in the Amended Complaint or to explain how his allegations pertaining to business conspiracy satisfy Rule 24(a).

Although Sweigert mentions some factual similarities by describing an alleged smear campaign by Goodman analogous to the alleged defamation campaign undertaken by Defendants against Plaintiffs, the distinctions outnumber the similarities. Here, Plaintiffs seek recovery from three Defendants: Goodman, Negron, and Lutzke. Sweigert, on the other hand, seeks to recover

19

from Goodman and Hawkins, a non-party whom Sweigert seeks to join as a defendant. Sweigert

fails to mention any relevant conduct by either Negron or Lutzke in his briefings. These

differences underscore the disparate qualities of Plaintiffs' and Sweigert's claims.

Considering the "significantly protectable" quality an intervenor's interest must have

under the *Westinghouse-Teague* standard, Sweigert does not stand to gain or lose anything by the

"direct legal operation" of the Court's decision in this case because nothing stands to preclude

him from asserting any claim he may have against Goodman in a separate suit.[39] *See Teague*,

931 F.2d at 261. The underlying controversy between the existing parties pertains to them only.

Even read liberally, Sweigert has shown no connection between his purported claims and

Plaintiffs', meaning Sweigert fails to establish the first element of intervention as of right.[40]

Falling short on the first prong, Sweigert proves no right to intervene in this action. The Court

will deny the Motion to Intervene under Rule 24(a)(2).

### B.    Sweigert May Not Intervene Permissively

Intervenors may seek to intervene in a case by permission when they "ha[ve] a claim or

defense that shares with the main action a common question of law or fact." Fed. R. Civ. P.

---

[39] Sweigert raises res judicata as a potential impairment of his interest should Goodman prevail in this litigation. (Sweigert's Reply to Negron's Resp. Mot. Intervene ¶¶ 53–54, ECF No. 111.) This argument misconstrues res judicata. Even if Goodman prevailed in *this* suit, he could not necessarily use such an outcome as a shield from claims against by Sweigert in a *different* suit. *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971); *Va. Hosp. Ass'n v. Baliles*, 830 F.2d 1308, 1311-12 (4th Cir. 1987). Even if the Court denies Plaintiffs the relief they seek, nothing would preclude Sweigert from seeking to assert legally similar claims under different facts.

[40] Considering the second and third elements would highlight this fatal flaw. As to the second element, this action must impair Sweigert's ability to protect his interest, *see Teague*, 931 F.2d at 262, but Sweigert and Plaintiffs do not share the same claims. Evaluating the third element would lead to the same inevitable conclusion: the Court cannot determine whether Plaintiffs can adequately represent Sweigert's interests because Sweigert's interests, whatever they may be, are not at issue in this case.

24(b)(1)(B). The Court has "substantial discretion" to allow or deny intervention of such claims provided they do not unduly prejudice the existing parties. *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003). Because allowing Sweigert to intervene would cause such prejudice, the Court will deny intervention by permission.

### 1.   Legal Standard:  Permissive Intervention

District courts enjoy wide discretion to grant or deny permissive intervention. *See Wright v. Krispy Kreme Doughnuts, Inc.*, 231 F.R.D. 475, 479 (M.D.N.C. 2005). The United States Court of Appeals for the Fourth Circuit favors "liberal intervention . . . to dispose of as much of a controversy" as possible, *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986), but stops short of allowing the existing parties to suffer prejudice or delay on the intervenor's account. *See Alt*, 758 F.3d at 591.

Permissive intervention requires a court to apply a three-part test requiring the movant to show "1) that [her or his] motion is timely; 2) that [her or his] claims or defenses have a question of law or fact in common with the main action;[41] and 3) that intervention will not result in undue delay or prejudice to the existing parties." *RLI Ins. v. Nexus Servs.*, No. 5:18-cv-00066, 2018 WL 5621982, at *5 (citing *Wright*, 231 F.R.D. at 479). The Fourth Circuit has instructed courts to weigh the third element, undue prejudice, most heavily. *Spring Constr.*, 614 F.2d at 377.

---

[41] The second element, requiring a common question of law or fact, evinces a lower standard than the corresponding element of mandatory intervention. 7C Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1911 (3d ed.). A treatise reports:

> Close scrutiny of the kind of interest the intervenor is thought to have seems especially inappropriate under Rule 24[b] since it makes no mention of interest. . . .

### 2.   Sweigert May Not Intervene Because Intervention <u>Would Unduly Burden the Existing Parties</u>

The Court finds that Sweigert falters on each of the three elements of permissive

intervention, even reading his Motion to Intervene liberally.  As to the first element of the

analysis, timeliness, the parties chose not to raise the issue despite its seeming relevance to the

case at bar.  *See supra* n.38.

As to the second element, a common question of law or fact, Sweigert's arguments do not

persuade the Court that the actions or claims sufficiently overlap.  *See supra* Section II.A.2.[42]

Factually, the parties are not common between the two sets of claims.  Plaintiffs sued Goodman,

Negron, and Lutzke, (Am. Compl. *passim.*), while Sweigert seeks to adjudicate claims against

only Goodman and non-party Hawkins, (Mot. Intervene *passim.*).  Sweigert implicitly concedes

that he has no business with Negron and Lutzke when he omits them from his pleadings, and

Plaintiffs bring no claim against Hawkins.

The two sets of claims also lack a common factual foundation.  For example, in order to

adjudicate an unlawful combination for the purpose of "willfully and maliciously injuring

[Sweigert] in his reputation, trade, business or profession," this Court would have to both add

Hawkins as a defendant and review allegations premised on a new set of videos and online

postings—wholly irrelevant to the existing Plaintiffs—into evidence.  *See* VA. CODE ANN.

§ 18.2-499.  The defamation *per se* claims that Plaintiffs and Sweigert assert highlight Sweigert's

---

The concept of a common question of law or fact . . . has not been a difficult concept
to apply in other contexts and it should not be here.

7C Fed. Prac. & Proc. § 1911 (3d ed.).

[42] Sweigert fails to connect his own allegations with those in the Amended Complaint,
except to the general extent that he accuses Goodman of similar actions against Sweigert to those
alleged in the Amended Complaint against Plaintiffs Steele and EIN.

failure to satisfy a common question of fact.  Even though both Sweigert and Plaintiffs assert

defamation *per se* against Goodman, no factual overlap would exist because the Court would

have to consider statements that are allegedly defamatory against Plaintiffs separately from

statements that are allegedly defamatory against Sweigert.  As explained throughout this

Memorandum Opinion, the alleged factual similarities between the type and manner of harm

suffered by parties do not vest Sweigert either with a right or reason to join this case.

Legally, the Amended Complaint and Sweigert's Motion to Intervene lack a common

foundation.  Sweigert's Motion to Intervene raises entirely new questions of law, such as the

witness retaliation claims under § 1985 in Counts I and II, and civil contempt in Count III.

Because the factual allegations underlying the additional claims differ from the allegations

already before the Court, the new legal causes of action would add complexity without

conserving judicial or party resources.  And even when Sweigert asserts the same causes of

actions, the facts underlying them differ.  This would result in hearing two parallel trials in one

proceeding.  It is crystal clear that Sweigert's claims raise different questions of both law and

fact from those alleged in the Amended Complaint.

Even were the Court to assume that Sweigert's Motion to Intervene satisfied the first and

second elements of permissive intervention, it patently fails to overcome the third element, the

resulting delay or prejudice to the existing parties.  All existing parties—Plaintiffs and

Defendants alike[43]—oppose intervention.  Sweigert has filed more than fifty documents with the

Court in this litigation to date, including multiple declarations and motions for injunctive relief.

---

[43] Lutzke alone, against whom the Clerk has entered default, has not responded to oppose
intervention or for any other purpose.

Many of these prolix filings appear frivolous, even construing them liberally.  Going forward,

existing parties would suffer both delay and prejudice if the Court allowed Sweigert to intervene.

      The Fourth Circuit has expressed sensitivity to a "deluge[ of] additional briefs and

pleadings" that would add "no new viewpoints and little if any illumination to the original . . .

disputes." *Westinghouse*, 542 F.2d at 217.  If the Court were to allow any party claiming

defamation by these Defendants to intervene against them in this case, the "resultant complexity

of the litigation, combined with increases in cost and judicial time, would hinder resolution of

the present conflict." *Id.*  Sweigert's intervention would result in undue delay and prejudice.

Even liberally construing the Motion as seeking permissive intervention, the Court will deny the

Motion to Intervene under Rule 24(b)(1)(B).

### III.  Conclusion

      For the foregoing reasons, the Court will deny Sweigert's Motion to Intervene.  (ECF

No. 93.)  The Court will also deny Sweigert's other motions as moot.  (ECF Nos. 102, 108, 124.)

The Court will strike Sweigerts' miscellaneous filings from the record.  (ECF Nos. 51, 54, 55,

56, 58, 59, 60, 75, 77, 84, 103, 120, 137, 138, 140, 142, 145, 147, 149, 150.)  The Court

addresses all other pending motions by separate Memorandum Order and Opinion.  (ECF Nos.

109, 121, 126, 127.)

      An appropriate Order shall issue.

                                              M. Hannah Lauck
                                    United States District Judge

Date: 7/25/19
Richmond, Virginia

24

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
SWEIGERT V. GOODMAN, CIVIL CASE #: 1:18-CV-08653-VEC - JUDGE VALERIE E. CAPRONI

*D. G. SWEIGERT, C/O*
*GENERAL DELIVERY*
*ROUGH AND READY, CA 95975*
*Spoliation-notice@mailbox.org*

U.S. District Court for the Southern District of New York
(FOLEY SQUARE)

D George Sweigert

**Plaintiff**

v.

Jason Goodman

**Defendant**

CIVIL CASE #: 1:18-CV-08653-VEC

JUDGE VALERIE E. CAPRONI

CERTIFICATE OF SERVICE

I hereby attest that a true copy of this letter has been sent to the following addressees on the 5th day of July, 2019

AUG

Jason Goodman, CEO
Multi-media Design Systems, Inc.
252 7th Avenue, Apart. #6S
New York, NY 10001

Clerk of the Court, Room 200
U.S. District Court
500 Pearl Street
New York, New York 10007-1312

D. GEORGE SWEIGERT

8 . 5 . 19



EP14F Oct 2018

# PRIORITY MAIL

**EXPECTED DELIVERY DAY:** 08/07/19

## USPS TRACKING NUMBER

9505 5159 2260 9217 4095 59

* Date of delivery specified*

* USPS TRACKING™ included to many major international destinations.

* Limited international insurance.

* Pick up available.*

* Order supplies online.*

* When used internationally, a customs declaration label may be required.

* Domestic only



To schedule free Package Pickup, scan the QR code.

PRO SE 2 cc

USM P3 SDNY

**FROM:**

*D. G. SWEIGERT, C/O*
*GENERAL DELIVERY*
*ROUGH AND READY, CA 95975*
*Spoliation-notice@mailbox.org*

**TO:**

Clerk of the Court, Room 200
U.S. District Court
500 Pearl Street
New York, New York 10007-1312