**U.S. DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
SDNY PRO SE OFFICE
2020 DEC 16 AM 11: 01

| SWEIGERT | CIVIL CASE #: |
|---|---|
| V. | 1:18-CV-08653-VEC |
| GOODMAN | JUDGE VALERIE E. CAPRONI |

### PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION (DKT. 176) TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

MAY IT PLEASE THE COURT:

This pleading is in REPLY to Defendant's opposing papers (ECF Dkt. 176).



*D. G. SWEIGERT, C/O*
*GENERAL DELIVERY*
*ROUGH AND READY, CA 95975*
*Spoliation-notice@mailbox.org*

12 · 14 · 20

## MEMORANDUM OF LAW

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................ 2

**TABLE OF AUTHORITIES** ......................................................................................... 3

**SUMMARY OF RELIEF SOUGHT** .............................................................................. 4

**PRELIMINARY STATEMENT** ..................................................................................... 5

**PROCEDURAL HISTORY** ........................................................................................... 6

**LAW AND ARGUMENT** .................................................................. Error! Bookmark not defined. 15 *12·14·20*

**CONCLUSION** ............................................................................................................. 18

**CERTIFICATE OF SERVICE** .................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Playgirl*, 447 F. Supp 723, 726 (SDNY 1978) ...................................................... 16

*Ali v. Playgirl*, 447 F. Supp. 723, 727 (S.D.N.Y. 1978) .............................................. 16

*Ali v. Playgirl*, 447 F.Supp. 723, 726-727 (SDNY 1978) ............................................ 16

*Binns v. Vitagraph* ........................................................................................................ 17

*Binns v. Vitagraph Co.*, 210 N.Y. 51, 57-58 (1913) .................................................... 15

*International Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir. 1977), *cert. denied,* 434 U.S.
1014, 98 S.Ct. 730, 54 L.Ed.2d 758 ......................................................................... 7

*Messenger v. Gruner + Jahr Printing & Publishing,* Court of Appeals of the State of New York,
94 N.Y.2d 436 (N.Y. 2000) ...................................................................................... 17

*Messenger v. Gruner,* 94 N.Y.2d 436, 446, 706 N.Y.S.2d 52, 58 (2000) .................... 17

*Spahn v. Messner, Inc.* , 18 N.Y.2d 324, 274 N.Y.S.2d 877 (1966) ............................. 17

*Time, Inc. v. Hill*, 385 U.S. 374 (1967) ...................................................................... 17

*Wojtowicz v. Delacorta Press,* 58 A.D.2d 45, 46-47, 395 N.Y.S.2d 205, 206-207 (1st Dept. 1977)
aff'd 43 N.Y.2d 858, 403 N.Y.S.2d 218 (1978) ........................................................ 9

**Statutes**

NYCRL §§ 50, 51 ............................................................................................................ 5

NYCRL § 50                                                                                   15, 16

## SUMMARY OF RELIEF SOUGHT

**THE PLAINTIFF REQUESTS** injunctive relief against the Defendant.  New York Civil Rights Law supports the Plaintiff's request that images, surnames, and other *persona* identification used in the promotion of fictionalized commercial video podcasts should be restrained.

Technical instrumentalities ("wrappers") in the form of video podcast "thumb nails", titles and descriptions herald and announce the availability of the commercial video content.  The Plaintiff does not propose that video content itself should be curtailed or enjoined by this Court.  Rather, the use of content "wrappers" (thumb nails, titles and video descriptions).

Therefore, at a minimum ALL images depicting Plaintiff's likeness in podcast video "thumb nails", and ALL references to his name used in video podcast titles and descriptions, as clearly identified in the Second Amended Complaint (**ECF Dkt 88**), should be removed from the view of the general Internet browsing public and from ALL social media platforms controlled by the Defendant until such time as those commercial podcast video wrappers remove the imagery / name / persona of the Plaintiff, **UNLESS** the Defendant can demonstrate that the discontinued commercial use of such "wrapper" instrumentalities (imagery in "thumbnails", names in titles and descriptions) will cause some kind of detriment or injury to the Defendant that would tip the equitable injunctive relief balance in his favor.

These wrapper instruments are separate and apart from any content of the video podcast itself.

## PRELIMINARY STATEMENT

The gravamen of the Defendant's opposing papers (**Dkt. 176**) rely on his determination as to what is, and what is not, "commercial speech" or "advertising" as defined by Section 5 of the New York Civil Rights Law (NYCRL §§ 50, 51).  Defendant contends that the use of heralding technical instrumentalities such as YouTube (and social media podcast platforms) thumbnails, podcast titles and podcast video descriptions do not fall within the scope of NYCRL §§ 50, 51 and recent decisions.

At the outset, the Court is well advised to consider that most – if not all – of the podcast content described at length in the **SAC** and the **FSC** are works of fiction, fantasy, and have little basis in reality ("fictionalized").  Nonetheless, the Defendant purposely chosen time and time again to include the real name and actual photograph / likeness / persona of the Plaintiff in grotesque "concocted conspiracy theories" (**Dkt. 140, 175**) fictionalized productions without the express written permission of the Plaintiff.

To offer the Court a short hand for social media technical instrumentalities (thumbnails, video titles, video descriptions) the term "click-bait" is appropriate.  "Click-bait" is the practice of publishing "wrapper" items (image / persona / name) to attract members of the public to "click" on the video thumbnail and engage their video player or viewer to watch the podcast.

To be blunt, the general public has little interest in the fictionalized "Alice in Wonderland" podcast creations that rehash conspiracy theories about various events, such as incidents surrounding the collapse of the World Trade Center (WTC) on 09/11/2001.

As the district judge has observed, the Defendant is engaged in the "rehash [of] "incomprehensible and illogical online conspiracy theories," **Dkt. 87** at 1.  Further, the

Defendant's behavior is described as "concocting outlandish conspiracy theories" (**Dkt 87, 140**). The release and publication of these "outlandish" podcasts filled with fictionalized conspiracy theories by the Defendant, is heralded by these "wrappers" (image / persona / name).

As described in the **SAC**, these podcast fairy tales have claimed that the Plaintiff may have turned off the encryption modules of the Fire Department of New York (F.D.N.Y.) public safety radios, which led to the death of 343 fire-fighters on 09/11/2001.  The Defendant's podcasts laid blame for these deaths at the feet of the Plaintiff.  The Defendant's CrowdSource The Truth specializes in fictionalization of a real news events that ignores the "debunking" of the conspiracy theories that link to the Plaintiff to these events.  The Plaintiff has no relationship to these events.

In fact, those F.D.N.Y. Motorola radios had no encryption module to tun off (an opinion based on the research of this exact issue and the expertise of emergency radio communications knowledge possessed by the Plaintiff, a California licensed Emergency Medical Technician (E.M.T.) and as a California Emergency Management Specialist as certified by the California Office of Emergency Services (CalOES)).

## PROCEDURAL HISTORY

Plaintiff alleged that the Defendant has used Plaintiff's image and name without his consent in the **SAC (Dkt. 88)** and the First Supplemental Complaint (**FSC, Dkt. 150**).  The magistrate has ordered that the **SAC** is to be supplemented by "*paragraphs 1, 39 through 45 and 47 through 50*" of the **FSC**, see ORDER (**Dkt. 160**).  The Defendant's various motions to dismiss the claims of the **SAC** and **FSC** have been heard and terminated.

As stated in the ORDER of 08/03/2020 (**Dkt. 140**) the Defendant was allowed leave of the court to file his third counterclaim, which he did on 09/01/2020 (**Dkt. 145**).  Plaintiff filed a motion to dismiss (**Dkt. 151**), which was opposed by the Defendant (**Dkt. 161**), to which the Plaintiff filed a reply (**Dkt. 162**).

The magistrate judge issued a Report and Recommendation (**R&R**) on 11/05/2020 (**Dkt. 164**) recommending dismissal of the Defendant's counterclaims.

As stated in the ORDER of 12/11/2020 (**Dkt. 175**), the Defendant opposed the magistrate's R&R (**Dkt. 167**), which was answered by Plaintiff's in his reply (**Dkt. 172**).  The district judge granted the operative relief requested in Plaintiff's **Dkt. 172** and dismissed the Defendant's third counterclaim.

Plaintiff sought injunctive relief by his motion for injunctive relief (**Dkt. 168**) on 11/19/2020, which was supplemented by **Dkt. 169** on 11/25/2020.  **Dkt. 168** was superseded by Plaintiff's amended injunctive relief pleading on 12/08/2020 (**Dkt. 174**).

Defendant filed his opposition to injunctive relief (**Dkt. 174**) with his opposing papers (**Dkt. 176**) on 12/14/2020 and chose to specifically address the amended pleading (**Dkt. 174**). Therefore, **Dkt. 168** is not the operative motion in play, as it is an amended legal nullity.

"It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." *International Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir. 1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758.

## BACKGROUND STATEMENT

1.     For the purposes of this motion the Defendant has not denied the allegations of the **SAC** (**Dkt. 88**), although ordered to provide an "Answer" by ORDERS of 10/24/19 and 11/18/2019. Instead, the Defendant filed a motion to dismiss (**Dkt. 106**) which was terminated by ORDER of 08/03/2020 (**Dkt. 140**). The Defendant has sufficiently forfeited any opposition to the SAC (**Dkt. 88**). Thus, the well-pleaded factual allegations of the SAC (**Dkt. 88**) should be assumed to be true by this Court as they have never been denied by the Defendant.

2.     The Plaintiff is seeking the removal of his image / persona /likeness, his surname ("wrappers") from video podcasts and his surname from podcast descriptions of only those podcast video described in the SAC (**Dkt. 88**). The Plaintiff's amended pleading (**Dkt. 174**) narrowly scoped the issue of technical instrumentalities (or "wrapper" artifacts) that promote and herald the Defendant's fanciful ghost stories described in the SAC (**Dkt. 88**).

3.     In his opposing papers the Defendant merely attempts cloaks himself in First Amendment arguments (**Dkt. 176**). The Plaintiff purposely attempted to advance judicial economy by "de-scoping" the injunctive relief requested to the issue of technical instrumentalities – without disturbing the actual podcast content itself (**Dkt 168, 174**).

4.     Nevertheless, the Defendant has conceded that the issue in controversy is whether or note these technical instrumentalities can be construed as commercial speech (see excerpt below of Defendant's **Dkt. 176**).

> 4   picture or voice is used within [New York] for advertising purposes or for the purposes of trade
> 5   without" written consent. To state a claim under NYCRL § 50 and 51, the Plaintiff must satisfy
> 6   three elements (1) use of name, portrait, or likeness; (2) for "advertising purposes or for the
> 7   purposes of trade;" (3) without written permission.
>
> 8     Defendant does not dispute that Plaintiff has satisfied (1) and (3). However, Plaintiff has
> 9
> 10   failed to satisfy (2) by falsely claiming his likeness was used for "advertising purposes or for the
> 11   purposes of trade" as defined by NYCRL § 50 and 51. The statute includes broad exceptions for

5.      Defendant does not dispute that he uses the Plaintiff's "name, portrait, picture or

voice"(as discussed in *Wojtowicz v. Delacorta Press*, 58 A.D.2d 45, 46-47, 395 N.Y.S.2d 205,

206-207 (1st Dept. 1977) aff'd 43 N.Y.2d 858, 403 N.Y.S.2d 218 (1978) ).

6.      In *Binns,* the plaintiff was a telegraph operator on a steamship that hit another steamship

at sea where he used that then new technology to call ashore and to another ship for help (see

mayday signals of maritime wireless sets).  Like, the Defendant's "CrowdSource The Truth", the

news service in *Binns* used pictures to simulate the telegraph operator which were not of the

actual event.  The defendant in *Binns* created "moving pictures" of the telegraph mayday events

to display to audiences for commercial purposes, analogous to the CrowdSource The Truth

podcasts.

7.      For example, on page 26 of the **SAC** the following appears.

  Susan "Queen Tut" Lutzke Reveals David 
Sweigert – Robert David Steele Lawsuit        ...
Crowdsource the Truth 2
Streamed 2 months ago • 975 views
Susan Lutzke aka Susan Holmes aka Queen Tut is a horrible but frequent
liar. She recently called me, revealing a long suspected ...

[video description]
Streamed live on Apr 30, 2019

Susan Lutzke aka Susan Holmes aka Queen Tut is a horrible but frequent liar. She
recently called me, revealing a long suspected conspiracy between her, D. George "Acton"
Sweigert and Robert David Steele. While nothing she says can be believed at this point,
how else would David Sweigert know the true identity of Oakey Marshall Richards were
this particular admission not true?

The sinister plans of these malicious social engineers are being revealed before our eyes as
the fraudulent and vexatious lawsuit brought by Steele continues to crumble.

8.      The Defendant is asking the Court to find that a video podcast with a former

CrowdSource The Truth side-kick (see above), that the Defendant calls "a horrible but frequent

liar", that somehow implicates the Plaintiff is a type of "news" or is "newsworthy" as it has

interest to the public at larger.  Note the language "while nothing she says can be believed at this point" to describe this former side-kick.  Further, sworn testimony has been provided by Robert David Steele in the Virginia lawsuit (*Steele v. Goodman*) disavowing any involvement or association with the Plaintiff.  This appears to be nothing more than a fictionalized "news" story.

9.      Defendant published wrappers and announcements to advertise the above video as articulated on page 26 of the **SAC** (shown below).

**Twitter tweet sent by Def Goodman**



10.     As shown on page 39 of the SAC, the Plaintiff's image and name is used to illustrate another podcast that addresses the erasure of supposed digital evidence of the Clinton first family "death pool betting" scheme (see below).



11.    Another example appears on page 40 of the **SAC**, displaying the image of the Plaintiff in a fictionalized "news story" related to the possible erasure of electronic evidence – presumably by the Plaintiff – to hid evidence of various murder plots.  Again, there is no connection between these "news" (concocted conspiracy theories) and the Plaintiff.



12.    As seen on page 42 of the SAC, the Plaintiff's image is present in the thumbnail of the podcast and his name is used in podcast title and podcast description.  Again, the Plaintiff has no

connection with this fictionalized podcast which rehashes the murder of a British intelligence agent whose body was found in a padlocked gym bag.



13.     The Plaintiff is not involved, whatsoever, in the grotesque "news" podcasts concocted by the Defendant and his side-kick David Charles Hawkins (White Rock, British Columbia, Canada) as described in the SAC (**Dkt. 88**).

14.     David Charles Hawkins has a long history as a W.T.C. 9/11/01 "denier" conspiracy theorist who worked with an incarcerated former pilot (Field McConnell) to create the 911 conspiracy movement known as "ABEL DANGER".  See pages 16 – 19 and 21 – 22 of the SAC (**Dkt. 88**).

15.     In fact, Mr. Hawkins produced an untold number of Internet podcasts with Mr. McConnell to totally destroy any public reputation of McConnell's sister Kristine Marcy, with a non-stop smear campaign that lasted well over a decade.  Mr. Hawkins has now joined forces with the Defendant to destroy the privacy of their jointly selected targets (like the Plaintiff).

16.     For at least fourteen (14) years, Mr. Hawkins has polluted the Internet with his entertaining fictionalized accounts of the Jon Benet Ramsey murder, the cause of death by

gunshot wound to the head of a U.S. Navy Captain at the Pentagon on 9/11/2001, the use of a University of Illinois "bat cave" simulation center to enable the Clinton first family to place "death pool bets" on the number of victims at a mass causality incident such as the W.T.C. 09/1101 disaster.  The Plaintiff has no connection with any of these events and yet his persona is associated with these tragedies by the Defendant.

17.     As seen on page 43 of the **SAC**, the Plaintiff's name is associated with the conspiracy theory that orbits around so-called "missing encryption keys" at the University of Illinois "EVL BAT CAV", a supposed high-speed network simulation center.  This theory is then connected in a disjointed manner with a Pentagon bomb theory ("BAE Bit-Spread").  The Plaintiff has nothing to do with this (see excerpt below).



18.     The same is true for the images on page 47 of the SAC (see below).



19.     In the video above, the podcast content describes the death of a U.S. Navy Captain at the Pentagon and stipulates he was murdered by a "wet hit team" that used the pre-planned crash of the jetliner on 09/11/2001 at the Pentagon as a "cover" for this assassination.  Again, the Plaintiff has no connection with this so-called "news" or "concocted conspiracy theory".

20.     Page 49 of the SAC includes more of the same (see below).



A simple Google search "Sweigert ethical hacker" reveals CSTT videos

21.     The Defendant and his side-kick Mr. Hawkins (as described in the **SAC**) have injured -- and continue to injure -- the Plaintiff by the unauthorized inclusion of his persona / image /name to a barrage of fictional, non-news, outlandish "Alice in Wonderland" stories.  This is not news.

14

There is no public interest in such "outlandish" and "concocted conspiracy theories" which hold no news value.

22.     Recall that this Court opined that these stories were deemed "outlandish conspiracy theories" (**Dkt. 140, 175**).  The Court would have to amend its "outlandish conspiracy theories" opinion with a revised characterization of "news" and/or "newsworthiness" to describe podcasts of the Defendant that are catalogued in the SAC (**Dkt. 88**).

23.     The Court should recall that the CrowdSource The Truth trademark was issued for "Educational and <u>Entertainment</u> Purposes".

## CROWDSOURCE THE TRUTH - Trademark Information

**By Multimedia System Design, Inc**

The CROWDSOURCE THE TRUTH trademark was assigned a Serial Number #87752970 – by the United States Patent and Trademark Office (USPTO). Trademark Serial Number is a unique ID to identify the CROWDSOURCE THE TRUTH mark in USPTO. The CROWDSOURCE THE TRUTH mark is filed in the category of **Education and Entertainment Services** . The legal correspondent for CROWDSOURCE THE TRUTH trademark is **MULTIMEDIA SYSTEM DESIGN, INC**, 252 7TH AVENUE, 6S NEW YORK, NY 10001 . **The current status of the CROWDSOURCE THE TRUTH filing is REGISTERED**.

Based on Multimedia System Design, Inc, the CROWDSOURCE THE TRUTH trademark is used in the following business: Providing on-line videos featuring news in the nature of current event reporting, not downloadable .

Cite:  https://www.trademarkelite.com/trademark/trademark-
detail/87752970/CROWDSOURCE-THE-TRUTH

## LAW AND ARGUMENT

24.     Simply stated, pictures / personas / images of an individual not related to an actual "news story", but were merely used to entertain the audience, violate NYCRL § 50, as discussed in *Binns v. Vitagraph Co.*, 210 N.Y. 51, 57-58 (1913).

25.     In *Binns,* the plaintiff was a telegraph operator on a steamship that hit another steamship

at sea where he used that then new technology to call ashore and to another ship for help (see

mayday signals of maritime wireless sets). Like, the Defendant's "CrowdSource The Truth", the

news service in *Binns* used pictures to simulate the telegraph operator which were not of the

actual event. The defendant in *Binns* created "moving pictures" of the radio telegraph "mayday"

events to display to audiences for commercial purposes, analogous to the CrowdSource The

Truth podcasts.

26.     The Court of Appeals, in holding that the "entertaining" pictures not relating to the actual

news story violated NYCRL § 50, specifically as follows.

> "A picture within the meaning of the statute is not necessarily a photograph of the
> living person, but includes any representation of such person. The picture
> represented by the defendant to be a true picture of the plaintiff and exhibited to
> the public as such, was intended to be, and it was, a representation of the plaintiff.
> The defendant is in no position to say that the picture does not represent the
> plaintiff or that it was an actual picture of a person made up to look like and
> impersonate the plaintiff."

27.     Similarly, in *Ali v. Playgirl*, 447 F. Supp 723, 726 (SDNY 1978) the statutory definition

of "portrait" is satisfied by the cartoon titled "Mystery Man" depicting a nude black man seated

in the corner of a boxing ring with the cartoon making further reference using the phrase "the

Greatest" in the carton notes. *Ali v. Playgirl,* 447 F.Supp. 723, 726-727 (SDNY 1978).

28.     The S.D.N.Y. citing well established case law held in order for the statute to be displaced,

the unauthorized use of the image must be in connection with an item of news or otherwise be

newsworthy as a matter of public interest. *Ali v. Playgirl*, 447 F. Supp. 723, 727 (S.D.N.Y.

1978).

29.     The Defendant's use of "click-bait" wrappers (thumbnails, video titles and video descriptions) are designed to leverage the Google Search Engine Optimization (**S.E.O.**) program to increase "clicks" of the podcast video.  When a member of the public views a Google entry and clicks on the thumbnail the video is launched in the individual's player or viewer.  Such "click-bait" wrappers are not embedded into the video content itself (which is not in dispute in this motion).

30.     As the Plaintiff has no real relationship to these "stories" the Defendant's use of these click-bait wrappers is solely for the purpose of advertising the fictionalized video ("concocted conspiracy theories") content in violation of the statute as opposed to the newsworthy and public interest exception.

31.     Defendant's podcasts are "substantially fictional works at issue are nothing more than attempts to trade on the persona", which does not fulfill the purposes of the newsworthy exemption. *Messenger v. Gruner*, 94 N.Y.2d 436, 446, 706 N.Y.S.2d 52, 58 (2000) citing *Binns v. Vitagraph* and *Spahn v. Messner, Inc.* , 18 N.Y.2d 324, 274 N.Y.S.2d 877 (1966).

32.     Defendant's podcasts are "substantially fictional works at issue are nothing more than attempts to trade on the persona", which does not fulfill the purposes of the newsworthy exemption. *Messenger v. Gruner + Jahr Printing & Publishing,* Court of Appeals of the State of New York, 94 N.Y.2d 436 (N.Y. 2000).

33.     As stated in *Time, Inc. v. Hill*, 385 U.S. 374 (1967):

> "But although the New York statute affords "little protection" to the "privacy" of a newsworthy person, "whether he be such by choice or involuntarily" the statute gives him a right of action when his name, picture, or portrait is the subject of a "fictitious" report or article. FN9".
> See Footnote 9 below (quoted in relevant part).

*Binns* v. *Vitagraph Co.*, 210 N.Y. 51, 103 N.E.
1108 (1913); *Youssoupoff* v. *Columbia Broadcasting System, Inc.*, 19 A.D.2d
865, 244 N.Y.S.2d 1 (1963); *Sutton* v. *Hearst Corp.*, 277 A.D. 155, 98 N.Y.S.2d
233 (1950); *Koussevitzky* v. *Allen, Towne Health, Inc.*, 188 Misc. 479, 68
N.Y.S.2d 779, aff'd 272 A.D. 759, 69 N.Y.S.2d 432 (1947); *Lahiri* v. *Daily
Mirror, Inc.*, Page 385 162 Misc. 776, 295 N.Y.S. 382 (1937). The doctrine of
"fictionalization" has been applied where there is no statute. See, *e. g.,
Leverton* v. *Curtis Pub. Co.*, 192 F.2d 974 (C.A. 3d Cir. 1951); *Hazlitt* v. *Fawcett
Pubs.*, 116 F. Supp. 538 (D.C. Conn. 1953); *Garner* v. *Triangle Pubs., Inc.*, 97 F.
Supp. 546 (D.C. S.D. N.Y. 1951).

## CONCLUSION

This pleading performs a carve out of the *wrapper thumbnail / name* wrapper click-bait issue

apart from any legitimate newsworthy exemption of NYCRL § 50.

The Defendant has misappropriated the Plaintiff's name and likeness into wrapper

instrumentalities to promote via click-bait practices the Defendant's fictionalized commercial

content to the general Internet browsing public.

These instruments (thumbnails, titles and descriptions) are not intrinsically newsworthy and are

not embedded within the fictionalized video podcast content of "concocted conspiracy theories".

Rather these wrapper instruments act as an advertising announcement for members of the general

Internet browsing public to watch commercial video content.  These wrappers are 100%

commercial content that herald a fictionalized version of events (e.g., see 09/11/2001 W.T.C.

grotesque ABEL DANGER conspiracy theories).  The Plaintiff has no relationship to these

"news stories" and thus the newsworthy exemption of NYCRL § 50 is not applicable.

The Defendant will not be harmed if he is restrained for this continued commercial exploitation

of the Plaintiff and will not be financially harmed by any order of this Court directing the

Defendant to cease and desist the commercial exploitative use video podcast wrappers that

include the Plaintiff's persona, name or likeness to promote fictionalized events that the Plaintiff

has no relationship to.

This Court should ORDER the Defendant to remove all reference to the Plaintiff by image /

name / persona that are attached to any video podcast described in the **SAC or the FSC.**

D. G. SWEIGERT, C/O
GENERAL DELIVERY
ROUGH AND READY, CA 95975

12 · 14 · 20

## CERTIFICATE OF SERVICE

I HEREBY ATTEST that a true copy of the attached pleadings has been sent to the

following addressees on the **14** day of December via prepaid First Class U.S. Mail.  So

sworn under oath.


       Jason Goodman, CEO
       Multimedia Systems Design, Inc.
       252 7th Avenue, Apart. #6S
       New York, NY 10001

       PRO SE OFFICE, #200
       U.S. District Court
       500 Pearl Street
       New York, New York 10007-1312


*D. G. SWEIGERT, C/O*
*GENERAL DELIVERY*
*ROUGH AND READY, CA 95975*
*Spoliation-notice@mailbox.org*

12·14·20

USPS TRACKING® NUMBER



**UNITED STATES POSTAL SERVICE**®

# PRIORITY® MAIL

- Date of delivery specified*
- USPS TRACKING™ included to many major international destinations.
- Limited international insurance.
- Pick up available.*
- Order supplies online.*
- When used internationally, a customs declaration label may be required.

  * Domestic only

FROM:

D. G. SWEIGERT, C/O
GENERAL DELIVERY
ROUGH AND READY, CA 95975
Spoliation-notice@mailbox.org



PRO SE #200

TO:

PRO SE OFFICE, Room 200
U.S. District Court
500 Pearl Street
New York, New York 10007-1312

10007

To schedule free
Package Pickup,
scan the QR code.



USPS.COM/PICKUP

PS00001000014    EP14F Oct 2018
SDMA 12.5 x 9.5

✱ Domestic only.    ✱ For Domestic shipments, the maximum weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.