**U.S. DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
SDNY PRO SE OFFICE

2021 JAN -5  AM 10: 33

| SWEIGERT | CIVIL CASE #: |
|----------|---------------|
| V. | 1:18-CV-08653-VEC |
| GOODMAN | JUDGE VALERIE E. CAPRONI |

## PLAINTIFF'S OPPOSITION TO
## MAGISTRATE'S REPORT AND RECOMMENDATION
## DKT. 181

**MAY IT PLEASE THE COURT:**

This is document is in OPPOSITION to the magistrate's Report and Recommendation, **Dkt. 181.**

The undersigned certifies this pleading is not filed for the purposes of creating an undue burden upon the Court or the Defendant.

A certificate of service is included on the last page of this document.  So sworn under oath.

Signed this ⟋ day of January, 2021

*D. G. SWEIGERT, C/O*
*GENERAL DELIVERY*
*ROUGH AND READY, CA 95975*
*Spoliation-notice@mailbox.org*

D. S⟋

/ . / . /

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ 3

PRELIMINARY STATEMENT ..................................................................................... 5

SPECIFIC OBJECTIONS TO MAGISTRATE'S R&R ........................................... 6

CONCLUSION ................................................................................................................ 20

EXHIBIT ONE................................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Arrington v. New York Times Co., 55 N.Y.2d at 440* ................................................................. 15

*Beverly v. Choices Women's Med. Ctr., Inc., 587 N.E.2d 275, 279 (N.Y. 1991)* ........................ 12

*Blumenthal v. Picture Classics, Inc., 235 App. Div. 570 – 1932* .................................................. 16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 566 (1980)* ................... 10

*Citigroup, 598 F.3d at 35* .............................................................................................................. 18

*Connick v. Myers, 461 U.S. 138, 146 (1983)* ................................................................................ 11

*Connick, 461 U.S at 147-48* ........................................................................................................... 11

*Dallesandro v. Henry Holt & Co., 4 A.D.2d 470, 166 N.Y.S.2d 805* ........................................... 15

*Haelan Laboratories v. Topps Chewing Gum, 202 F.2d 866 (2d Cir. 1953)* ............................... 19

*Lewis v. Cowen, 165 F.3d 154, 162 (2d Cir. 1999)* ....................................................................... 12

*Murray v. New York Mag. Co., 27 N.Y.2d406, 409 [1971]* .......................................................... 15

*Ohralik v. Ohio State Bar Ass'n, 436 US 447, 456 (1978)* ........................................................... 11

*Onassis v. Christian Dior-New York., 472 N.Y.S.2d 254, 258 (NY.Sup.Ct. 1984)* ..................... 19

*Quinn v. Aetna Life and Cas. Co., 96 Misc.2d 545, 554 (Queens.Cty.Sup.Ct.1978)* ................... 11

*Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989)* ........................................................................ 12

*Sonesta Int'l Hotels Corp v. Wellington Assoc., 483 F.2d 247 (2d Cir. 1973)* ............................ 17

*Spahn v. Julian Messner, Inc, 21 N.Y. 2d 124 (1967)* .................................................................. 14

*Thompson v. Close-Up, Inc., 277 AD 848 – NY: Appellate Div., 1st Dept. 1950* ....................... 15

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748 (1976)* .......... 11

*Walter v. NBC Television Network, Inc., 27 A.D.3d 1069, 1070, 811 N.Y.S.2d 521,*

     *523 (4ᵗʰ Dept, 2006)* ............................................................................................................. 14

*Yasin v. Q-Boro Holdings, LLC*, No. 13259109, 2010 WL 1704889, at *2 (N.Y. Sup. Ct. Apr. 23, 2010) ........................................................................................................................... 9

**Statutes**

AMEND. I, U.S. Const. .................................................................................................... 10, 12

NYCRL §§ 50, 51 ......................................................................................................... passim

**Treatises**

*Did Sweigert Hack the EVL BAT CAVE & Switch Pentagon Attack Simulation to Live Fire?*
     *David Hawkins* ......................................................................................................... 12

*Martin H. Redish and Kyle Voils, False Commercial Speech and the First Amendment:*
     *Understanding the Implications of the Equivalency Principle*, 25 Wm. & Mary Bill Rts. J. 765
     (2017) ....................................................................................................................... 11

*William H. Mulligan, Foreword—Preliminary Injunction in the Second* Circuit, 43 Brook. L.
     Rev. 831 ................................................................................................................... 17

## SUMMARY OF ISSUES PRESENTED FOR REVIEW

The magistrate's Report and Recommendation (**R&R**) (**Dkt. 181**) should be reviewed for clear error as it: (1) fails to provide accurate information about the Plaintiff's previous attempts to obtain injunctive relief from this Court, (2) fails to consider the Second Circuit's *serious questions* test for deciding the need for injunctive relief, (3) ignores the "no relationship" test of misappropriated personas used in non-related stories or articles, and (4) has an overly narrow simplistic interpretation of the newsworthiness privilege of Article 5 of the New York Civil Rights Law (NYCRL §§ 50, 51).

## PRELIMINARY STATEMENT

The Plaintiff apologies for the length of this pleading, every effort has been made to support judicial efficiency in this document.

It appears to the *pro se* non-attorney layman that this Court believes that the application of the newsworthiness privilege of NYCRL §§ 50, 51 applies to the Defendant's "concocted conspiracy theories".

The Court can assume *arguendo* that the **R&R** accurately interprets the newsworthiness privilege of NYCRL §§ 50, 51 to protect the Defendant who "concocts outlandish conspiracy theories" online that are "highly illogical and inconceivable" (**Dkt. 87, 140 and 175**).  However, this issue is moot as there is still no justification for the use of the Plaintiff's likeness, name and persona in news articles that have no relationship to the Plaintiff.  If these podcasts are newsworthy then the Defendant must show a relationship between such "news" and the Plaintiff.

**ERATTA:** As a housekeeping matter **footnote 5 of the R&R** refers to the Plaintiff's admission to a law school where he subsequently dropped out at the conclusion of the first semester mid-terms. The Plaintiff's "legal training" is one half semester of law school and nothing more.

The R&R makes reference to "repeatedly filing" an amended pleading. The Plaintiff's original motion papers, signed 11/29/2020 (**Dkt. 178**), were lost in the U.S. Postal System and delivered three weeks late. An identical replacement set of motion papers (Dkt. 174) were served when it appeared Dkt. 178 was lost in the mail. This is explained on the cover sheet of Dkt. 174. **See R&R footnote 6, "**The Court admonishes the Plaintiff to cease and desist from <u>repeatedly</u> filing amended documents."

## SPECIFIC OBJECTIONS TO MAGISTRATE'S R&R

*I.*     ***The Magistrate Erred By Not Acknowledging  Earlier Attempts at Preliminary Injunctive Relief***

Numerous references in the magistrate's R&R (**Dkt. 181**) that posited the Plaintiff delayed in seeking Preliminary Injunctive Relief (**P.I.R.**) are wrong and in **clear error.** Plaintiff attempted to obtain P.I.R. via motions that appear as docket entries **68, 69 and 71** (see November 2018). These motions were stayed by the Court's ORDER (**Dkt. 65**). See pages 5-6 of R&R (**Dkt. 181**). According to a magistrate's order of 12/30/2020 (**Dkt. 183**), the Plaintiff's previous motions (**Dkt. 68, 69 and 71**) were terminated ten (10) months later by ORDER ("See 8/27/19 Order, ECF No. 87, at 14"). Accordingly, Plaintiff's motions (**Dkt. 68, 69 and 71**) were denied by the ORDER (**Dkt. 87**) ("All other pending motions by either party, including all motions for orders to show cause, are similarly denied as moot."). These moot motions mirrored the present request for P.I.R. as they also relied upon NYCRL §§ 50, 51. The record would be more correct

to acknowledge the earlier P.I.R. motions from November 2018 to demonstrate the Plaintiff's due diligence to mitigate the damages inflicted on his professional reputation by the Defendant.

## II.   _Magistrate does not appear to understand the nuances of podcast monetization on YouTube, LLC._

### A.   Thumbnail Wrappers Equivalent to Book Covers

The magistrate appears to err on page 8 of the R&R (**Dkt. 181**) by assuming that no trade or commercial mechanism is at play with Defendant's video podcasts that are "available free of charge" to the general public on YouTube.COM.

As discussed on page 8 of the **R&R**, a PATREON "patron" is not the Defendant's only manner to obtain financial pecuniary payments from the videos described in the **SAC** ("_podcasts and/or in the wrappers was for advertising purposes or for the purposes of trade_"). The magistrate did not address the "click-bait" monetization issue.

Monetization is the YouTube, LLC process that provides financial pecuniary benefits to the video podcast creator when a member of the public merely clicks on a "wrapper" thumbnail or title. All the video content discussed in the **SAC** (**Dkt. 88**) had been "monetized" by YouTube, LLC on both the "Jason Goodman" and "CrowdSource The Truth 2" podcast channels (at a minimum).

This means that YouTube, LLC has inserted third-party paid advertisements into the embedded video content within the Defendant's streams and podcasts. This monetization process pays creators (Defendant) for podcast videos that have been "clicked" (as in "click-bait") to activate a user's browser to watch the content. The very act of "clicking" the thumbnail activates YouTube "AdSense" and pays the creator (Defendant).

> AdSense allows YouTube partners to get paid for monetizing their videos. Make sure to follow the <u>AdSense program policies</u> and YouTube's <u>Terms of Service</u>. AdSense content policies are extensive and include <u>quality guidelines</u> from the <u>Webmaster/Search Console</u> policies. We've highlighted some of the most relevant policies for YouTube creators below.
> Cite: https://support.google.com/youtube/answer/1311392?hl=en

For example, when an individual conducts a Google search, the results display a thumbnail, or miniaturized pictorial version of the content, of an image that appears on a third-party website (YouTube.COM).  Clicking that image will open a page on Google's site that displays the thumbnail again and, beneath that, it 'frames' the third party website.  That is action is enough to activate AdSense.

Below is a representation of a CrowdSource The Truth (CSTT) podcast as presented in the First Supplemental Complaint (FSC)(**Dkt. 150**).  The Court will note the word "demonetizated" in the podcast description.

> "In the most recent salvo against the truth, YouTube has **demonetized** Crowdsource the Truth 2 for what they have determined to be "harmful content". Is the total removal of Crowdsource the Truth coming next?"  [emphasis added]
>
> April 7, 2020   URL:  https://www.bitchute.com/video/gja5c4TCCjU/



Note: The word "**demonetization**" means YouTube decides which podcast videos can collect ad revenue (AdSense). It means YouTube believes that advertisers don't want to advertise their messages in certain podcast video content.

In the monetization "click-bait" scheme, each click by a public viewer produces an advertiser monetized micro-payment to the podcast creator (Defendant), as was the case for all videos discussed in the **SAC (Dkt. 88)**.

Thus "click-bait" imagery and titles lure viewers to "click" on the thumbnail or title "wrapper" so the Defendant can get paid. There is no other reason to provide luring thumbnails, titles and video descriptions (video "wrappers" as in a book cover and back-cover) except to entice viewers to click on the "wrapper".

The thumbnail wrapper is analogous to a book cover. As there is no relation between the thumbnail and the fictionalized drama (podcast) there is no legal protection afforded the Defendant. *Yasin v. Q-Boro Holdings, LLC*, No. 13259109, 2010 WL 1704889, at *2 (N.Y. Sup. Ct. Apr. 23, 2010) ("[T]he use of Yasin's image on the front cover of defendant's book is purely for marketing and trade purposes; solely as a means to attract customers and generate sales.").

The *Yasin* court appears to conflict with page **8 of the R&R**, "The fact that Defendant solicits visitors to his platforms to make payments in order to become "patrons" (see id.) does not establish that Defendant's use of Plaintiff's name and likeness in his podcasts and/or in the wrappers was for advertising purposes or for the purposes of trade." The *Yasin* court would disagree.

"Clicks" are directly proportional to micro- payments to the creator (Defendant) from YouTube, LLC. This precludes the need for the viewer to watch the video to establish commercial and

trade use of the Plaintiff's persona, name, picture within the podcast itself. These "click-bait wrappers" are intrinsically commercial in nature, as the mere click generates revenue for the Defendant.

It is the Plaintiff's name, likeness and persona in the wrapper thumbnails and titles (appearing in Google search results) that are used "purely for marketing and trade purposes, solely as a means to attract customers" (*Yasin* court).

In sum, the Defendant was receiving payments for "views" or "clicks" (*Yasin* court "book cover") from the public based solely on those viewers being lured to the content by video "wrappers". In fact, at the time (November 2018) docket entries **68, 69 and 71** were filed, Plaintiff had sent letters to the advertisers whose ad content appeared in a particularly cruel and gruesome video about the Plaintiff (see three (3) letters attached **EXHIBIT ONE**).

### III.   *Magistrate errs in application of so-called First Amendment privilege*

#### A.   False Commercial Speech Not Protected

False commercial speech has long been categorically excluded from the protective reach of the First Amendment. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 566 (1980) (holding that for commercial speech to be protected by the First Amendment, it "must . . . not be misleading").

As these CrowdSource The Truth fictionalized "dramas" are false commercial speech, they are afforded NO protection under AMEND. I, U.S. Const. To amplify:

> "From this line of reasoning, it is clear that while commercial speech is "protected" under the First Amendment from prior restraint, the protection afforded is less than that provided for noncommercial speech, **so that when commercial expression is false or misleading it is afforded no protection**

**whatsoever**".  See *Quinn v. Aetna Life and Cas. Co.,* 96 Misc.2d 545, 554
(Queens.Cty.Sup.Ct.1978); *Ohralik v. Ohio State Bar Ass'n,* 436 US 447, 456
(1978).
[emphasis added]

"False commercial speech, of course, serves no value in and of itself; indeed, it is reasonable to

believe that it can only be harmful to society and the individuals who populate it, in a variety of

ways. ... Moreover, false speech may unjustly injure the reputations of innocent individuals."

*Martin H. Redish and Kyle Voils, False Commercial Speech and the First Amendment:*

*Understanding the Implications of the Equivalency Principle*, 25 Wm. & Mary Bill Rts. J. 765

(2017).

As the U.S. Supreme Court held in *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,*

*Inc.,* 425 U.S. 748 (1976) "the First Amendment must in some instances protect false

noncommercial speech, <u>under no circumstances does it protect false commercial speech</u>."  425

U.S. 771–73 [emphasis added]

### B.  Flawed Analysis of Newsworthiness Privilege

Page 4 of the **R&R** offers a simplistic view of the "purposes of trade" versus the so-called

newsworthy privilege to NYCRL §§ 50, 51.  The newsworthiness privilege of NYCRL §§ 50, 51

allows the use of others' names and images in "newsworthy" discussions (under AMEND. I,

U.S. Const.) unless the use is "wholly unrelated" or "simply a disguised commercial

advertisement for the sale of goods or services."  *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir.

1989)

As the New York Court of Appeals has stated, commercial entities "may not unilaterally

neutralize or override the long-standing and significant statutory privacy protection by wrapping

its advertising message in the cloak of public interest, however commendable the educational

and informational value." *Beverly v. Choices Women's Med. Ctr., Inc.*, 587 N.E.2d 275, 279

(N.Y. 1991).

A representative example of the Defendant's so-called "public interest" fictionalized drama is

described in the **SAC** on page **57** (see below). As seen below, the monetized <u>CrowdSource The</u>

<u>Truth 2</u> content entitled "*Did Sweigert Hack the EVL BAT CAVE & Switch Pentagon Attack*

*Simulation to Live Fire?  David Hawkins*".



Note: Plaintiff's face appears under hoodie in the lower right of the thumbnail "wrapper" (*Yasin*

court "book cover"). Most of the discussion between Defendant and Hawkins centers around the

thumbnail collage created by the Defendant that pushes humilitainment.

The Defendant himself admits that this thumbnail wrapper is a "comedy", as recorded in the

podcast, and disseminated to thousands of viewers

(https://www.youtube.com/watch?v=kWJXzIqUcdg):

0:00:12  GOODMAN:  There is no more a persistent opponent than the individual (Plaintiff) listed in the graphic today, or should I say depicted, **uh, in this comedy interpretation** of a potential hack of the EVL BAT CAVE.  How did we come to this image David (Hawkins)?

0:00:33  HAWKINS:  Well, it is quite extraordinary – I mean, it is your image.  .. The one you have got put up (thumbnail) with your magnificent gift in putting what I call "collages" together.

0:02:14  HAWKINS:  Well you got the hooded figure and I understand that that is **Mr. David Sweigert** (Plaintiff).  Is that correct?

There is NO relationship between this fictionalized "concocted conspiracy theory" and the

Plaintiff.  **Z E R O**.

This is just one example of fictionalized drama designed to hurt the Plaintiff and amuse and

entertain the CrowdSource The Truth humilitainment audience with false commercial speech to

settle a score and personal grievance of the Defendant.

The Defendant's podcast is "*infected with material and substantial falsification and published

with knowledge of such falsification or with a reckless disregard for the truth,*" *Spahn v. Julian

Messner, Inc,* 21 N.Y. 2d 124 (1967).

The Court must now decide if the above example represents an article that is newsworthy and in

the public interest.

"In addition, sections 50 and 51 of the Civil Rights Law "do not apply to reports of newsworthy events" ( *Messenger,* 94 NY2d at 441), **and the issue whether an item is newsworthy is a question of law to be determined by the court** ( *see Freihofer v. Hearst Corp.,* 65 NY2d 135, 140-141; *Glickman v. Stern,* 19 Media L Rptr 1769, 1775-1776, *affd* 188 AD2d 387). Newsworthiness is to be broadly construed ( *see Messenger,* 94 NY2d at 441) and "liberally applied" ( *Finger,* 77 NY2d at 143)." [emphasis added]

*Walter v. NBC Television Network, Inc.,* 27 A.D.3d 1069, 1070, 811 N.Y.S.2d 521, 523 (4th Dept, 2006)

To be fair to both parties, the <u>Court has a duty</u> to conclude whether or not the Defendant's "concocted conspiracy theories" that are "outlandish" and "illogical and inconceivable" (**Dkt. 87, 140 and 175**) are newsworthy and of public interest.

"Speech is a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146 (1983).

<u>Courts determine whether speech is on a matter of public concern by examining the</u> "content, form, and context of a given statement, as revealed by the whole record". *Id. Connick,* 461 U.S at 147-48.

Relevant considerations include "whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis v. Cowen*, 165 F.3d 154, 162 (2d Cir. 1999).

Assuming *arguendo* that these podcasts qualify for the newsworthiness privilege the Defendant must demonstrate a real connection of the Plaintiff to these "concocted conspiracy theories". No such connection exists. **Z E R O.**

### C. No real connection of Plaintiff to "news dramas"

NYCRL §§ 50, 51 protects the Plaintiff if he "has no real relationship to the article, or unless the article is an advertisement in disguise." *Arrington v. New York Times Co.,* 55 N.Y.2d at 440 (quoting *Murray v. New York Mag. Co.*, 27 N.Y.2d406, 409 [1971]).

Dragging the Plaintiff's picture, name and persona into some fictionalized account of *"Did Sweigert Hack the EVL BAT CAVE & Switch Pentagon Attack Simulation to Live Fire?"* is not protected speech.

In order to be able to claim a newsworthiness or public interest exception, the person's name, picture, portrait or voice <u>must bear a real relationship to the subject matter</u> of the article, book, television segment, movie or scene.  This is because, by definition, if a person's image has no real relationship to the work then <u>its only purpose must be for the sale of the work.</u>

In *Thompson v. Close-Up, Inc.*, 277 AD 848 – NY: Appellate Div., 1st Dept. 1950, a publication of a photograph did not fall within exceptions to NYCRL §§ 50, 51 where plaintiffs had no connection to dope peddling, which was the subject of defendant's article.

> "A picture illustrating an article on a matter of public interest is not considered used for the purpose of trade or advertising within the prohibition of the statute **unless it has no real relationship to the article or** unless the article is an advertisement in disguise. It makes no difference whether the article appears in a newspaper, a magazine, a newsreel, on television, in a motion picture, or in a book. The test of permissible use is not the currency of the publication in which the picture appears but whether it is illustrative of a matter of legitimate public interest." [emphasis added]
>
> *Dallesandro v. Henry Holt & Co.,* 4 A.D.2d 470, 166 N.Y.S.2d 805

There must be a legitimate connection between the name, portrait, picture or voice and the publication.

> "Of course, **there must have existed a legitimate connection** between the use of plaintiff's name and picture and the matter of public interest sought to be portrayed ( *Murray v New York Mag. Co.*, <u>27 N.Y.2d 406</u>, *supra; Bass v Straight Arrow Publishers*, <u>59 A.D.2d 684</u>), and the plaintiff must not have been singled out merely because he was part of the over-all scene ( *Gautier v Pro-Football*, <u>304 N.Y. 354</u>, *supra*)." [emphasis added]

*Delan v. CBS, Inc.,* 91 A.D.2d 255 (2d Dept. 1983)

A person may not be singled out and unduly featured in a movie merely because she happens to

be on the scene when there's filming going on.  Thus, in *Blumenthal v. Picture Classics, Inc.,*

235 App. Div. 570 – 1932, the court granted an injunction where defendant produced and

distributed a short film about historical points, views and life in various parts of New York City,

showing a six second shot of a close-up full-sized picture of the plaintiff selling bread and rolls

to passersby on a street corner, without plaintiff's consent. Although the film itself was not

inherently a work of fiction, it was a violation to use plaintiff's picture in the movie without

consent, even though her trade brings her into public view.

**IV.**   ___Magistrate fails to consider the "serious questions" test, an alternative to the so-___
___called "irreparable harm test"___

### A.  Second Circuit's "serious questions" Test

The *serious questions* in this instant litigation have not been adequately addressed in the **R&R**

**(Dkt. 181)**.  By not addressing the *serious questions* test, the Plaintiff will continue to be harmed

by the Defendant's humilitainment and the Court will continue to bear the burden while these

underlying claims are resolved between the two parties.

In determining whether a preliminary injunction should be granted, the Second Circuit has

adopted the two-alternative-tests formula enunciated in *Sonesta Int'l Hotels Corp v. Wellington*

*Assoc.,* 483 F.2d 247 (2d Cir. 1973), so-called *"Sonesta test"*.   Citing (in relevant part):

> The settled rule is that a preliminary injunction should issue only upon a clear
> showing of either (1) probable success on the merits *and* possible irreparable
> injury, *or* (2) sufficiently serious questions going to the merits to make them a fair
> ground for litigation *and* a balance of hardships tipping decidedly toward the
> party requesting the preliminary relief. Gulf Western Industries, Inc. v. The Great
> Atlantic Pacific Tea Co., 476 F.2d 687, 692-693 (2d Cir. Mar. 12, 1973); Checker

Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).  [no emphasis added]

*Sonesta Int'l Hotels Corp v. Wellington Assoc.*, 483 F.2d 247 (2d Cir. 1973)

This formulation was repeated verbatim in a series of cases. See *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976); *New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 750 (2d Cir. 1977); etc.  See also *William H. Mulligan, Foreword—Preliminary Injunction in the Second* Circuit, 43 Brook. L. Rev. 831.

The magistrate should have applied the so-called "*serious questions standard*", which is an alternative to the "irreparable harm test".  Proving irreparable damage is not the central question before this Court.

The *serious questions* test, which permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction.  The benefit here is towards the Defendant's continued misappropriation of the Plaintiff's likeness, while the Plaintiff suffers long term career damage and loss of professional reputation.

In *Citigroup Global Mkts, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34-38 (2d Cir. 2010), the Second Circuit defended its continued practice of allowing the *serious questions* standard as a preliminary injunction test, as it is useful because the "*serious questions* going to the merits" option "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail

on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup*, 598 F.3d at 35.

Such a *serious questions* investigation should consider the totality of NYCRL §§ 50, 51, as it is often blended with the common law right to publicity and the common law right of privacy to create a statutory right of these two principles.

This approach is described in *Ali v. Playgirl* (cited below):

> "It must be noted, however, that the courts of New York do not regularly distinguish between the proprietary right of publicity, discussed *infra*, and the § 51 right of privacy. The latter has been characterized as establishing and limiting the right of a person "to be left alone" and protecting "the sentiments, thoughts and feelings of an individual . . . from [unwanted] commercial exploitation," *Flores v. Mosler Safe Co., supra*, 7 N.Y.2d at 280, 196 N.Y.S.2d at 977-78, 164 N.E.2d at 855, **but numerous cases blend the concepts together and expressly recognize a right of recovery under § 51 for violations of an individual's property interest in his likeness or reputation**." [emphasis added]

> "The nude portrait was clearly included in the magazine solely "**for purposes of trade e. g., merely to attract attention.**" *Grant v. Esquire, Inc.*, 367 F. Supp. 876, 881 (S.D.N.Y. 1973)." [emphasis added]

>                                                 *Ali v. Playgirl, Inc.*, 447 F. Supp. 723 (S.D.N.Y. 1978)

To amplify, the Second Circuit expressed that a "right of publicity" was embedded with NYCRL §§ 50, 51, cited in relevant part:

> "We think that, in addition to and independent of that right of privacy (which in New York derives from statute**), a man has a right in the publicity value of his photograph**, i.e., the right to grant the exclusive privilege of publishing his picture .... This right might be called a 'right of publicity.' For it is common knowledge that many prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likeness, would feel sorely deprived if they no longer received money for authorizing

advertisements, popularizing their countenances, displayed in newspapers, magazines, buses, trains and subways." [emphasis added]

*Haelan Laboratories v. Topps Chewing Gum,* 202 F.2d 866 (2d Cir. 1953)

The **R&R** (**Dkt. 181**) stops short and fails to consider the *serious questions* of this blending of the common law right to publicity and NYCRL §§ 50, 51 as it applies to the Plaintiff's situation. The fusion of the "common law right to publicity" and NYCRL 50, 51 indicates §§ 50, 51 is broader in scope to include the dilution of a Plaintiff's reputation (amongst other things). The **R&R** should have considered the broader scope of NYCRL §§ 50, 51.

### B. Irreparable Harm Need Not Be Demonstrated

As stated in *Onassis v. Christian Dior-New York.,* 472 N.Y.S.2d 254, 258 (NY.Sup.Ct. 1984) the Plaintiff has an absolute right to injunctive relief, regardless of "irreparable" damages:

> "Once the violation is established, the plaintiff may have an absolute right to injunction**, regardless of the relative damage to the parties**. ( *Blumenthal v Picture Classics,* 235 App. Div. 570, affd 261 N.Y. 504; *Loftus v Greenwich Lithographing Co.,* 192 App. Div. 251; *Durgom v Columbia Broadcasting Systems,* 29 Misc.2d 394, 395.) [emphasis added]"

*Onassis v. Christian Dior-New York.,* 472 N.Y.S.2d 254, 258 (NY.Sup.Ct. 1984)

### V.    *Magistrate does not understand the problem with postal mail delays*

As explained on the cover sheet of the **Dkt. 174** (signed 12/04/2020) motion papers, that document was placed in the U.S. Postal Service (U.S.P.S.) when it was believed that the original (mailed 11/29/2020) was lost. **Dkt. 174** was sent in an overabundance of caution as the U.S.P.S. tracking of the original motion papers had not been updated for 24 hours. Unfortunately, the U.S.P.S. delivered the "lost document" to the Pro Se intake office almost three weeks later,

where it was docketed as **Dkt. 178** (see below).  This created the impression of "repeated filings" and was an innocent error.  <u>However, this U.S.P.S. delay was outside the control of the Plaintiff</u>.

The Plaintiff's **Dkt. 174** attempted to lessen the burden upon the Court to decide a narrowly scoped matter as to podcast wrappers, avoiding analysis of the Defendant's video content itself. **See R&R footnote 6,** "The Court admonishes the Plaintiff to cease and desist from <u>repeatedly</u> filing amended documents." [emphasis added].



## CONCLUSION

This Court should consider an expansive view of NYCRL §§ 50, 51 to include the statutory rights created by same.  The Plaintiff asserts these rights include the right to publicity and the right to privacy.

The Defendant's fictionalized "dramas" masquerade as "advertisements in disguise" to allow the Defendant to humiliate the Plaintiff to settle scores of a personal grievance, hence "the constitutionalizing of grievances" by the Defendant.

The Defendant's misappropriation of the Plaintiff's likeness, persona, and name was used to increase "clicks" to the Defendant's podcasts. The Plaintiff had no relationship to the content of these fictionalized podcasts. Nevertheless, the Defendant was rewarded with monetized pecuniary benefits when members of the public "clicked" on the thumbnail bearing Plaintiff's likeness, or title with Plaintiff's name.

The act of "clicking" is the demarcation point for this discussion. Nothing further need to be analyzed expect the lure of the Plaintiff's name, likeness, and persona to cause the potential viewer to "click" on the "wrapper" (analogous to a book cover) to activate payment to the Defendant.

Meanwhile, it has been over two (2) years since the Plaintiff first sought Preliminary Injunctive Relief (**P.I.R.**) in the form of motions filed as Docket entries **68, 69 and 71**. When the Court failed to address these motions for ten (10) months it allowed a new level of smear attacks to be ushered onto the CrowdSource The Truth podcast platforms as inventoried in the Second Amend Complaint (**SAC**) (**Dkt. 88**), all to the detriment and injury of the Plaintiff. Meanwhile, the Defendant has flourished with his spewing of "public interest" "concocted conspiracy theories" for commercial humilitainment purposes.

The Plaintiff has no relationship to these "illogical and inconceivable" news dramas. **Z E R O.**

Signed this ___ day of January, 2021

*D. G. SWEIGERT, C/O*
*GENERAL DELIVERY*
*ROUGH AND READY, CA 95975*
*Spoliation-notice@mailbox.org*

# EXHIBIT ONE

I hereby certify that the materials included in this exhibit are true and accurate under penalties of

perjury.

Signed this ⁄ day of January 2021

*D. G. SWEIGERT, C/O*
*GENERAL DELIVERY*
*ROUGH AND READY, CA 95975*
*Spoliation-notice@mailbox.org*

**D. GEORGE SWEIGERT, C/O**
**P.O. BOX 152**
**MESA, AZ 85211**
**Spoliation-notice@mailbox.org**

**DECEMBER 4, 2018**

**Corporate Counsel**
**YOUTUBE, LLC**
**901 Cherry Ave**
**San Bruno, CA 94066**

**Corporate Counsel**
**YOUTUBE, LLC**
**251 Little Falls Drive**
**Wilmington, DE 19808**

REF:   (1)   **https://www.youtube.com/watch?v=qyg9YejHy0k**
      (2)   **California Civil Code 3344,** Use of Another's Name, Voice, Signature,
                Photograph, or Likeness in Advertising or Soliciting Without Prior Consent.

Ladies and Gentlemen:

As you are well aware, the YouTube channel known as "Crowdsource The Truth 2" (CSTT) has
disseminated, in a widely pervasive manner, a video (ref: (a)) which appears to be in violation of
California and New York state laws.  Your office has been previously warned on three (3)
separate occasions concerning this video and New York state law.  This letter addresses
California state law.

This is the Internet URL address of the offending video described herein:

      **https://www.youtube.com/watch?v=qyg9YejHy0k**  ,  **Crowdsource The Truth 2**

As you are well aware, ref (b) provides a private right of action for videos of this nature.
RedBubble.Com wisely complied with similar demand letters to have CSTT merchandising with
the undersigned's portrait removed from their marketing channel.  It is hoped that YouTube will
also find it prudent to have this video (The Trolls of Mount Shasta, CSTT) removed.

It would be prudent for your staff to review the guidelines of your corporation in light of the perverted content featured on the CSTT channel.

## Harassment and cyberbullying policy

We want you to use YouTube without fear of being subjected to malicious harassment. In cases where harassment crosses the line into a malicious attack it can be reported and will be removed. In other cases, users may be mildly annoying or petty and should simply be ignored.

Harassment may include :

- Abusive videos, comments, messages
- Revealing someone's personal information, including sensitive personally identifiable information such as social security numbers, passport numbers, or bank account numbers.
- Maliciously recording someone without their consent
- Deliberately posting content in order to humiliate someone
- Making hurtful and negative comments/videos about another person
- Unwanted sexualization, which encompasses sexual harassment or sexual bullying in any form
- Incitement to harass other users or creators

08:08  GOODMAN:   Now I don't want to speak about Dave's own brother having sex with his wife, which is disgusting.  I want to speak about how Dave is disgusting.

09:45  GOODMAN:   And now, this disgusting troll.  This wretch of a man.  This horrible potato adled [?] moron – David Sweigert    [cut to graphic, see below]



The Trolls of Mount Shasta
Crowdsource the Truth 2

10,334 views

Your prudent action to remove this video will prevent the unnecessary clogging of the courts with a private right of action to seek your compliance with this request.

As a courtesy to your staff, I am providing copies of this letter to one of the advertisers whose ads have appeared on this via through the monetization process.

Respectfully,

D. G. Sweigert

**Bradley J. Hoover**
**Chief Executive Officer**
**GRAMMARLY, INC.**
**548 Market Street  #35410**
**San Francisco, CA 94104**

**Mark Allen**
**Chief Executive Officer**
**General Catalyst**
**Two South Park Street**
**Suite 100**
**San Francisco, CA 94107**

**D. GEORGE SWEIGERT, C/O**
**P.O. BOX 152**
**MESA, AZ 85211**
**Spoliation-notice@mailbox.org**

**DECEMBER 6, 2018**

**General Counsel**
**YOUTUBE, LLC**
**901 Cherry Ave**
**San Bruno, CA 94066**

**Corporate Counsel**
**YOUTUBE, LLC**
**251 Little Falls Drive**
**Wilmington, DE 19808**

**REF:** **(1)**   **https://www.youtube.com/watch?v=qyg9YejHy0k**
         **(2)**   **New York General Business Law §§ 349 and 350**
         **(3)**   **New York Civil Rights Law §§ 50 – 51**
         **(4)**   **New York Penal Law § 135.60**
         **(5)**   **California Civil Code 3344, Use of Another's Name, Voice, Signature,**
                **Photograph, or Likeness in Advertising or Soliciting Without Prior Consent.**
         **(6)**   **Cal. Bus. & Prof. Code §§ 17200,** *et seq.*

Ladies and Gentlemen:

As you are well aware, the YouTube channel known as "Crowdsource The Truth 2" (CSTT) has
disseminated, in a widely pervasive manner, a video (ref: (1)) which is in violation of California
and New York state laws.  Your office has been previously warned on five (5) separate occasions
concerning this video and New York state law violations (ref: (2), (3), and (4)).  This letter
addresses California state law violations (see ref (5) and (6)) and is the second letter of this type.
Therefore, this letter memorializes adequate notification provided to YouTube, LLC.

This is the Internet URL address of the offending video described herein:

   **https://www.youtube.com/watch?v=qyg9YejHy0k** ,  **Crowdsource The Truth 2**

As you are well aware, ref (5) and (6) provides a private right of action for plaintiffs attacked in
videos of this nature.  RedBubble.Com has wisely complied with similar demand letters to have
CSTT merchandising with the undersigned's portrait removed from their marketing channel.
This perverted use of the undersigned's image was recognized by RedBubble.Com to be a
violation of New York state law.  It is hoped that YouTube will also find it wise to have this
video (The Trolls of Mount Shasta, CSTT) removed for the same reasons.

It would be prudent for your staff to review the guidelines of your corporation in light of the perverted content featured on the CSTT channel.

## Harassment and cyberbullying policy

We want you to use YouTube without fear of being subjected to malicious harassment. In cases where harassment crosses the line into a malicious attack it can be reported and will be removed. In other cases, users may be mildly annoying or petty and should simply be ignored.

Harassment may include :

- Abusive videos, comments, messages
- Revealing someone's personal information, including sensitive personally identifiable information such as social security numbers, passport numbers, or bank account numbers.
- Maliciously recording someone without their consent
- Deliberately posting content in order to humiliate someone
- Making hurtful and negative comments/videos about another person
- Unwanted sexualization, which encompasses sexual harassment or sexual bullying in any form
- Incitement to harass other users or creators

Offending remarks in the video (small sampling).

08:08  GOODMAN:   Now I don't want to speak about Dave's own brother having sex with his wife, which is disgusting.  **I want to speak about how Dave is disgusting.**

09:45  GOODMAN:   And now, this disgusting troll.  **This wretch of a man.**  This horrible potato adled [?] moron – David Sweigert    [cut to graphic, see below]



The Trolls of Mount Shasta
Crowdsource the Truth 2

10,334 views

Your prudent action to remove this video will prevent the filing of a second lawsuit (one is presently pending in the USDC for the SDNY). A second (California) lawsuit would list YouTube, LLC as a defendant. Such a lawsuit would only add to the unnecessary clogging of the courts with a private right of action lawsuit to seek your compliance with state law. As you are well aware, the undersigned must demonstrate that all reasonable efforts were taken to obtain YouTube, LLC's compliance with the laws of New York and California.

As a courtesy to your staff, copies of this letter are hereby provided to one of the advertisers whose ads have appeared on this video production via through the monetization process. This advertiser is underwriting the CSTT confederation, which is nothing more than a political digital lynch operation and is the defendant in a racketeering lawsuit in New York.

Such underwriting can be a thorny issue for advertisers like CHOC Children's Hospital, as they are a non-profit institution. The Internal Revenue Service 501(c)(3) rule prevents funding of political causes and political operatives by such organizations. This would be an embarrassing issue for CHOC Children's to explain if this matter reaches fruition of a private right of action lawsuit.

The undersigned would be compelled to present this letter to the individual judges (in New York and California) to demonstrate that reasonable efforts were taken to have YouTube, LLC comply with the relevant laws in question.


Respectfully,


D. G. Sweigert


Copies provided:


[The Magic Snow Globe]

**General Counsel**
**CHOC Children's**
**1201 West La Veta Avenue**
**Orange, CA 92868**

**General Counsel**
**Government Relations Office**
**American Honda Motor Company, Inc.**
**10001 G Street, NW**
**Washington, D.C. 20001**

D. GEORGE SWEIGERT, C/O
P.O. BOX 152
MESA, AZ 85211
Spoliation-notice@mailbox.org

DECEMBER 6, 2018

Corporate Counsel
YOUTUBE, LLC
901 Cherry Ave
San Bruno, CA 94066

Corporate Counsel
YOUTUBE, LLC
251 Little Falls Drive
Wilmington, DE 19808

REF:   (1)   **https://www.youtube.com/watch?v=qyg9YejHy0k**
       (2)   **California Civil Code 3344,** Use of Another's Name, Voice, Signature, Photograph, or Likeness in Advertising or Soliciting Without Prior Consent.
       (3)   **Cal. Bus. & Prof. Code §§ 17200, *et seq.***

Ladies and Gentlemen:

As you are well aware, the YouTube channel known as "Crowdsource The Truth 2" (CSTT) has disseminated, in a widely pervasive manner, a video (ref: (1)) which appears to be in violation of California and New York state laws.  Your office has been previously warned on four (4) separate occasions concerning this video and New York state law.  This letter addresses California state law (see ref (2) and (3)).

This is the Internet URL address of the offending video described herein:

**https://www.youtube.com/watch?v=qyg9YejHy0k**  ,  **Crowdsource The Truth 2**

As you are well aware, ref (b) provides a private right of action for videos of this nature. RedBubble.Com wisely complied with similar demand letters to have CSTT merchandising with the undersigned's portrait removed from their marketing channel.  It is hoped that YouTube will also find it wise to have this video (The Trolls of Mount Shasta, CSTT) removed.

It would be prudent for your staff to review the guidelines of your corporation in light of the perverted content featured on the CSTT channel.

# Harassment and cyberbullying policy

We want you to use YouTube without fear of being subjected to malicious harassment. In cases where harassment crosses the line into a malicious attack it can be reported and will be removed. In other cases, users may be mildly annoying or petty and should simply be ignored.

Harassment may include :

- Abusive videos, comments, messages
- Revealing someone's personal information, including sensitive personally identifiable information such as social security numbers, passport numbers, or bank account numbers.
- Maliciously recording someone without their consent
- Deliberately posting content in order to humiliate someone
- Making hurtful and negative comments/videos about another person
- Unwanted sexualization, which encompasses sexual harassment or sexual bullying in any form 
- Incitement to harass other users or creators

08:08  GOODMAN:  Now I don't want to speak about Dave's own brother having sex with his wife, which is disgusting.  I want to speak about how Dave is disgusting.

09:45  GOODMAN:  And now, this disgusting troll.  This wretch of a man.  This horrible potato adled [?] moron – David Sweigert   [cut to graphic, see below]



Your prudent action to remove this video will prevent the unnecessary clogging of the courts with a private right of action to seek your compliance with this request.

As a courtesy to your staff, I am providing copies of this letter to one of the advertisers whose ads have appeared on this video production via through the monetization process.

This letter will be presented to the individual judges in upcoming and on-going federal lawsuits to demonstrate that reasonable efforts were taken to have YouTube comply with the relevant laws in question.


Respectfully,


D. G. Sweigert


**Patrick-Grossman-Kavanagh**
**President and Manager**
**RobinHood Crypto, LLC**
**85 Willow Road**
**Menlo Park, CA 94025**


**RobinHood Cypto, LLC**

**GA LICENSE# 61417**


**Rod Carnes, CFE**
**Department of Banking and Finance**
**State of Georgia**
**2990 Brandywine Road, Suite 200**
**Atlanta, GA 30341**

## CERTIFICATE OF SERVICE

I HEREBY ATTEST that a true copy of the attached pleadings has been sent to the

following addressees on the ___ day of January 2021 via prepaid First Class U.S. Mail.  So

sworn under oath.

> Jason Goodman, CEO
> Multimedia Systems Design, Inc.
> 252 7th Avenue, Apart. #6S
> New York, NY 10001
>
> PRO SE OFFICE, #200
> U.S. District Court
> 500 Pearl Street
> New York, New York 10007-1312

*D. G. SWEIGERT, C/O*
*GENERAL DELIVERY*
*ROUGH AND READY, CA 95975*
*Spoliation-notice@mailbox.org*

24



USPS TRACKING NUMBER

9505 5067 1486 1002 3917 65



**PRIORITY®**
**MAIL**

FROM:

> *D. G. SWEIGERT, C/O*
> *GENERAL DELIVERY*
> *ROUGH AND READY, CA 95975*
> *Spoliation-notice@mailbox.org*

■ Date of delivery specified*
■ USPS TRACKING™ included to many major
   international destinations.
■ Limited international insurance.
■ Pick up available.*
■ Order supplies online.*
■ When used internationally, a customs
   declaration label may be required.
   * Domestic only

*PRO SE #200*

TO:

**PRO SE OFFICE, Room 200**
**U.S. District Court**
**500 Pearl Street**
**New York, New York 10007-1312**

To schedule free
Package Pickup,
scan the QR code.



USPS.COM/PICKUP

*10007*

P S 0 0 0 0 1 0 0 0 0 1 4   EP14F Oct 2018
OD: 12 1/2 x 9 1/2

This envelope is made from post-consumer waste. Please recycle again.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; October 2018; All rights reserved.

* Domestic only.   ✕ For Domestic shipments, the maximum weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.