IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| D. GEORGE SWEIGERT | Case No.: 1:18-cv-08653-VEC-SDA |
|---|---|
| Plaintiff, | |
| vs. | **DEFENDANT'S ANSWER TO SUPPLIMENTED SECOND AMENDED COMPLAINT** |
| JASON GOODMAN, | |
| Defendant | |

Defendant Jason Goodman Pro Se respectfully for his answer, alleges as follows on personal knowledge as to matters relating to them, and on information and belief as to all other matters.

I hereby attest that the pleadings herein are accurate and true under penalties of perjury. Further, I hereby attest that the attached exhibits are accurate and true copies of source documents as described.

Respectfully submitted

January 28, 2021

_____

Jason Goodman, Defendant, Pro Se
252 7th Avenue Apt 6s
New York, NY 10001
(323) 744-7594
truth@crowdsourcethetruth.org

DEFENDANT'S ANSWER TO SUPPLEMENTED SECOND AMENDED COMPLAINT - 1

## ANSWER TO SUPPLEMENTED SECOND AMENDED COMPLAINT

1. The allegations of Paragraph 1 are partially admitted and partially denied. Defendant admits to being a resident of New York and to operating social media accounts under the name Crowdsource the Truth. However, persistent extrajudicial actions undertaken by the Plaintiff have resulted in the termination of several of Defendant's social media accounts. Specifically, Goodman's access to Facebook and all previous contents, images, video, messages, comments including other social media accounts linked to Facebook such as Instagram, Oculus and others have been terminated. Goodman's appeals to restore the social media accounts have been denied. Goodman prays the court will find Plaintiff's ongoing extra judicial activities constitute deliberate outside interference in this instant legal matter. Plaintiff's actions have effectively destroyed elements of evidence that are in part the focus of interest in this legal action. This effort serves to supersede the role of the court in deciding the outcome in these controversies and has delivered the Plaintiff partial, instant relief for claims he has yet to prove. Goodman hopes the court will find Plaintiff in contempt, in part for his actions to deliberately cause third parties to destroy relevant evidence that could be used against him. Goodman's Twitter linked video account on Periscope has also been terminated along with third party comments and other relevant evidence. In addition to his excessive filings in this matter, Plaintiff has engaged in a similarly energetic effort to file a litany of complaints and engage in additional activities including publication of false and defamatory allegations as previously plead. Plaintiff has also continued his persistent harassment of Defendant's service providers including Patreon and their legal representatives. On January 10, 2021 Plaintiff sent an email to Colin Sullivan, inside counsel for Patreon as well as numerous government officials and members of the

press including CNN and CBS news falsely alleging that Defendant "acted as an outside agitator at the recent breach of the U.S. Capitol". This email included a "Draft Complaint" connected to a threatened new action in United States District Court Northern District Oakland which at the time of this writing remains unfiled. **(EXHIBIT A)** The complaint has not been filed and therefore the Plaintiff should not enjoy immunity from the defamatory claims stated therein. In today's unprecedented "cancel culture" driven frenzy we hear daily news reports about people losing their jobs, their reputations or being treated as guilty due to mere accusations. Plaintiff's objective is clear. These extrajudicial efforts aim to force the very relief he seeks in this legal action. Plaintiff is determined to destroy Defendant's ability to conduct business by any means available to him, effectively attempting to sidestep any potential judgment of this court.

2.   The allegations in Paragraph 2 are denied. Goodman is actually being sued because the Plaintiff is a malicious and vexatious litigant working to suppress Defendant's first amendment rights and to destroy his business, reputation and ability to earn money. Defendant lacks sufficient knowledge to admit or deny musculoskeletal damage, but Plaintiff's own public statements reveal a family history of medically diagnosed severe mental illness and indicate the Plaintiff could pose a threat to himself, those around him and members of the general public including the Defendant.

3.   The allegations in Paragraph 3 are denied. Defendant has never knowingly made a false statement of fact in any broadcast on Crowdsource the Truth. The statement "continuous non-stop weekly broadcasts" as it pertains to the Plaintiff is absolutely false. Goodman has produced over two thousand five hundred videos under the brand name

DEFENDANT'S ANSWER TO SUPPLEMENTED SECOND AMENDED COMPLAINT - 3

Crowdsource the Truth since its inception in 2016.  As many as seven to ten broadcasts are produced each week.  Only a small number of these videos even mention the Plaintiff let alone feature him, his likeness or any information related to him.  This is demonstrated by the small number of video examples offered in Plaintiff's numerous filings.  It is materially misleading to refer to the isolated selection of videos pertaining to Plaintiff as "continuous non-stop weekly" broadcasts.  Defendant would like to call the court's attention to Plaintiff's frequent reference to Steele v Goodman, a similarly vexatious and frivolous lawsuit brought against Defendant by a close associate of Plaintiff's brother, Robert David Steele.  The court may recall Plaintiff has been denied repeated attempts to intervene in Steele v Goodman. Defendant restates his allegation that Plaintiff has collaborated directly or indirectly with third parties to facilitate additional lawsuits against Defendant, including Steele v Goodman which was dismissed in September 2020.

4.   Defendant admits that Plaintiff relies on his claims but denies the validity of Plaintiff's claims.  Additionally, with regard to financial damages, Plaintiff has offered no evidence of actual financial injury, only conclusory statements of expected or estimated financial injury which are contradicted by his own public claims of being retired and receiving Military and or other financial benefits leaving him with ample time to do nothing more than sue the Defendant and waste valuable public resources including those of this honorable court.

5.   The allegations of Paragraph 1 are partially admitted to and partially denied. Defendant admits he is a limited purpose public figure as a result of his broadcasts on YouTube and other social media channels.  Goodman admits that these broadcasts have been

viewed by hundreds of thousands of viewers around the world and that he maintains his primary business address in New York City. Goodman admits that he is being sued by Plaintiff, however he denies making any false defamatory, slanderous or libelous statements targeted to destroy the Plaintiff's career, profession or trade. Ironically, this is what the Plaintiff has repeatedly and consistently attempted to do to Defendant.

6.    The allegations in paragraph 6 are denied.

7.    The allegations in paragraph 7 are partially admitted to and partially denied. Goodman admits to being the CEO of Multimedia System Design, Inc. and admits the corporate entity owns the Trademark Crowdsource the Truth. This trademark was sought after agents and / or associates of the Plaintiff attempted to create hoax web pages using the Tradename Crowdsource the Truth. Specifically, Manuel Chavez III posted a Linkedin.com profile page (since removed) using Crowdsource the Truth graphics and claiming he had been hired by Crowdsource the Truth. After this hoax was perpetrated, Goodman sought a trademark for the brand name.

8.    The allegations in paragraph 8 are partially admitted and partially denied. Defendant denies the designation "alt-right". This term has no legal or technical definition but is an internet born colloquialism frequently used to describe supporters of Nazism, white supremacy and the malicious online movement Q-anon among other objectionable things. As a person of Jewish descent with relatives who specifically fled Europe during the rise of Nazism, Defendant takes personal offense at this grotesque false statement from Plaintiff. Goodman is not alt-right, has never supported Nazism, white supremacy or Q-anon and specifically denounces and rejects each of these movements and political ideologies. This is

yet another example of the Plaintiff falsely ascribing statements or attributes to Defendant in his persistent malicious effort to destroy Defendant's reputation and attempt to prejudice this court. Defendant denies being an all-purpose public figure, this designation is generally reserved for people who are world renowned such as Presidents, royalty or international celebrities. Defendant further denies disseminating any malicious defamatory, slanderous or libelous material at any time. Defendant admits to operating the enumerated social media accounts with the exception of Facebook and its related entities (Instagram, etc). Goodman's Facebook and related accounts were terminated on or around October 2020. Based on his ongoing malicious activities, Defendant suspects this termination was motivated by complaints and or false allegations from Plaintiff. Facebook has offered no specific details as to why this account was terminated and no opportunity for appeal. In a post on his SDNY.info blog, Plaintiff created a fraudulent headline claiming to expose a link between Defendant Goodman and Q-anon despite the fact that no such link exists. **(EXHIBIT B).** There is not and has never been a link between Q anon and the Defendant, but with almost clairvoyant prescience, the Plaintiff has attempted to create connections between Defendant and this toxic hoax that now costs people their reputations and even their freedom. The coincidental nature of Plaintiff's actions should not be ignored.

9. The allegations in paragraph 9 are denied. Defendant has never knowingly made a false statement, has never knowingly deceived his audience or engaged in fraud. Defendant specifically denies the claim of disseminating false narratives and reminds the court that this description in fact matches Plaintiff's ongoing behavior.

DEFENDANT'S ANSWER TO SUPPLIMENTED SECOND AMENDED COMPLAINT - 6

10. The allegations in paragraph 10 are denied.  This is further description of Plaintiff's own actions.  Plaintiff even references the hoax activities in the port of Charleston in which his brother played the key role.  Attached **(EXHIBIT C)** is a publicly released, redacted version of an FBI official report into the events of June 14, 2017 at the Port of Charleston.  The report goes into extensive detail about Plaintiff's brother George Webb Sweigert and his arrest in Zanesville Ohio subsequent to the event.  The report discusses the YouTube broadcast in question, but it does not mention Goodman because the FBI knows as Defendant has stated, Goodman did nothing wrong and acted only in good faith out of an abundance of caution.  The publication referenced by Plaintiff is a self-published book authored by Plaintiff with the specific intent of misrepresenting facts in the Port of Charleston matter.

11. The allegations in paragraph 11 are denied.  The subscription numbers and dollar amounts have been fabricated by Plaintiff with no actual source information beyond his own guess.  No donations are made to Crowdsource the Truth, this wording implies a charitable gift.  Defendant sells sponsorships directly to viewers much as traditional news programs sell sponsorships to corporate advertisers.  By foregoing corporate advertising, Defendant has upended traditional broadcasting business models and has enjoyed success with direct audience sponsorship.  These are sales, not donations.  These funds allow Goodman to operate his business which consists of producing and broadcasting news, information, opinion-based analysis and entertainment in a similar fashion to traditional news broadcasters.  Defendant again calls the court's attention to Plaintiff's reliance on his own hoax activities (Port of Charleston) to disparage Defendant.  Whether Plaintiff planned this hoax, or opportunistically seized on it is irrelevant in this context.  Plaintiff perpetuates and

uses the hoax to write a book and in the furtherance of his efforts to destroy Defendant's reputation.

12. Defendant lacks sufficient information to admit or deny claims pertaining to the specific credentials of the Plaintiff, however many of his public statements contradict the claims of paragraph 12. Specifically, Plaintiff is not a private individual in the context of this controversy, he is also a YouTube broadcaster, an attribute Plaintiff uses to claim Defendant IS a public figure. It stands to reason if YouTube broadcasting makes Goodman a public figure, it should do the same for Sweigert. Furthermore, Plaintiff is or at one time was a professional actor who has appeared in movies and TV shows including Alex Jones InfoWars. These activities would qualify Plaintiff as a limited purpose public figure in the same way they would Defendant. Plaintiff is also an author and would be considered a limited purpose public figure with regard to matters pertaining to ethical hacking and other subjects he has published books on, including the bomb hoax incident in the Port of Charleston. It is noteworthy to observe Plaintiff's books are self-published. Interestingly, his ethical hacking book is out of print, while his Port of Charleston book is readily available. Defendant denies the claim that Plaintiff's brother was ever his "roommate" or "business partner". Webb was a house guest for a very limited period of time and participated in a limited number of YouTube and other broadcasts with Defendant voluntarily. No official relationship ever existed in the manner described by Plaintiff. Webb was never employed by Goodman. Webb did not participate in any legally binding agreements with Goodman. Webb was never Goodman's roommate. Webb was never Goodman's business partner. These claims are further supported by Webb's testimony to FBI agents after his incarceration in Zanesville Ohio, where he makes no claims whatsoever in support of these allegations.

Webb told the FBI specifically that he was employed by and working for US News Corp (sic).  Goodman is aware that U.S. News Corps is a fictitious entity and not an actual business or organization. On several occasions, Goodman observed that Webb would use this claim to fool people into thinking he was a legitimate news reporter.  It is noteworthy but not surprising that Webb appears to have lied to FBI agents in the course of their investigation.

13. The allegations in paragraph 13 are denied.  Defendant lacks sufficient knowledge to confirm or deny Plaintiff's status as an Emergency Medical Technician however he has provided no evidence of any such employment at present or historically and merely repeats his claim.

14. The allegations in paragraph 14 are denied as an outright lie.  Defendant asks that Plaintiff be held in contempt of court for the deliberate and willful misrepresentation of facts. Defendant could not possibly have behaved in the way Plaintiff describes because he was not aware of Plaintiff at all until Plaintiff began making public video threats against Defendant. These threats were brought to Goodman's attention via unsolicited emails from unknown viewers of Goodman's program.

15. Defendant lacks sufficient knowledge to admit or deny the allegations in paragraph 15.

16. Defendant denies allegations of "attacks" and lacks sufficient knowledge to admit or deny the other claims of paragraph 16.

17. Defendant lacks sufficient knowledge to admit or deny the claims of paragraph 17.  Based on information and belief, Defendant accepted the statements by Webb about his

own brother as true.  To the best of Defendant's recollection, no evidence to disprove the veracity of the statements has been presented.

18. Defendant lacks sufficient knowledge to admit or deny the claims of paragraph 18.

19. Defendant denies accusing Plaintiff of using his knowledge of PKI to arrange for the death of New York fire fighters, U.S. military personnel, and other innocents using his "hacking" skills to breach network security and commit criminal activity while destroying "evidence".  Although there is ample evidence of Plaintiff destroying evidence, the editorialized approximate statements referenced in paragraph 19 were made by a third party and in a speculative manner, acknowledging that activities of any hacker COULD result in unanticipated consequences.  Defendant lacks sufficient knowledge of Plaintiff's alleged membership in any Bar Association or other associations to admit or deny.

20. Defendant denies the allegations in paragraph 20 which are themselves ridiculous on their face.  Defendant has virtually no knowledge of or information about the Federal Bridge, except for information brought to him by third-party participants in his broadcasts. David Hawkins, mentioned extensively in Plaintiff's pleadings, is another voluntary participant in Goodman's broadcasts.  Hawkins is not employed by Goodman and receives no compensation from Goodman for his appearance on the show.  Hawkins participates voluntarily and is solely responsible for his own views, opinions and statements.  As Goodman understands it, the Federal Bridge is a computer network, not dissimilar to the internet itself in concept, interconnecting other computer networks.  Defendant rejects the notion that criticism or commentary about potential security lapses in a computer network

could reasonably be construed as an attack on the Plaintiff even if such statements had been made by the Defendant.

21. Defendant denies the allegations in paragraph 21.  Goodman is free to review, criticize and even condemn public works by authors should his opinion or observations differ from that of the author.  Nothing stated by Goodman was an "attack" as characterized by Plaintiff.

22. Defendant denies the claims in paragraph 22.  Sweigert's CV was published online, press releases and other public documents revealed his previous employment.  Entrust is one of the entities on the Federal Bridge.  Sweigert's aggressive, years long efforts to destroy Goodman's ability to broadcast, viewed in juxtaposition with investigations into computer networks that involved Sweigert's former employer is suggestive that Goodman's reports may contain information unfavorable to Sweigert.  These matters became topics of discussion merely due to Sweigert's persistent interest in Goodman's activities and herculean efforts to halt them.  Given Swiegert was totally unknown to Goodman prior to broadcasting on YouTube, the very fact that Sweigert had the level of interest that he does in these broadcasts became a topic of interest in and of itself.

23. Defendant partially denies and partially admits the allegations in paragraph 23. Defendant admits there were two active Federal Lawsuits against Goodman at the time of the filling.  Goodman alleges these were both brought about in a coordinated effort to destroy him financially.  Steele v Goodman (Case 3:17-cv-00601-MHL) was dismissed on September 25, 2020.  Sweigert made numerous attempts to intervene in Steele v Goodman all of which were denied.  In defiance of the Honorable M. Hannah Lauck's oral statements in

the final hearing, Steele v Goodman was refiled in a different division of Virgina's District court on September 28, 2020.  Sweigert sought leave of the court to intervene in that matter and was denied on November 5, 2020. **(EXHIBIT D)** It is also noteworthy that Sweigert's brother Webb introduced Goodman to Robert David Steele, Plaintiff in Steele v Goodman. The coordinated effort alleged by Plaintiff in paragraph 23 was coordinated AGAINST Goodman, not by Goodman.  Defendant denies unauthorized use of likeness.

24. Defendant denies the allegations in paragraph 24

25. Defendant denies the allegations in paragraph 25

26. Defendant denies the allegations in paragraph 26.  References to mental illness, PTSD or other loathsome characteristics have been based on information and belief learned from watching Plaintiff's own broadcasts in which he admits these things himself.  These opinions or statements are otherwise provided by or based on things said by family members or close associates including Plaintiff's brothers.  Defendant has no reason to believe these individuals made false statements with regard to specific claims.

27. Defendant denies the allegations in paragraph 27.

28. Defendant denies attempts to "mentally trigger" Plaintiff and lacks sufficient knowledge to admit or deny the remaining claims of paragraph 28.

69.     Defendant denies the allegations in paragraph 69.

70.     Defendant denies the allegations in paragraph 70.

DEFENDANT'S ANSWER TO SUPPLIMENTED SECOND AMENDED COMPLAINT - 12

71.     Defendant denies the allegations in paragraph 71.

72.     The allegations in paragraph 72 pertain to statements made by Hawkins. Defendant is described as laughing at the statement which cannot in and of itself be construed as inherently libelous or slanderous.  Hawkins is not named as a party in this suit.  Goodman denies responsibility for statements made by third party participants on Crowdsource the Truth and is specifically protected from civil actions based on such statements pursuant to 47 USC § 230.

73.     Defendant denies the allegations in paragraph 73.

74.     Defendant admits to making the statement in paragraph 74.

75.     Paragraph 75 pertains to a statement made by Hawkins, Defendant denies responsibility for statements made by third parties pursuant to 47 USC § 230.

76.     Defendant denies the use of any "smear technique" as characterized in paragraph 76.

77.     Defendant admits to making the statement in paragraph 77.

78.     Defendant admits to making the statements in paragraph 78 in which he speculates about a hypothetical situation in which Plaintiff might have been employed as an ethical hacker.

79.     Defendant denies responsibility for statements of opinion made by third parties pursuant to 47 USC § 230.

DEFENDANT'S ANSWER TO SUPPLIMENTED SECOND AMENDED COMPLAINT - 13

80.     Defendant denies responsibility for statements of opinion made by third parties pursuant to 47 USC § 230.

81.     Defendant denies the allegations in paragraph 81

82.     Defendant lacks sufficient knowledge to admit or deny the allegations in paragraph 82.

83.     To the best of Defendant's understanding, paragraph 83 pertains solely to statements and internet posts made by Hawkins.  Defendant denies responsibility for actions of third parties pursuant to 47 USC § 230 and common sense.  Goodman denies responsibility for the actions of Hawkins.  Goodman denies allegations of prescripted broadcast.

84.     Defendant does not understand the allegations as stated in paragraph 84 and cannot admit or deny.

85.     Defendant denies responsibility for statements made by third parties pursuant to 47 USC § 230.

86.     Defendant denies the allegations of paragraph 86.

87.     Defendant denies the allegations of paragraph 87.

88.     Defendant admits that Plaintiff repeats his allegations.

89.     Defendant admits the described broadcasts originated from New York.

DEFENDANT'S ANSWER TO SUPPLIMENTED SECOND AMENDED COMPLAINT - 14

90.     Defendant denies the allegations of paragraph 90.

91.     Defendant admits to having incorporated political cartoons into items that were offered for sale on Redbubble.com.  The newsworthiness is determined by the content of the broadcasts and the photorealistic digitally created political cartoons are elements of the news broadcasts.  The political cartoons are a fair use of Plaintiff's likeness pursuant to the newsworthiness exception.  The transformative nature of the use of portions of Plaintiff's likeness is allowed and the newly resultant image is the intellectual property of the Defendant who is free to commercialize it as he sees fit.  It is worth mentioning, on or about November 28, 2018 possibly due to his dissatisfaction with this court's ability to resolve this dispute in his favor, Sweigert took the extrajudicial step of misrepresenting facts in a complaint made with Redbubble.com.  The artwork in question was removed by Redbubble.com perhaps due to their desire to avoid entanglement in legal action as threatened by Sweigert.  Despite the unresolved legal dispute, Goodman sent a counterclaim to Redbubble.com (**EXHIBIT E**) which was denied.  Sweigert has demonstrated a pattern and practice of seeking extrajudicial relief for the precise matters at controversy in this legal action.  In doing this, Plaintiff brazenly defies this honorable court's authority to resolve this dispute in the interest of justice.

92.     Defendant denies the allegations of paragraph 92.

93.     Defendant admits that Sweigert has not given written permission to use his likeness, but this is irrelevant pursuant to the broad newsworthiness exception in NYCRL § 51.

DEFENDANT'S ANSWER TO SUPPLIMENTED SECOND AMENDED COMPLAINT - 15

94.     Defendant lacks sufficient knowledge to admit or deny the claim in paragraph 94.

95.     Defendant admits that the newsworthiness of Plaintiff's actions allows the use of his name and likeness in broadcasts about those actions without his written consent. Artwork or other content created for news broadcasts including images and commentary pertaining to the broadcasts are the intellectual property of the Defendant to do with as he chooses.

96.     Defendant denies creating a playlist called "Jason Goodman & David Hawkins" as described in paragraph 96.  The examples provided by Plaintiff show the playlist bears the name "Bella Meya" this is an entity unknown to Defendant but presumed to be a YouTube viewer.  Defendant denies responsibility for the actions of unknown third parties.

97.     Defendant denies the allegations of paragraph 97.

98.     Defendant denies the allegations of paragraph 98, any use of Plaintiff's name or likeness is a fair use and newsworthy based on Plaintiff's actions in the public domain, including his ongoing abuse of the civil justice system.

99.     Defendant denies the allegations of paragraph 99.

100.     Defendant denies the allegations of paragraph 100 and specifically cites this allegation as absurd.  It is obvious to any reasonable observer that content containing reference to or likenesses of the Plaintiff makes up only a small fraction of the total library of content created by Defendant making this allegation implausible on its face.

DEFENDANT'S ANSWER TO SUPPLIMENTED SECOND AMENDED COMPLAINT - 16

101.    Defendant denies the allegations of paragraph 101 as being additionally absurd for the same reasons as 100.

102.    Defendant denies the allegations of paragraph 102.  Images used on Redbubble were the rightful intellectual property of Defendant, have been removed more than two years ago after a total of six sales resulting in less than $20 in profit. **(EXHIBIT F)**

103.    Defendant denies the allegations of paragraph 103 but would like to bring the court's attention to Plaintiff's mention of Periscope here in this paragraph, notably absent from other mentions.  This account was recently terminated, on information and believe Defendant alleges this was a result of extrajudicial activity by Plaintiff.  Periscope has refused to provide any details or entertain any appeal to this action.

104.    Defendant partially admits and partially denies the allegations of paragraph 104.  Plaintiff is not used for advertising, his image and likeness were used in stories where his activities are deemed newsworthy such as abuse of the civil justice system and public dissemination of lies about the Defendant, including incitements to violence against Defendant as previously plead.

105.    Defendant lacks sufficient knowledge to admit or deny the allegations in paragraph 105.

106.    Defendant denies the allegations of paragraph 106.

107.    Defendant denies the allegations of paragraph 107.

DEFENDANT'S ANSWER TO SUPPLIMENTED SECOND AMENDED COMPLAINT - 17

108.    Defendant lacks sufficient knowledge to admit or deny allegations in paragraph 108 but draws the court's attention to Plaintiff's reference to "both defendants".  Plaintiff clearly recognizes that Hawkins is an entity separate from Goodman, and imagines him to be a Defendant however only one Defendant is named in this action and it is not Hawkins.

109.    Defendant denies the allegations of paragraph 109.

110.    Defendant denies the allegations of paragraph 110.

123.    Defendant lacks sufficient knowledge to admit or deny the allegations in paragraph 123 and Plaintiff has failed to provide any evidence of alleged damages.

125.    Defendant lacks sufficient knowledge to admit or deny the allegations in paragraph 123 and Plaintiff has failed to provide any evidence of alleged damages.

126.    Defendant denies the allegations in paragraph 126.

127.    Defendant denies the allegations in paragraph 127.

128.    Defendant denies the allegations in paragraph 128.

129.    Defendant lacks sufficient knowledge to admit or deny the allegations in paragraph 129 and asks the court to take notice that Plaintiff has repeatedly failed to provide any evidence of alleged injuries.

130.    Defendant lacks sufficient knowledge to admit or deny the allegations in paragraph 130 and has no recollection of uttering the specific quoted statement.  No

reference to the origin of the alleged quote is provided by Plaintiff.  Plaintiff made numerous broadcasts in which he described himself as an "apathetic CIA troll" or similar language to the best of Defendant's recollection.  This was understood by Defendant to be an admission by Plaintiff of his affiliation with the CIA as ridiculous as it would seem.

131.    The allegations in paragraph 131 lack sufficient specificity for Defendant to admit or deny.

132.    Defendant admits that Plaintiff denies his own allegations of paragraph 131.

133.    Defendant lacks sufficient knowledge to admit or deny the allegations in paragraph 133.

### ANSWERS TO SUPPLIMENTAL COMPLAINT

1.  Defendant denies that Plaintiff's complaint provides a factual background. The majority of it is pure fabrication.

39. Defendant denies the allegations in paragraph 39.

40. Defendant denies the allegations in paragraph 40.

41. Defendant denies the allegations in paragraph 41.  Defendant would like to advise the court that each of the referenced tweets were made in response to Plaintiff's unmotivated publication of false statements about Defendant on his SDNY.info blog similar to false statements from that blog as previously referenced in these pleadings and presented to NYPD.  By eliminating his antagonistic tweets from his pleadings and selectively presenting elements of

DEFENDANT'S ANSWER TO SUPPLIMENTED SECOND AMENDED COMPLAINT - 19

evidence Plaintiff attempts to materially misrepresent the context in which any

responses from Defendant were provoked.

42. Defendant admits that to the best of his limited legal knowledge, Plaintiff has

accurately quoted New York laws in paragraph 42 and denies making any

false statements.

43. Defendant denies the allegations in paragraph 43.

44. Defendant denies the allegations in paragraph 44.

45. Defendant denies the allegations in paragraph 45.

47. Defendant denies the allegations in paragraph 47.

48. Defendant denies the allegations in paragraph 48.

49. Defendant admits that to the best of his limited legal knowledge, Plaintiff has

accurately described New York Civil Rights Law § 50 and 51.

50.  Defendant denies the allegations in paragraph 50.

Respectfully submitted

January 28, 2021

_____

Jason Goodman, Defendant, Pro Se
252 7th Avenue Apt 6s
New York, NY 10001
(323) 744-7594
truth@crowdsourcethetruth.org

DEFENDANT'S ANSWER TO SUPPLIMENTED SECOND AMENDED COMPLAINT - 20

**(EXHIBIT A)**

**From:** **Spoliation Notice** spoliation-notice@mailbox.org  📎
**Subject:** Re: Complaint to Human Rights Commission <-- Corrected
**Date:** January 10, 2021 at 3:27 PM
**To:** disable@patreon.com, mullane.ahern@sfgov.org, legal@patreon.com, colin@patreon.com, donieosullivan@protonmail.com, donie.osullivan@turner.com, georg.webb@gmail.com, jason@21stcentury3d.com, jasongoodman72@protonmail.com, truth@crowdsourcethetruth.org, metro@sfchronicle.com, newstips@nbc11.com, ilelchuck@sfchronicle.com
**Cc:** press@indexventures.com, sfcitypartnersupport@sfgov.org, feedback feedback@calbar.ca.gov, lawenforcement@paypal.com, sheryl.cowan@sfgov.org, legal@support.youtube.com, info info@privacyrights.org, ahern@sfgov.org, dosw@sfgov.org, legal@indexventures.com, sinead@indexventures.com, hrc.info@sfgov.org, privacy@patreon.com, subscriptions@thr.com, crime@mercurynews.com, themerc@bayareanewsgroup.com, legals@mercurynews.com, aruggiero@bayareanewsgroup.com, investigates@cbsnews.com, kev@cbsnews.com, HartT@cbsnews.com

To:  Donie O'Sullivan, CNN

Dear Sir,

Millions of people have enjoyed your CNN news stories about George Webb Sweigert and Jason Goodman, both alleged to be pro-Trump militant extremists.

It may interest you that the apparent financial facilitator of these extremists is a San Francisco based company known as PATREON, which is being sued as demonstrated by the attached DRAFT complaint.

As you may know, both "George Webb" and Jason Goodman were on hand at the terrorist penetration of the U.S. Capitol to support the alleged assault.

A courtesy copy of the DRAFT complaint is provided as a litigation privilege to Jason Goodman and the legal staff at PATREON. Either party is free to provide a critique of this DRAFT complaint.

This may make another interesting news article for CNN.

Best,

D. George Sweigert


On 05/30/2018 11:42 PM Spoliation Notice <spoliation-notice@mailbox.org> wrote:

To:  HRC

Attached is a corrected version of the Complaint.

Warm regards,

Evidence Collection Team


On May 30, 2018 at 7:57 PM Spoliation Notice <spoliation-notice@mailbox.org> wrote:

To:  General Counsel, Patreon, Inc.

Colin:

Please see attached complaint.

Warm Regards

Evidence Collection Team


On November 29, 2017 at 7:15 PM Spoliation Notice <spoliation-notice@mailbox.org> wrote:

To:
Colin Sullivan
Bar no. 285203

Bar no. 200200
General Counsel
Patreon, Inc.

Dear Sir,

This notice requests that you begin the process of a litigation hold on all electronic evidence stored, processed or transmitted by your organization for the following account:

crowdsourcethetruth

The operator of this account is a defendant in a federal lawsuit:

Jason Goodman

This request is an evidence preservation request to prevent spoliation of electronic evidence that will be sought in federal litigation (please consult Federal Rules of Civil Procedure for guidance).

Mr. Goodman is a defendant to allegations that concern public doxing, copyright violations, harassment and hate speech.  All which appear to violate the community standards policy of Patreon.

Recently, Mr. Goodman has allegedly published a series of videos on your platform that attack the privacy, physical characteristics, and intelligence of private citizens in the State of California that Mr. Goodman perceives may be friends of the plaintiff in this federal lawsuit.

Therefore, as your company holds this evidence, and as it will be required to be admitted into the court record, a strong request is hereby made that you preserve this evidence (account application, invoices, payments, video content, records of messages, transactions with Mr. Goodman, etc.).

As many of these actions allegedly violate California privacy laws, there is an increased duty to preserve these records as follow-up complaints shall be lodged with the California Attorney General with a copy of this notification.

If your organization allows this behavior to persist, serious consideration will be given to adding Patreon as a co-defendant in this federal litigation -- as your company will only be aiding in the distribution of the offense material.

This is a very serious matter as law enforcement has become involved.

Thank you.

Evidence Collection Team



draft-complaint
- Copy.pdf

D. GEORGE SWEIGERT
c/o GENERAL DELIVERY
MOUNT SHASTA, CA 96067
Spoliation-notice@Mailbox.org

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT
## OAKLAND

| | |
|---|---|
| **D. GEORGE SWEIGERT,** | Case No.: |
| **Plaintiff,** | |
| **vs.** | COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST |
| **MULTIMEDIA SYSTEMS DESIGN, INC.,**<br>**A NEW YORK STATE CORPORATION** | |
| **DBA CROWDSOURCE THE TRUTH,** | |
| **DBA 21ST CENTURY 3D,** | |
| **PATREON, INC.,**<br>**A DELAWARE STATE CORPORATION** | |
| **Defendants** | |

Pro se non-attorney Plaintiff D. George Sweigert (herein the "Plaintiff") alleges as follows:

### SUMMARY OF ACTION

1.      Plaintiff is a U.S. Air Force veteran, licensed Emergency Medical Technician in Alameda County, a former member of the Livermore-Pleasanton Community Emergency Response Team (LPCERT), a 2018 graduate of Las Positas College (LPC), with honors, with a degree in Network Security, attended LPC under a Veterans Educational Assistance Program, and became a Certified Ethical Hacker (based upon LPC training) and a California Emergency Management Specialist as certified by the Governor's Office of Emergency Services (CalOES).

The Plaintiff has self-published a dozen white papers on cyber security of critical infrastructure as well as the book "Certified Ethical Hackers Field Operations Guide".

2.      The Plaintiff owns certain of the intellectual property rights, including all rights of publicity, or and associated with the Plaintiff's education, career reputation and professional persona.  The Plaintiff has published numerous white papers, articles and treatises on ethical hacking, network security, emergency management, protection of critical infrastructure, etc.

3.      The Plaintiff's name, photograph and likeness have tremendous value, in particular to the industries associated with cyber security infrastructure protection aka "network security".

4.      Plaintiff brings this action against a social media business that operates a humilitainment network known as CrowdSource The Truth (CSTT) hosted on YouTube.com (YouTube, LLC) and Patreon.com (PATREON, INC.).  The corporate entity that owns the trademark for CrowdSource The Truth is a New York State chartered corporation known as Multimedia Systems Design, Inc. (MSDI).  The C.E.O. of M.S.D.I. is Jason Goodman of New York City and is presently a defednat in a federal action for defamation brought by this Plaintiff.

5.  "Humilitainment" describes public smear campaigns, publication of private facts, "doxing", deployment of law enforcement to an individual's home for a "wellness check", telephoning an individual's work place to create office embarrassments and employment terminations, telephoning unlisted telephone numbers to record conversations (unknown to the receiver of the call) for broadcast on social media networks YouTube and Patreon.

6.      The Plaintiff brings this action in California to pursue his common law rights to privacy and control of his publicity, as well as the statutory rights created by California Civil Code of § 3344.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 2

7.      The claims presented herein will demonstrate that MSDI, that maintains well over 13 social media properties (footprint), operates a profit-driven commercial "humilitainment" network designed to create debilitating humiliation in CrowdSource targets and entities (like the Plaintiff) to settle scores and personal grievances of the CEO.  The web-site for this tradename is CROWDSOURCETHETRUTH.ORG.

8.      The CEO is a former "3-D cameraman" who was employed in the production of feature length films in Hollywood, California – see the "X-Men".  While in California (from approximately 2005 to 2016) the CEO of the Defendant corporation (MSDI) established business operations for several ventures related to MSDI.  This included the operation of a MSDI subsidiary known as "21st Century 3D" (21C3D), which published business addresses on public Internet websites for both MSDI and 21C3D in Hollywood, California during this period (2005 to 2016).  Supposedly this CEO was good friends with Brian Singer, the producer of "The X-Men".

## JURISDICTION AND VENUE

9.      Pursuant to California's Code of Civil Procedure (C.C.P.) §§ 395 and 395.5, jurisdiction is proper in California because the harms and obligations alleged herein occurred in this judicial district, and the amount of Plaintiff's damages exceeds the jurisdictional limit of this Court (the amount of damages exceeds $75,000.01).  Jurisdiction is also based upon diversity of parties.

10.      This Court has personal jurisdiction over Defendants pursuant to Code of Civil Procedure § 410.10.  Defendants have manifested the malicious intent to target Plaintiff and his family in this jurisdiction with humilitainment torts.  Therefore, Plaintiff and his family was directly impacted and injured by Defendants' wrongful actions in Alameda County.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 3

11.     Venue is proper before this Court because, inter alia, Defendants reside and/or do business in California, and/or each of the acts, events, occurrences, or transactions referred to herein occurred in California, and/or had the proximate effect of causing damages to Plaintiff therein.

12.     MSDI has operated a "DBA" in both New York and California known as "21st CENTURY 3D" (21C3D).  MSDI, as the operator of CrowdSource The Truth, maintains social media accounts via the network communications servers located within this Court's jurisdiction at YouTube,LLC, a subsidiary of Google, LLC in Oakland, California and at PATREON, INC. A paywall hosting service in San Francisco, California.  Both YouTube/Google and PATEON hosts social media podcasts available to the general public over the Interstate wires of the public Internet service.  Both YouTube and Patreon have received at least two dozen warnings from the Plaintiff requesting deletion of video podcast content that violates the aforementioned California statutes.

13.     Organizations outside of California are subject to tort liability in California when an intentional act that is likely to cause harm in California and is aimed at California.  During the entire time of the tortious conduct described the Defendants directed such acts at the Plaintiff as he resided in California.

14.     California Civil Code of § 3344 and Code of Civil Procedure § 410.10 confer jurisdiction, the claims alleged herein are within this time period of the statute of limitations. California has a two-year statute of limitations for "right of publicity" claims (California Civil Code of § 3344) while New York only allows a one-year limit.  New York State does not recognize a common law right to publicity or privacy, but instead has only created a statutory right of privacy as codified in New York Civil Rights Law §§ 50, 51 (NYCRL §§ 50, 51).  There

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 4

is no duplication of claims with this action and any pending federal action in the New York

against the natural person Jason Goodman.

15.     Further, New York State does not recognize an action for the public disclosure of

private facts that would tend to embarrass and humiliate the target, unlike California.  California

typically has a statute of limitations of one year, from the date of disclosure, to file a claim of

private disclosure of public fact claim, the claims alleges herein are within this time period.

## PARTIES

### DEFENDANTS

**16.     MSDI and 21C3D.**  A more complete description of MSDI has been provided in

EXHIBIT ONE.  Suffice that it is a New York State charted corporation that has listed the CEO,

known as "Jason Goodman", and operates other affiliates such as 21C3D.  As stated on a public

website, 21C3D maintains offices in New York and Los Angeles (21C3D 505 8th Avenue, New

York, N.Y. 10018 and 3450 Cahuenga Blvd, West, Los Angeles, California 90068 (see "21st

Century 3D is a full-service stereoscopic 3D motion picture production company with offices

in New York City and Los Angeles.")).

17.     The Plaintiff is presently suing the CEO of MDSI in the U.S. District Court for

the Southern District of New York (S.D.N.Y.).  The National Academy of Television Arts and

Sciences (NATAS), organizer of the "EMMY" Awards, is also suing MDSI in the S.D.N.Y. for

trademark infringement.  (*The National Academy of Television Arts and Sciences, Inc. et al v.*

*Multimedia System Design, Inc.,* 1:20-cv-07269-VEC).  Both S.D.N.Y. lawsuits have a common

federal judge – Hon. Valerie E. Caproni.

18.     The CEO (Jason Goodman) is a pro-Trump, alt-right political figure who, as of

late, has taken to maintaining alliances with individuals tracked by the Southern Poverty Law

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 5

Center (S.P.L.C.) HATE WATCH, to include: Laura Loomer, a pro-Trump one time candidate for Congresswoman in South Florida, Larry Klayman, esq. a pro-Trump attorney who had his law license revoked for two months by the District of Columbia Bar Association, and "Dr." Jeromer Corsi, PhD, a former pro-Trump suspect in the Robert S. Mueller, II special council investigation.  Messrs Klayman, Corsi and CEO Goodman held a series of on-line podcasts entitled "Citizen's Grand Jury" to issue indictment papers against Robert S. Mueller, III.

19.     On several occasions MSDI / 21C3D CEO Goodman has appeared on the conspiracy channel, hosted by Alex Jones, known as "INFOWARS".  Likewise, Mr. Jones has appeared on the MSDI / 21C3D podcast known as "CrowdSourceThe Truth" channels 2 and 3 on YouTube.COM.

20.     Using MSDI and 21C3D social media properties to "livestream" his inflammatory video podcasts, this "CEO" acted as an outside agitator at the recent breach of the U.S. Capitol on January 6, 2021.  In April 2020 the social media platform FACEBOOK terminated the account of the CEO for the video podcast that was hoax peddling conspiracy theories about the COVID-19 corona virus.

21.     The CROWDSOURCETHETRUTH.ORG website contains the phrase "Sponsorship By Mail :  21st Century 3D, 252 7th Avenue, New York, N.Y. 10001" (home address for Jason Goodman).  The e-mail address provided is: truth@crowdsourcethetruth.org .  The Internet domain 21STCENTURY3D.COM shows registration information as belonging to: jason@21stcentury3d.com.

22.     In related S.D.N.Y. litigation Jason Goodman has listed his telephone number as 323-744-7594, a Los Angeles prefix (*Sweigert v. Goodman*, 1:18-cv-08653-VEC-SDA). The Plaintiff's lawsuit against the CEO of MDSI sues him personally as a natural person.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 6

23.     The CEO has gone as far as telephoning ambulance and emergency medical service providers in the City of Mount Shasta, California to allege that the Plaintiff was under investigation by the F.B.I..  These telephone calls were designed for the purposes of damaging the long-term career opportunities of the Plaintiff (April 2018, see EXHIBIT ONE).

24.     The CEO maintained a close relationship with "George Webb" who was recently featured on the C.B.S. News program "Sixty Minutes", which aired 01/03/2021, entitled "*What is Section 230 and why do people want it repealed?*".  George Webb and the CEO were responsible for creating unnecessary public panic on June 14th, 2017 when their YouTube podcast led to the emergency evacuation of the Port of Charleston, South Carolina, aka the "Port of Charleston dirty bomb hoax".  "60 Minutes" used the term "hoax peddler" to describe George Webb, which is a term that could be applied to the CEO of the Defendants.

25.     The CEO has also featured discredited anti-COVID-19 conspiracy theorists (such as Judy Mikovits), pro-Trump election fraud litigator Sidney Powell, esq., and other pro-General Michael Flynn (U.S.A., retired) and so-called "F.B.I. whistle-blower" Robyn Gritz, all of whom have recently had their "TWITTER" accounts permanently suspended.   Powell and Gritz and other pro-Trump affiliates have appeared countless times on "CrowdSource The Truth" podcasts. The CEO has also been closely aligned with militant extremists involved in the armed Cliven L. Bundy Ranch stand-off near Las Vegas, Nevada and the armed Bundy stand-off in Southeastern Oregon.

**26.     PATREON, INC.**  Defendant Patreon, Inc. is, upon information and belief, a Delaware corporation having a principal place of business and regular and established place of business at 230 9th Street, San Francisco, California 94103.  Patreon is a membership platform that helps artists and creators get paid by their fans.  Since being founded in 2013, Patreon has

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 7

sent over $1 billion in payments to over 150,000 creators.  On information and belief, Defendant

has operated a website located at **patreon.com.**

27.     On information and belief, Defendant PATREON's web servers utilize a system

of notifications and authorizations to control the distribution of content, e.g., what webpage

content may be served from web servers and intermediate caches and what cached webpage

content a browser is re-authorized to use to render Defendant's webpage(s).

28.     PATREON is an online platform that allows individuals to set up a web page for

their creations.  The creator of the page can then charge each "patron" a fee (or "pledge") to

access said creations (e.g. a monthly fee of $5.00 for access to the creator's podcast.)  In addition

to this fee, creators can charge additional fees (or "pledges"), whereby their "patrons" may pay

additional fees to access other content, such as: an extra podcast, or merchandise.

29.     In sum, PATREON offers a monthly credit card subscription to the general public

for individual content providers (like CrowdSource The Truth).  This utility acts as a "pay-wall",

that is PATREON redirects video podcast content to the subscriber "patron".  Therefore, all

content available on PATREON is considered commercial speech that is only available for

payment, which can be considered an entertainment service.

30.     For a more technical discussion of the particular operations of this "pay-wall"

process the Court may refer to litigation in this district known as Case No.: 5:18-cv-05599-BLF,

PERSONALWEB TECHNOLOGIES, LLC. V. PATREON, INC.  Suffice to say that when two

computers are communicating over the Internet (subscriber/patron and server/content provider)

they usually are not directly connected to each other but rather interact via chains of network

appliances and other computers (e.g., "switches" and "intermediate" servers).  PATREON acts as

a third-party intermediary to facilitate the commercial distribution of such video podcast content.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 8

31.     PATREON's "Community Guidelines" state, in pertinent part, as follows:

<u>Bullying, Harassment, Threats and Hate Speech</u> "Patreon should feel like a safe place for normal people. We don't allow bullying or harassment on Patreon…. That said, there is no room on Patreon for hate speech or serious threats of violence. For us, hate speech includes serious attacks on people based on their race, ethnicity, national origin, religion, sex, gender, sexual orientation, age, disability or serious medical condition."

<u>Facilitating Harmful or Dangerous Activity</u>

"We don't allow funds to be collected for organizations that promote, forums that distribute, or anything else that primarily facilitates harmful or dangerous activities. For example, an organization that promotes sexual abuse, intellectual property violations, weapons, commercial spamming, self harm, drug manufacturing techniques, or property crimes would be prohibited from receiving funds through Patreon."

<u>These Guidelines are Enforced</u>

"Creators who violate these community guidelines may be banned from using Patreon. Depending on the severity of the violation, a Creator may instead receive a strike on his or her account. If you see a page on Patreon that you feel violates our community guidelines, please send us an email. Please also realize that Patreon is a diverse community, and while you may not necessarily agree with someone's point of view, it may not be a violation of our community guidelines."

32.     PATREON has been notified of Defendants' harassments campaigns on several occasions, however, they have yet to take down Defendant CrowdSource The Truth page, and continue to receive a substantial amount of revenue from CrowdSource The Truth "subscribers" / "patrons".

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 9

33.     PATREON's lack of response, when notified on at least seven (7) occasions, that specific users were inciting followers to harass, stalk, and threaten the Plaintiff is unconscionable, and tantamount to being a willful participant in the threats, and encouraging the harassment to continue, for their own financial gain.

34.     PATREON did nothing to stop the Defendants' conduct, and instead, tacitly encouraged its continuation, for its own financial gain.  Therefore, the threats and harassment against Plaintiffs' continues unabated on their pages, while PATREON generates substantial revenues from the Defendants' campaigns against Plaintiff.

### *PLAINTIFF*

35.     The Plaintiff is a *pro se* non-attorney layman that has suffered Article III (U.S. Constitution) injuries and damages and seeks redress in the federal courts.  The background statement concerning the Plaintiff is hereby incorporated as if fully restated herein.  Plaintiff has suffered the dilution of his career in the emergency medical services and the emergency management field as a direct result of the activities of the defendant corporations – MSDI / 21C3D.

36.     Plaintiff is informed and believes and based theron alleges that MSDI and/or 21C3D (Defendants), and all times relevant hereto was, a corporation organized under the laws of the State of New York, with principal place of business located at 252 7th Ave, #6s, New York, NY 10001.

37.     Plaintiff is informed and believes and based thereon alleges that each of the Defendants (MSDI / 21C3D) are in some manner responsible or legally liable for the actions, events and circumstances described herein.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 10

38.     Plaintiff is informed and believes and based thereon alleges that each of the Defendants (MSDI / 21C3D), and each of them, were and are agents, licensees, employees, partners, joint-ventures, co-conspirators, joint tortfeasors, and/or principals and each of them are, and at all times herein mentioned were, acting with the course and scope of agency, license, partnership, employment, conspiracy, ownership, or joint venture.

## DEFENDANT'S WRONGFUL CONDUCT

39.     Defendant companies and organizations, under the direction of the CEO, have a four-year history of creating professional smear campaigns, reputation destruction campaigns and political opposition attacks on social media.  These Defendant entities have produced well over fifty (50) podcast video productions that have singled out the Plaintiff and have insinuated his involvement in criminal activities to an audience of tens of thousands.

40.     Defendant companies, under the direction of the CEO, have a reputation for the public broadcast of sensitive and personal facts about its individual targets to include the Plaintiff.  For example, the CEO, using these Defendant entities under the CrowdSource The Truth trademark, has publicly revealed the name of the Plaintiff's handicapped son, along with affirmative statements that Plaintiff is a "dead beat dad" and "wife swapper".

41.     Defendants MSDI / 21C3D market their CrowdSource The Truth video podcast content to the general public via several social media platforms, to include YouTube.com, Bit-Chute, Twitter, Periscope, etc.  The Defendants MSDI / 21C3D have used the Plaintiff's persona in about fifty (50) video podcasts that associate the Plaintiff's ethical hacking skills with fictionalized news accounts produced for the entertainment of the CrowdSource The Truth audience.  In this manner the Plaintiff's persona is used in "click-bait" video wrappers

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 11

(thumbnails, titles and podcast descriptions) to attract the general public to click on the content which can provide monetized micro-payments to the Defendants MSDI / 21C3D.

42.     These public videos are "adevetisements in disguise" commercial speech which lure viewers to the public content, the first stage in a compklex monetization scheme.  During the stage one videos, the CEO proclaims that viewers should continue to watch the second part of the fictionalized entertainment on the CrowdSource The Truth PATREON gfan page – which requires a paid membership (five dollars [$5.00 US] per month).  This is stage two.

43.     Stage two videos are not available to the public and can only be viewed as part of a paid performance.  Again, indices of the Plaintiff's persona (photo, name, persona) are linked to these fictionalized news stories.  These stories lay the blame for several tragic mass casualty events at the feet of the Plaintiff.  The CEO, using MSDI / 21C3D, has accused the Plaintiff of operating as a "crisis actor" to participate in mass casualty events resulting in the deaths of hundreds of people.

44.     CrowdSource The Truth video content was widely disseminated beginning in January of 2019 that implicated the Plaintiff in attempting hacking into the Vancouver Police Department, British Columbia, in 2001 to destroy evidence related to the serial killings of prostitutes at "Pig Farm" in Canada.  See Robert Pinketon.

45.     Several video podcasts (presumably displayed on both public social media and PATREON) linked to the Plaintiff to the de-activation of encryption modules on public safety radios used by fire fighters at the World Trade Center on September, 11, 2001.  The Plaintiff was linked to the deaths of 343 fire fights due to radio malfunctions.

46.     Several video podcasts (presumably displayed on both public social media and PATREON) linked the Plaintiff to the "Weatherman Underground" and a command center

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 12

operated at the University of Illinois "EVL" research center that was used to break security at the AEGIS combat ship training center near Trenton, New Jersey.

47.     Dozens of other videos targeted the Plaintiff's professional credentials as an "ethical hacker" for the purpose of sensationalized fictionalized content to increase individual web browser "clicks" ("click-bait") and to gain more subscribers / "patrons" on the PATREON pay-wall service (stage one, stage two).

48.     Defendants – all of them -- have intimidated, harassed, and threatened Plaintiff and his family members by disseminating to then of thousands of people the name of the Plaintiff's handicap son, which include slanderous remarks such as "dead beat dad", "wife swapper", "schizophrenic" and a participant in criminal conspiracies and gangs.  These claims of defamation are presently in adjudication in the S.D.N.Y. and not in this Court.  They defamatory remarks are merely provided for instructional purposes.

## FIRST CAUSE OF ACTION

### (Misappropriation of Right of Publicity

### California Civil Code § 3344.1 – Against All Defendants)

49.     Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 – 48, inclusive, as if fully restated herein.

**50.**     The conduct of Defendants, as alleged hereinabove, under the CrowdSource The Truth trademark, constitutes a violation of Section 3344.1 of the California Civil Code, due to the knowing and unauthorized use of the Plaintiff's name, likeness, photograph and name for commercial purposes, which have substantial commercial value.

51.     Beginning in January 2018, the Defendant companies, via the direction of the CEO, under the CrowdSource The Truth trademark, sanctioned a series of podcast with a

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 13

Canadian hoax peddler named David Charles Hawkins.  Fifty (50) video podcasts were disseminated widely to tens of thousands of viewers which included the likeness, photograph, and the name of the Plaintiff.  These productions were commercial broadcasts of fictionalized "news accounts" for which the Defendant companies received pecuniary renumeration from Google, LLC / YouTube, LLC in the form of monetized video content.

52.    As set forth more fully above, Defendants' entire business is based around their harassment campaigns against the Plaintiff and other like situated individuals, and creating content around the use of Plaintiff's name, photograph, picture, portrait and/or likeness, to solicit patronage by their fans.  Defendants' most lucrative use of Plaintiffs' name, photograph, picture, portrait and/or likeness, appears to be through Defendants' podcast, on PATREON, wherein Defendants' solicit fees from their "patrons" or fans, to access their podcasts, which are principally based on using Plaintiffs' name, photographs, pictures, portraits and/or likenesses, as punching bags, and the basis of their shows, and the content therein.  This is commercial speech which does not qualify for the newsworthy privilege of Section 3344.1.

53.    Defendants' used Plaintiff's name, photograph, picture, portrait and/or likeness in numerous ways, to advertise, solicit, and promote their business to tens of thousands of listeners, fans, and consumers; and on a variety of formats, and popular digital platforms, including, but not limited to: PATREON, Facebook, YouTube, Twitter, Periscope, Bit-Chute, SubscribeStar, and countless others.

54.    In sum, this is considered "click-bait" or the use of a persona's persona to attract viewers to "click" on the podcast advertisement thumbnail (displayed in Google, LLC and YouTube, LLC search results).  The Plaintiff had no relationship to these advertisements in disguise that proclaim viewers should become "patrons" via the PATREON.com and/or

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 14

SubscribeStar.com "pay-walls", or metered video content that requires pre-payment via credit card by subscribers.

55.     The Defendant companies, operating at the direction of the CEO, under the CrowdSource The Truth trademark, have made purely commercial video content with the Plaintiff's likeness available on the PATREON and SubscribeStar podcast subscription credit card "pay for view" website.  Such commercial content that attempts to establish a non-existent relationship with The Plaintiff does not qualify for the newsworthy privilege exemption, as codified in California Civil Code § 3344.1.

56.     All of these tortious video productions are displayed for view to the general public using an Internet browser to access video podcast content via Internet networked servers that are maintained on-line by entities that operate public social media platforms in the jurisdiction of this Court (e.g. Google, LLC, YouTube, LLC, PATREON, INC, etc.).

57.     Mr. Goodman is not being sued as CEO of these enterprises as he is a well experienced as *pro se* litigant of two (2) lawsuits filed against him in the Eastern District of Virginia (Steele v. Goodman).  This CEO has been rebuked several times by the presiding judge in one of the E.D.VA lawsuits (filed in 2017).  Mr. Goodman, as CEO, has co-hosted podcast videos with a large host of attorneys in something called the "COUNTER LAWFARE REPORT"; to include Jared Beck, Alan Dershowitz, and Larry Klayman, etc.  This CEO has attempted to manipulate the courts with resourceful but meritless claims.

### SECOND CAUSE OF ACTION

(**Public Disclosure of Private Facts**  -- Against All Defendants)

58.     Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 – 57, inclusive, as if fully restated herein.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 15

59.    Defendants used Plaintiff's' name, photograph, picture, portrait and/or likeness, without his written consent, within the state of California, for purposes of advertising or trade. Defendants use of Plaintiff's name, photograph, picture, portrait and/or likeness, was a use in, or as part of, an advertisement or solicitation for patronage.

60.    Defendants' published and republished Plaintiff's name, photograph and/or likeness in multiple formats, including their own promotions and advertisements, websites, social media platforms.  Defendants' use of Plaintiff's name, photograph, image and/or likeness – on countless occasions and in numerous formats - is clearly a recognizable likeness of the Plaintiff and is readily identifiable by someone familiar with him.

61.    Under California law, the public disclosure of private facts is defined as (1) a public disclosure of (2) private facts about an individual (3) that would offend the average person, that (4) was not of legitimate public concern; and (5) where defendant published private facts with reckless disregard for their truth or falsity.

62.    This tort can be described as, "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." (Rest.2d Torts, § 652D.)

63.    Plaintiff claims that Defendants – all of them – violated Plaintiff's right to privacy by their tortious conduct by the publicized of private information concerning the Plaintiff, that a reasonable person in Plaintiff's position would consider the publicity highly offensive, that Defendants – all of theme --  knew, or acted with reckless disregard of the fact, that a reasonable person in Plaintiff's position would consider the publicity highly offensive, that the private information was not of legitimate public concern (or did not have a substantial connection to a matter

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 16

of legitimate public concern), that the Plaintiff was harmed, and that the Defendant's conduct was a substantial factor in causing Plaintiff's harm.

64.     The Defendants – all of them – as directed by the CEO acting in the scope of his authority, released private information about the Plaintiff that was made public by either communicating said information via social media accounts controlled by the Defendants, to include Twitter, YouTube, PATREON, SubscribeStar, Vimeo, Banned.Video, Facebook (now banned), BitChute, Periscope, etc.  These social media services were used to obtain commercial value by the morbid and sensational prying into private life of the Plaintiff for the sake of financial reward.

### THIRD CAUSDE OF ACTION

### (Common-law right to publicity)

65.     Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 – 64, inclusive, as if fully restated herein.

66.     The Defendant entities used the Plaintiff's identity, likeness, name and persona for commercial purposes without the Plaintiff's authorized permission which has resulted in injury to the Plaintiff's career, reputation and long-term employment prospects.

67.     This tort can be described as, "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy", Restatement (Second) of Torts Sec. 652 C (1977)

### FOURTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

68.     Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 – 67, inclusive, as if fully restated herein.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 17

69.     Plaintiff claims that Defendants' conduct caused to suffer severe emotional distress due to the outrageous conduct of the Defendant's – all of them – and that Defendants' acted in reckless disregard to the probability that Plaintiff would suffer emotional distress, and that the Defendants – all of them – intended to cause emotional; distress with their outrageous conduct which was a substantial factor in causing Plaintiff's severe emotional distress.

## FIFTH CAUSE OF ACTION

## (Intentional Misrepresentation)

70.     Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 – 69, inclusive, as if fully restated herein.

71.     Plaintiff claims that Defendant PATREON made false representations that harmed him, by the Defendant's (PATREON) willful conduct to represent the integrity of the "Trust and Safety Team program" and that misrepresentations and falsehoods about the "Trust and Safety Team program" were true, that the Defendant knew this representation was false, that Defendants allowed these statements to be widely published  recklessly and without regard for its truth; and that Defendant intended that Plaintiff, and others like him, rely on the misrepresentation and that Plaintiff reasonably relied on the false representations about the "Trust and Safety Team program" which caused harm to the Plaintiff.

## DAMAGES

Defendants' acts and conduct have caused damage to Plaintiff and Plaintiff is entitled to recover from Defendant the damages sustained by Plaintiff as a result of Defendant's wrongful acts in an amount subject to proof at trial.

## PRAYER FOR RELIEF

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 18

WHEREFORE, Plaintiff D. GEORGE SWEIGERT requests entry of judgment in its favor and against Defendant as follows:

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b) and Local Rule 3–6, Plaintiff D. GEORGE SWEIGERT hereby demands a trial by jury on all issues triable in this action.

Respectfully submitted, Dated:

D. GEORGE SWEIGERT
c/o GENERAL DELIVERY
MOUNT SHASTA, CA 96067
Spoliation-notice@Mailbox.org

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF TRUST - 19

**(EXHIBIT B)**



**SDNY.ORG**

Home    New Page    Blog

---

All Posts                                                    🔍    Log in / Sign up

---

 #SDNYORG 👑 · Oct 19, 2020 · 4 min read                    ⋮

## QAnon "founder" DEFANGO linked to Steven Scott Biss, esq. in

## Virginia court documents

Updated: Oct 23, 2020



## ADVISORY:

The teleconference will be held as scheduled on
**October 30, 2020 at 12:00 p.m.** The parties must
appear for the conference by dialing 888-363-4749,
using the access code 3121171, and the security

The teleconference will be held as scheduled on
October 30, 2020 at 12:00 p.m. The parties must
appear for the conference by dialing 888-363-4749,
using the access code 3121171, and the security
code 7269. Plaintiffs' counsel may participate in the
conference even if the *pro hac vice* motions have not
been granted.

SO ORDERED.

*Valerie Caproni*

HON. VALERIE CAPRONI                    10/22/2020
UNITED STATES DISTRICT JUDGE

Above: Hearing set for Jason Goodman

## OPINION AND EDITORIAL

### MASTER MIND OF QANON IDENTIFIED (?)

Dramatic events continue to unfold as the Financial Times of the **City of London** has
outed Carson City, Nevada resident Manuel Chavez, III as "DEFANGO", alleged founder
of the alt-right wing militant movement "QAnon".

Chavez (aka DEFANGO) makes no secret that he has openly communicated with Robert
David Steele in the context of lawsuits against Jason Goodman (New York City). Even
more disturbing is the link between DEFANGO and founder of Crowdsource The Truth,
Goodman.

Many Internet observers will recall when "DEFANGO" filmed himself outside of Jason
Goodman's New York City penthouse in the Chelsea section of Manhattan. That event
apparently preceded significant exchanges in e-mail messages and telephone calls
between the pair.

According to court documents filed in the federal court serving Alexandria, Virginia
today, "DEFANGO" apparently worked with several suspected "QAnon" promoters.

Scott Biss, esq.), the attorney's wife (Tanya Cornwell Biss), the attorney's brother-in-

**(EXHIBIT C)**

```
FEDERAL BUREAU OF INVESTIGATION
FOI/PA
DELETED PAGE INFORMATION SHEET
FOI/PA# 1336944-1

Total Deleted Page(s) = 161
Page 13 ~ b6; b7C;
Page 14 ~ b6; b7C;
Page 15 ~ b6; b7C;
Page 16 ~ b6; b7C;
Page 17 ~ b6; b7C;
Page 18 ~ b6; b7C;
Page 19 ~ b6; b7C;
Page 20 ~ b6; b7C;
Page 21 ~ b6; b7C;
Page 22 ~ b6; b7C;
Page 23 ~ b6; b7C;
Page 24 ~ b6; b7C;
Page 25 ~ b6; b7C;
Page 26 ~ b6; b7C;
Page 27 ~ b6; b7C;
Page 28 ~ b6; b7C;
Page 29 ~ b6; b7C;
Page 30 ~ b6; b7C;
Page 31 ~ b6; b7C;
Page 32 ~ b6; b7C;
Page 33 ~ b6; b7C;
Page 34 ~ b6; b7C;
Page 35 ~ b6; b7C;
Page 36 ~ b6; b7C;
Page 37 ~ b6; b7C;
Page 38 ~ b6; b7C;
Page 39 ~ b6; b7C;
Page 40 ~ b6; b7C;
Page 41 ~ b6; b7C;
Page 42 ~ b6; b7C;
Page 43 ~ b6; b7C;
Page 44 ~ b6; b7C;
Page 45 ~ b6; b7C;
Page 46 ~ b6; b7C;
Page 47 ~ b6; b7C;
Page 48 ~ b6; b7C;
Page 49 ~ b6; b7C;
Page 50 ~ b6; b7C;
Page 51 ~ b6; b7C;
Page 52 ~ b6; b7C;
Page 53 ~ b6; b7C;
Page 54 ~ b6; b7C;
Page 55 ~ b6; b7C;
Page 56 ~ b6; b7C;
Page 57 ~ b6; b7C;
Page 58 ~ b6; b7C;
Page 59 ~ b6; b7C;
Page 60 ~ b6; b7C;
```

```
Page 61 ~ b6; b7C;
Page 62 ~ b6; b7C;
Page 63 ~ b6; b7C;
Page 64 ~ b6; b7C;
Page 65 ~ b6; b7C;
Page 66 ~ b6; b7C;
Page 67 ~ b6; b7C;
Page 68 ~ b6; b7C;
Page 69 ~ b6; b7C; b7E;
Page 70 ~ b6; b7C; b7E;
Page 71 ~ b6; b7C; b7E;
Page 72 ~ b6; b7C; b7E;
Page 73 ~ b6; b7C; b7E;
Page 74 ~ b6; b7C; b7E;
Page 75 ~ b6; b7C; b7E;
Page 76 ~ b6; b7C; b7E;
Page 77 ~ b6; b7C; b7E;
Page 78 ~ b6; b7C; b7E;
Page 79 ~ b6; b7C; b7E;
Page 80 ~ b6; b7C; b7E;
Page 81 ~ b6; b7C; b7E;
Page 82 ~ b6; b7C; b7E;
Page 83 ~ b6; b7C; b7E;
Page 84 ~ b6; b7C; b7E;
Page 85 ~ b6; b7C; b7E;
Page 86 ~ b6; b7C; b7E;
Page 87 ~ b6; b7C; b7E;
Page 88 ~ b6; b7C; b7E;
Page 89 ~ b6; b7C; b7E;
Page 90 ~ b6; b7C; b7E;
Page 91 ~ b6; b7C; b7E;
Page 92 ~ b6; b7C; b7E;
Page 93 ~ b6; b7C; b7E;
Page 94 ~ b6; b7C; b7E;
Page 95 ~ b6; b7C; b7E;
Page 96 ~ b6; b7C; b7E;
Page 97 ~ b6; b7C; b7E;
Page 98 ~ b6; b7C; b7E;
Page 99 ~ b6; b7C; b7E;
Page 100 ~ b6; b7C; b7E;
Page 101 ~ b6; b7C; b7E;
Page 102 ~ b6; b7C; b7E;
Page 103 ~ b6; b7C; b7E;
Page 104 ~ b6; b7C; b7E;
Page 105 ~ b6; b7C; b7E;
Page 106 ~ b6; b7C; b7E;
Page 107 ~ b6; b7C; b7E;
Page 108 ~ b6; b7C; b7E;
Page 109 ~ b6; b7C; b7E;
Page 110 ~ b6; b7C; b7E;
Page 111 ~ b6; b7C; b7E;
Page 112 ~ b6; b7C; b7E;
Page 113 ~ b6; b7C; b7E;
Page 114 ~ b6; b7C; b7E;
```

```
Page 115 ~ b6; b7C; b7E;
Page 116 ~ b6; b7C; b7E;
Page 117 ~ b6; b7C; b7E;
Page 118 ~ b6; b7C; b7E;
Page 119 ~ b6; b7C; b7E;
Page 120 ~ b6; b7C; b7E;
Page 121 ~ b6; b7C; b7E;
Page 122 ~ b6; b7C; b7E;
Page 123 ~ b6; b7C; b7E;
Page 124 ~ b6; b7C; b7E;
Page 125 ~ b6; b7C; b7E;
Page 126 ~ b6; b7C; b7E;
Page 127 ~ b6; b7C; b7E;
Page 128 ~ b6; b7C; b7E;
Page 129 ~ b6; b7C; b7E;
Page 130 ~ b6; b7C; b7E;
Page 131 ~ b6; b7C; b7E;
Page 132 ~ b6; b7C; b7E;
Page 133 ~ b6; b7C; b7E;
Page 134 ~ b6; b7C; b7E;
Page 135 ~ b6; b7C; b7E;
Page 136 ~ b6; b7C; b7E;
Page 137 ~ b6; b7C; b7E;
Page 138 ~ b6; b7C; b7E;
Page 139 ~ b6; b7C; b7E;
Page 140 ~ b6; b7C; b7E;
Page 141 ~ b6; b7C; b7E;
Page 142 ~ b6; b7C; b7E;
Page 143 ~ b6; b7C; b7E;
Page 144 ~ b6; b7C; b7E;
Page 145 ~ b6; b7C; b7E;
Page 146 ~ b6; b7C; b7E;
Page 147 ~ b6; b7C; b7E;
Page 148 ~ b6; b7C; b7E;
Page 149 ~ b6; b7C; b7E;
Page 158 ~ b6; b7C; b7E;
Page 159 ~ b6; b7C; b7E;
Page 160 ~ b6; b7C; b7E;
Page 161 ~ b6; b7C; b7E;
Page 162 ~ b6; b7C; b7E;
Page 163 ~ b6; b7C; b7E;
Page 164 ~ b6; b7C; b7E;
Page 165 ~ b6; b7C; b7E;
Page 166 ~ b6; b7C; b7E;
Page 167 ~ b6; b7C; b7E;
Page 168 ~ b6; b7C; b7E;
Page 169 ~ b6; b7C; b7E;
Page 170 ~ b6; b7C; b7E;
Page 171 ~ b6; b7C; b7E;
Page 172 ~ b6; b7C; b7E;
Page 173 ~ b6; b7C; b7E;
Page 174 ~ b6; b7C; b7E;
Page 175 ~ b6; b7C; b7E;
Page 176 ~ b6; b7C; b7E;
```

```
Page 177 ~ b6; b7C; b7E;
Page 178 ~ b6; b7C; b7E;
Page 179 ~ b6; b7C; b7E;
Page 180 ~ b6; b7C; b7E;
Page 181 ~ b6; b7C; b7E;
```

```
XXXXXXXXXXXXXXXXXXXXXXXX
X    Deleted Page(s)    X
X    No Duplication Fee X
X    For this Page      X
XXXXXXXXXXXXXXXXXXXXXXXX
```



ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT WHERE SHOWN OTHERWISE
DATE 03-04-2020 BY

b3
b7E

FD-1036 (Rev. 10-16-2009)

SECRET//~~ORCON/NOFORN~~//~~LES~~

b6
b7C

# FEDERAL BUREAU OF INVESTIGATION
## Import Form

**Form Type:** FD-71A                                          **Date:** 09/21/2017

**Title:** U Potential WMD Threat aboard the Maersk Memphis in Charleston,
SC

**Approved By:**                                                                    b6
                                                                                    b7C

**Drafted By:**

**Case ID #:**                          (U) ASSESSMENT ZERO FILE FILES           b3
                                        MAINTAINED IN RECORDS SECTION             b7E

**Synopsis:**  U On 06/14/2017 the USCG was alerted to the presence of a
youtube broadcast, wherein the participants discussed unattributed
information that potentially, there was an RDD(radiological dispersal
device), or "dirty-bomb" aboard the Maersk Memphis, which was, at the
time of the broadcast, mooring at the Wando-Welch Terminal of the
Charleston (SC) Harbor.

b7E

After a telephonic encounter with the YouTube video's contributing
source of information, George Webb Sweigert, in order to obtain more
specific information regarding his source of threat information and
greater specificity of the threat, a joint agency team selected four
containers from the Maersk Memphis for thorough screening. The
selection of containers was based on information in the video and the
information provided by Sweigert by phone.

All four containers, which were                                          b7E
were offloaded, screened for radiological and other hazards, and
declared as a non-hazard. A fifth container meeting the same selection
criteria as the four in Charleston, which was previously offloaded in
NJ, was located and screened by CBP in Port of Elizabeth, NJ and
declared non-hazardous.

SECRET//~~ORCON/NOFORN~~//~~LES~~

b3
b7E

SECRET//ORCON/NOFORN//LES

Title:  U Potential WMD Threat aboard the Maersk Memphis in Charleston, SC

Re: [          ]   09/21/2017

b7E

Zanesville (OH) Police Department, with information provided by CO Division [      ] located Sweigert on the side of the road in a rental vehicle. He was subsequently arrested on a local jurisdiction charge. [          ] was sent an urgent lead for the interview of Sweigert at the Zanesville City Jail, Zanesville, OH, which was accomplished on 06/15/2017.

Further documentation of events will be captured in follow-up entries to this Assessment.

**Enclosure(s):** Enclosed are the following items:

1.  U//LES Police Incident Report: George Webb Sweigert
2.  U//FOUO Clear Database Check Results
3.  U//FOUO NYPD Database Check Results
4.  U//FOUO [          ] Database Check Results
5.  U//FOUO FD-302 Interview of George Webb Sweigert
6.  U//FOUO FBI SIOC final email update received on 06/15/2017

b7E

**Reason: 1.4(b)**
**Derived From: National**
**Security Information SCG**
**Declassify On: 50X1-HUM**

◆◆

SECRET//ORCON/NOFORN//LES

```
   OH0600199.256514.DR.OR0DMVR00.OH0600199.
TXT
                    OREGON MOTOR VEHICLES

NAM/SWEIGERT,GEORGE W              DOB/1960-10-12
```

PORTLAND, OR 97217

```
                                   SEX/MALE        HGT/608    WGT/260
PORTLAND, OR 97217                 HAI/            EYE/       RAC/UNKNOWN

   OLN/4266927      OLS/OR

STATUS: VALID OPERATORS LICENSE
ISSUED: 2014-11-04 CLASS: LICENSE    EXPIRES: 2022-10-12

***THIS INFORMATION IS PROVIDED FOR LAW ENFORCEMENT PURPOSES ONLY***

UNLESS OTHERWISE NOTED, THIS LEADS THROUGHPUT IS EXEMPT FROM PUBLIC RECORDS
REQUESTS PER ORC:149.43 AND OAC:4501:2-10-06.

MRI: 7685369
 IN:  #2263 AT 15JUN2017 02:31:32
OUT: OH0600199 #185 AT 15JUN2017 02:31:32
```

b6
b7C

P17-015065 BAN PLAYford
4 P17-015067

ADDRESS

FORT WAYNE IN AVE,

```
OH0600199.256513.KR.OR0DMVR00.OH0600199.
TXT
                    OREGON MOTOR VEHICLES                         b6
                                                                 b7C
SWEIGERT, GEORGE W

PORTLAND   OR  97217
LIC.NO:4266927  TYPE:C  END:
EXP:10-12-2022  ISS:11-04-2014 DOB:10-12-1960  1ST LIC:00-00-0000
SEX:M  HEIGHT:6-08  WEIGHT:260 CDL:NO  VETERAN:NO
STOPS:00  RES:D
   ****STATUS ON 06-14-2017****
CDL:NONE
 DL:VALID OPERATORS LICENSE
 ISS  10-14-98 INT EXP: 00-00-00 MAILED: 00-00-00
 ISS  10-04-99 INT EXP: 00-00-00 MAILED: 00-00-00
 ISS  05-05-03 INT EXP: 00-00-00 MAILED: 00-00-00
 ISS  10-22-04 INT EXP: 00-00-00 MAILED: 00-00-00
 ISS  07-25-06 INT EXP: 00-00-00 MAILED: 00-00-00
 ISS  01-18-12 INT EXP: 02-17-12 MAILED: 01-24-12
 DUPL 01-18-12
 ISS  11-04-14 INT EXP: 12-04-14 MAILED: 11-07-14
 DUPL 07-08-15 STICKER
 DUPL 12-24-15 STICKER


***THIS INFORMATION IS PROVIDED FOR LAW ENFORCEMENT PURPOSES ONLY***

UNLESS OTHERWISE NOTED, THIS LEADS THROUGHPUT IS EXEMPT FROM PUBLIC RECORDS
REQUESTS PER ORC:149.43 AND OAC:4501:2-10-06.

MRI: 7685317
 IN:  #2261 AT 15JUN2017 02:31:29
OUT: OH0600199 #184 AT 15JUN2017 02:31:31
```

**ZANESVILLE POLICE DEPARTMENT**
**332 SOUTH STREET**
**ZANESVILLE, OHIO 43701-3480**
**(740) 455-0700**

**SUPPLEMENTARY REPORT**

DATE:                                              INC. #:

06-15-2017                                         17-015065

Linked with 17-015067

On 06-15-2017 at approximately 0145 hours, I spoke to FBI agent [          ] Agent        b6
[          ] had contacted the Zanesville Police Department to speak with a supervisor   b7C
reference of matter. I was returning his phone call.

Upon speaking to Agent [          ] he advised me that he was a field agent from
Charleston, South Carolina area and they were actively investigating a claim that a
possible weapon of mass destruction or a dirty bomb had come into the Charleston
Port in a shipping container. Agent [          ] stated that the tip for the device was
given via YouTube and that they had had contact with the subject, identified as George
Webb. Agent [          ] advised me that he believed George Webb's full name included   b6
the last name Sweigert. He advised that they had conducted pings on his cell phone     b7C
during their communications and the most recent one showed that the phone was
within 30 meters of the location for The Barn at 1947 Linden Avenue in Zanesville.
Agent [          ] advised me that, while speaking with George Webb, he heard the door
chime of a vehicle and Webb had also advised the agent that he needed to go because
the music was about to begin. I advised him that this information sounded consistent
with most likely the parking lot near the patio of The Barn.

Myself and Patrolman [          ] responded to attempt to locate the subject. Agent     b6
[          ] had asked officers to attempt to locate George Webb, providing a description  b7C
of him as being between 40-50 years of age with dark hair and a possible gray patch in
the center. He stated he was unsure of his height based on the YouTube broadcast but
was forwarding information to the department's e-mail. I advised dispatchers that
there would be information regarding the subject coming through the department's e-
mail account and that I was going to respond to The Barn to attempt to locate the
subject for the FBI's investigation.

Upon my arrival, along with Patrolman [          ] there were numerous people on the    b6
patio and also inside the bar. A large number of people were leaving the bar. We began  b7C
checking the parking lot and I went into the bar attempting to locate anyone that I saw
on an electronic device or possibly matching the description. I spoke to the bartender

and the server on the patio.  No one had observed anyone suspicious or using electronic devices at the bar through the evening that matched the description I had been provided.

I made contact with Agent [____] advising him that we were unsuccessful in locating the subject in the area.

b6
b7C

As I concluded my conversation with him and was returning to my patrol car, I overheard radio traffic for the return of a driver's license returning to George Webb Sweigert.  At that time, I discovered that Patrolman [____] and Patrolman [____] were investigating a suspicious vehicle/suspicious person call at [____] Avenue.  I advised units that we needed to speak to the Sweigert subject.  Patrolman [____] advised me that they did have the subject along with his rental vehicle and they were actually located on Henry Street just east of Goddard.  Patrolman [____] and myself responded.

Upon our arrival, I made contact with George Webb Sweigert.  He was with his vehicle, which was a 2017 Dodge Ram, blue in color, rental vehicle.  The call that was being investigated was involving two to three subjects getting out of the vehicle where Mr. Sweigert's vehicle was at and heading into the wooded area with flashlights.  Upon officers' arrival to the area, they only located Sweigert in his vehicle in the driver's seat.

Upon officers' interaction with Sweigert, it was determined that he was intoxicated and in physical control of the vehicle.  I had requested him to perform some field sobriety tests for Patrolman [____] based on the investigation of him being impaired and in physical control, and he refused all tests and was taken into custody.

b6
b7C

I made contact with Agent [____] advising him of the arrest of Sweigert and that he had been located on an unrelated call by other officers and I had become aware of them locating him.  Patrolman [____] transported Sweigert to the Zanesville City Jail where he was booked in and processed for having physical control of a vehicle.

Myself, Patrolman [____] and Patrolman [____] performed an inventory and search of Sweigert's vehicle based on the arrest.  There was miscellaneous clothing and luggage that appeared that Sweigert had been traveling around the area.  I had located miscellaneous gas receipts and various pieces of scrap paper containing various names and locations.  All the items were inventoried.  Sweigert's cellular phone, charging cable, and his laptop (which was in a satchel-type backpack) were taken out of the vehicle to be submitted into his personal property during booking.  Officers did check the backpack that contained the laptop.  There was also miscellaneous clothing and a journal book that appeared Sweigert had been writing in which contained a variety of different names and locations.  Aside from Sweigert's cellular phone and laptop bag, all other personal items were secured in the vehicle after the inventory and the vehicle was taken to A-1 Towing's impound yard.

b6
b7C

Patrolman☐ advised me that Sweigert had refused all field sobriety and breath tests upon intake to the jail. He was cited into Municipal Court for Thursday, 06-15-2017.

My last communication with Field Agent☐ was that a FBI agent from the Columbus office would be coming to the Zanesville City Jail at approximately 0900 hours to interview Sweigert in reference to the tip involving the Port Charleston investigation.

When I had originally encountered Sweigert during the suspicious person call, I knew officers had already spoken to him regarding him being in the area. I again asked him as to why he was parked where he was. He had originally advised officers that he was unable to get a hotel, having checked three of them in the area, and he was going to simply sleep on the side of the road. Continuing to speak with Sweigert, he began to open up, stating that he was a reporter for the US News Corp and that he provided information and tips in addition to the news that people were too scared to share. I again asked him as to why he was not only parked where he was but in the Zanesville area in general. He advised that he had just met with one of the people that he gets information from and they live in Zanesville. He stated that he was in the location he was at because he had just dropped the subject off, identifying him as a former police officer who now works for the state and made a reference to the mental health board or something to that effect.

Sweigert also made the statement to officers that he had just left West Virginia, having met with six individuals down there that provided him with information and did acknowledge that he had provided a tip earlier in the evening to stop a terror attack. I did advise Sweigert that I was aware of the investigation involving his tip and that there was most likely going to be someone wanting to speak with him in the morning regarding that investigation.

During my speaking with Sweigert, he had asked about his rights involving the investigation on the physical control. I told him I could advise him of his Miranda rights and warnings. He advised that he was fully aware of those and I had simply advised him that he had the right to either perform or refuse to perform the field sobriety tests for the investigating officer. The information that Sweigert provided as far as his communication with people he felt he was protecting was given voluntarily on his own.

END OF REPORT
Sergeant☐

**ZANESVILLE POLICE DEPARTMENT**
**332 SOUTH STREET**
**ZANESVILLE, OHIO 43701-3480**
**(740) 455-0700**

**SUPPLEMENTARY REPORT**

DATE:                                                                    INC. #:

6/15/2017                                                    17-015065 & 17-015067

At approximately 0207 hours on the morning of 6/15/2017 I was dispatched to _____ Avenue in reference to a suspicious person where two to three males were seen getting out of a car parked on Henry Street and walked to Playford Avenue with flashlights and walked to _____ Avenue.

b6
b7C

Upon arrival I observed lights on in _____ Avenue and two individuals asleep in a bedroom inside the residence but I saw nobody outside of the residence with flashlights.

I knocked on the front door of _____ Avenue when a female came to the door, _____ who dispatch had on file as the public service and contact information. Ms. _____ stated she had not seen anybody outside of the residence and that she and her husband have lived at the residence for several years but there's always strange things going on at _____ Avenue.

b6
b7C

After speaking to Ms. _____ Ptl _____ and I went to _____ Avenue where I spoke to _____ the original caller. When speaking to _____, she stated she saw two or three subjects get out of a vehicle on Henry Street and walk up through the yards back toward the rear of _____ Avenue but then saw the subjects walk back behind her residence and up between some houses but saw one less return from the rear of _____ Avenue than had gone in from the rear of. _____ pointed to the vehicle that she observed the male subjects get out of on Henry Street.

b6
b7C

Ptl. _____ and I went down to the vehicle to investigate. Ptl. _____ ran the license plate number and then drove on down Henry Street to see if he could observe anybody out in that area and at that point in time I pulled up behind the vehicle, registration PIE7394 on a 2017 Dodge Ram 1500, blue in color and when walking up to the vehicle, I observed a male subject passed out in the driver's seat of the vehicle.

b6
b7C

While radioing to Ptl _____ to advise him that there was somebody in the vehicle, the male subject in the driver's seat woke up and looked at me. At that point in time I knocked on the window for him to put the window down or open up the door. He opened up the door and I immediately smelled the odor of an alcoholic beverage on his person. The truck was not running but the male subject inside stated "here let me

b6
b7C

turn the vehicle off". He pulled the keys from the ignition and sat them on the dash to prevent the bell of the door from dinging.

I asked the male subject if he had some form of ID on him. He stated he did and he provided me with. I identified the male subject in the driver's seat as George W. Sweigert with a driver's license from Portland, Oregon and when I asked Mr. Sweigert what he was doing asleep in his vehicle on a dead end street, he stated he was in town talking to a lead from an individual who he was doing a story on. I asked Mr. Sweigert what he meant by that and he stated that he was a reporter for US News and that he had a You Tube channel. I asked Mr. Sweigert what kind of news he reported and he stated he spoke to individuals to get information about incidents that they were too scared to talk about to people. Mr. Sweigert was having a hard time remembering where he had been so I asked Mr. Sweigert if he knew where he and he stated he had been all over but he had recently been in West Virginia meeting with a group of people about a possible terrorist attack and that now he was in Zanesville and had been on Linden Avenue and he thought he was parked in a parking spot where he could sleep until morning and then continue on to meet another informant somewhere else tomorrow.

When running Mr. Sweigert's information through dispatch, Sgt. [____] heard the radio traffic and when hearing the name advised me to hold the subject if I had him that he had been looking for him at The Barn on Linden Avenue.   b6 b7C

I advised Sgt. [____] that I had Mr. Sweigert on Henry Street and Sgt. [____] and Ptl. [____] arrived at Ptl. [____] and my location. When Sgt. [____] arrived on scene, he advised me he needed to use my cell phone which he used to call dispatch and advised me he had been in contact with the FBI in reference to George Sweigert. Sgt. [____] then made contact with somebody that he had spoken to who was searching for George Sweigert who the FBI wanted to speak with and after speaking to the agent Sgt. [____] had been working with to locate Mr. Sweigert.

Sgt. [____] asked George Sweigert if he wished to take field sobriety tests for his physical control or if he wanted to refuse. George Sweigert refused taking the field sobriety tests and he was advised he was going to be placed under arrest for the suspicion of having physical control of a vehicle while intoxicated. At which point in time I placed George Sweigert into handcuffs and under arrest and placed him in the back seat of my cruiser.   b6 b7C

Mr. Sweigert was advised that the FBI wanted to speak with him and that after court in the morning there would be an agent at the police department to speak with him. Sgt. [____] advised Mr. Sweigert that his laptop and cell phone would be taken to the jail with him to be placed in his property and that the vehicle would be towed and inventoried and he would be able to get out later.   b6 b7C

Sgt. [____] grabbed Mr. Sweigert's back pack with his laptop in it as well as his cell phone that I took into my cruiser and I transported George Sweigert to the Zanesville City Jail.

When getting to the Zanesville City Jail, I read George Sweigert the implied consent form on the back of the BMV 2255. Mr. Sweigert refused to take a Breathalyzer.

I completed the refused test on the Intoxilyzer 8000 and cited Mr. Sweigert into the Zanesville Municipal Court for Thursday 6/15/2017 at 9:00 a.m. for physical control.

I cleared the jail at 0428 hours.

END OF REPORT

Ptl

b6
b7C



# CITY OF ZANESVILLE POLICE DEPARTMENT
## VEHICLE INVENTORY

| REPORT NO. 17-015067 | DATE / TIME 6 15 17 | LOCATION Henry St | | REASONS FOR CUSTODY |
|---|---|---|---|---|

**REASONS FOR CUSTODY**
- ☒ Driver Arrested
- ☐ # _____ OVI
- ☐ DUS
- ☐ Wrongful Entrustment
- ☐ Forfeiture
- ☐ Abandoned – Hazardous
- ☐ 72 Hour Violation
- ☐ Evidence       b6
- ☐ Felony          b7C
- ☐ Crash
- ☐ Impound
- ☐ Owner Unverified
- ☐ Other _____

| VYR 2017 | VMA Dodge | VMO Ram 50 | VST 01 | VCO Blue | ODOMETER 8238 |
|---|---|---|---|---|---|

| VIN 1C6RR7GG0HS751429 | LIC PIE 7394 | STATE Ohio |
|---|---|---|

**DRIVER LAST NAME** Sweigert   **DRIVER FIRST NAME / MI** George W

**ADDRESS** Portland OR. 97217   **HOME / CELL NO.**

**OWNER (IF SAME AS DRIVER, WRITE "SAME")** EAN Holdings LLC.

**ADDRESS (IF SAME AS DRIVER, WRITE "SAME")** 554 Water St Chardon Oh 44024

**LOCATION**
P1 - Front Pass.
P2 - Rear Pass.
G - Glove Box
T - Trunk / Cargo
E - Engine
C - Center Console

- ☐ GPS Device
- ☐ Radar Detector
- ☐ CB
- ☒ Stereo_____/_____
- ☐ CD / DVD
- ☐ Laser Detector
- ☐ Cell Phone
- # CD's / DVD's

**2** Total Keys
**2** Key-Ignition
Key-Trunk

**CIRCLE DAMAGE** ◀

Condition **Good**
Seats   Wheels
Glass   Undercarriage
☐ Photos  ☐ Drivable

| LOC | INVENTORY / REMARKS | LOC | INVENTORY / REMARKS |
|---|---|---|---|
| P2 | Black Suit case  mis clothes | P2 | mis Trash |
| P2 | Brow Paper Bag | P2 | mis Papers |
| P2 | mis clothes | 6 | mis Papers |
| P2 | mis Books    (6) | P1 | 2 Pair Sunglasses |
| C | Blue Flash Dr. | | |
| C | 8.00 US Currency | | |
| C | Blue charger | | |
| C | Black charge | | |
| C | white wall charger | | |
| P1 | Pair Brown Dress Shoes | | |
| P1 | 1 Book | | |

| ARRESTING / INVENTORY OFFICER PT2 | UNIT NO. | DATE / TIME 6 15 17 | | Wrecker Company **A-1** | b6 |
|---|---|---|---|---|---|
| SUPERV___ | UNIT NO. | DATE / TIME 6 15 17/0425 | | Vehicle Store **A-1** | b7C |

Tow Driver Signature X
**Owner Request** ☐

passed

_____ (INITIALS) ENTERED INTO L.E.A.D.S TOWED VEHICLE FILE-DATE/OCA_____
_____ (INITIALS) CLEARED FROM L.E.A.D.S TOWED VEHICLE FILE-DATE_____

RELEASED BY _____ DATE RELEASED _____ TIME _____
REMARKS _____

**CONDITIONS FOR RELEASE**
- ☒ No Hold
- ☐ Hold
- ☐ Court Release
- ☐ Other _____

### RELEASE OF PROPERTY

| ☐ Plates | SIGNATURE X | UNIT NO. | DATE / TIME / / |
|---|---|---|---|
| ☐ Vehicle | SIGNATURE X | UNIT NO. | DATE / TIME / / |

Post Copy – White          Owner / Driver Copy – Canary          Wrecker Copy – Pink

2017 4:37:55 AM                          Printed By: RN619247 from: ZANPDD001

Received Time:        04:37:13 06-15-17      **Source ORI:**        OHBMV0000
Summary:              RP: LIC=PIE7394 REQ=RKB
  View Message Details


RP.OH0600100.**PIE7394** ,**PC.REQ**/RKB   06/15/2017  04:37:20
**PIE7394**  2018 TK (NORMAL ISSUE)  EXPIRES/20180331 REG **YR**:1
EAN HOLDINGS LLC            **TAX**/264086616
554 WATER ST               CHARDON       OH 44024 2803 RENTAL
1C6RR7GG0HS731429 2017 RAM   TK PURCHASED 04/05/2017
**TITLE**/6701962965 **ODOMETER**/0000010 **WGT**/002000  ·TAX-WT/006800

ISSUED 20170410 BY AGENCY 7726 APPLICATION 471337FX OLD-LIC/PIE7394
PLATE COLOR/ OHIO PRIDE    VEH COLOR/ UNKNOWN
END

b6
b7C


UNLESS OTHERWISE NOTED, THIS LEADS THROUGHPUT IS EXEMPT FROM PUBLIC RECORDS
REQUESTS PER ORC:149.43 AND **OAC**:4501:2-10-06.

**MRI**: 7746962
 **IN**: OHBMV0000 #16073 AT 15JUN2017 04:37:13
**OUT**: OH0600100 #34 AT 15JUN2017 04:37:13

FD-302 (Rev. 5-8-10)

- 1 of 7 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry        06/15/2017

George Webb Sweigert, date of birth (DOB) October 12, 1960, SSAN 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, residence address 3312 Rawlston Avenue, Fort Wayne, IN, cellular telephone number (503) 919-0748, was interviewed at the Zanesville City Jail. Also present during the interview was SA [            ]   After being advised of the identity of the interviewing Agents and the nature of the interview, Sweigert provided the following information:

**b6**
**b7C**

Sweigert was detained on local charges at the Zanesville City Jail. After asking for the above identifying information the interviewing agents provided Sweigert with his Miranda Rights via an FD-395. Sweigert understood his rights, read the consent paragraph, and agreed to speak with the interviewing agents. The signed FD-395 form will be kept in an FD-340/1A envelope.

Sweigert was asked about any contact he had with the FBI. Sweigert mentioned he had made multiple attempts to speak with FBI agents when he lived in Portland, Oregon, but had not contacted the FBI regarding any recent events. He stated that he had never been interviewed in person by the FBI. Sweigert asked the interviewing agents which field they were in for the FBI. He noted that he had a number of informants who were former FBI employees, but he had no way of verifying their identities. Sweigert admitted that the informants could be a part of a hoax, but he did not think so because their information often turned out to be true.

Sweigert then referenced his <u>investigation into the</u> [      ] brothers. He mentioned the brothers names were [            ] He could not remember the last brothers name. He then mentioned two wives of the brothers. They were [            ] Sweigert said the brothers work on [            ] with the [            ] He stated that he obtained open source information about the [      ] on the website www.insidegov.com, which compiles information from public officials personnel records.

**b6**
**b7C**

Sweigert said that he conducts open source investigations and could be characterized as a n open source journalist. He has over 800 videos on YouTube under the name "George Webb." Sweigert works with his followers of roughly 40,000 people to research his investigations. Regarding the

**b3**
**b7E**
**b7A**

Investigation on   06/15/2017   at  Zanesville, Ohio, United States (In Person)

File #  [            ]                                      Date drafted   06/15/2017

**b6**
**b7C**

by  [            ]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

**b3**
**b7E**
**b7A**

Continuation of FD-302 of  (U) Interview of George Webb Sweigert ,On 06/15/2017 ,Page 2 of 7

his investigation found they own ▮▮▮▮▮▮▮▮▮▮▮ Sweigert also referenced ▮▮▮▮▮▮▮▮▮▮ He noted that a car company called Cars International in Falls Church, VA had been ▮▮▮▮▮▮ but went bankrupt.  Sweigert believes the ▮▮▮▮ Pakistan via Florida out of a business in Lorton, VA.  Additionally, he referenced a produce transportation business the ▮▮▮▮ own.  He believed that they used these businesses to launder money in order to support radical Islamic terror.

**b6**
**b7C**

Sweigert mentioned the Facebook pages of the ▮▮▮ brothers.  Sweigert said there are pictures of radical Islamic clerics on their Facebook sites.  There were also pictures of men kissing AK-47s.

**b6**
**b7C**

Sweigert heard about the ▮▮▮▮ brothers roughly 100 days ago.  He heard about them on Foxnews.  Sweigert believes it was reported on by television journalist ▮▮▮▮▮▮▮ There were also other news articles and a report by ▮▮▮▮▮▮▮ (sic) of the Daily Caller.

Sweigert after hearing of the ▮▮▮▮ brothers he made multiple phone calls to the FBI Office in Portland, Oregon.  Sweigert lived there at the time.  Sweigert was trying to get a hold of Mr. McCabe.  Sweigert also referenced FOIA requests on himself he had sent to the FBI with no response.

**b6**
**b7C**

Sweigert is not employed at this time.  He was the number one computer software sales person for IBM in 2013.  He has since had trouble finding a job.  He has attempted to get a job all over the United States as well as in Canada.  Sweigert currently lives with ▮▮▮▮▮▮▮▮▮▮▮▮ in Fort Wayne, Indiana.

Sweigert believes he is a member of the Counter Intelligence Program of the FBI.  Sweigert said there are two fields in the FBI.  There are the field agents and the counter intelligence agents.  Neither side really communicates with the other.  He described a wall between the two fields.  Sweigert believes he has met with agents of the counter intelligence field.  He admitted he could have fallen for a trick.  Sweigert did not know any names of the people he met.  He said they would be called ▮▮▮▮▮ And that ▮▮▮ would tell him to meet him in a park where ▮▮▮ would be wearing a hat.

**b6**
**b7C**

Sweigert was asked specifically about communication he had with any sources for an incident in South Carolina on June 14, 2017.  Sweigert had received information from one of his sources.  Sweigert did not know his real name.  The source went by the name of ▮▮▮▮▮▮ The source is a ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

FD-302a (Rev. 05-08-10)

b3
b7E
b7A

Continuation of FD-302 of    (U) Interview of George Webb Sweigert                    , On   06/15/2017   , Page   3 of 7

[  ] currently lives in Parkersburg, WV.  Sweigert had a meeting with [  ] for a couple of hours on June 14, 2017.

b6
b7C

    Sweigert said he publishes all his source documents.  Most of the information he gets are from sources.  Sweigert mentioned that he received the Virginia business numbers and Bill of Ladings for the Maersk Memphis from his sources.  One of [  ] sources reported the Memphis was involved in moving contraband between the U.S.A and Pakistan.  It was mentioned Basmanti (sic) Rice was transported because its sweet smell would throw off search dogs.  He noted that the rice was only shipped once every 14 months, which was an "odd pattern".

b6
b7C

    Sweigert has used, and believes his sources used, a website called import genius to obtain the ship bill of ladings.  The Secretary of the State for Virginia website was also used to identify the business telephone numbers related to Maersk shipping.  Additionally, people who watch his YouTube channel would contribute information.

b6
b7C

    Sweigert never stated there was a dirty bomb on the Maersk Memphis.  Sweigert's followers helped connect the dots.  One of his followers found a website which can geo-locate any ship.  The followers on YouTube found the ship in South Carolina and told Sweigert where it was.

    Sweigert first heard about the Maersk contraband issue from his source 45 days ago.  The source was [  ] told Sweigert the Memphis was a potential vehicle for terrorist activity.  Sweigert then met with the source for three and a half hours in Parkersburg, WV on June 14, 2017.  [  ] contacted Congressman Louie Gohmert, US Congressman from Texas.  Gohmert was contacted because he was the only one to put the [  ].

    After meeting with [  ] Sweigert live streamed from outside the FBI center in Clarksburg, WV.  Sweigert believe the center is used for fingerprint analysis, biometrics, and is secretly used for satellite data for the CIA.  Sweigert found most of the information on the FBI website and a lawsuit by [  ] against the satellite usage at Clarksburg.

b6
b7C

FD-302a (Rev. 05-08-10)

b3
b7E
b7A

Continuation of FD-302 of  (U) Interview of George Webb Sweigert  , On  06/15/2017  , Page  4 of 7

Sweigert mentioned he had attempted to have meetings with approximately 30 US Senators and Congressmen on Capitol Hill.  He referenced Rand Paul.  Sweigert said he had a meeting with Paul's legislative affairs person.  He said all of his attempts were documented on his YouTube channel.  Sweigert also mentioned a tweet he received from Former FBI Director Louis Freeh.

Sweigert stated that he had gone to all ████████████████████ brothers.  He had attempted to speak with someone at each of the residences.  Sweigert made contact with a US Marine named ████████████ at ████████████, Lorton, VA.  The Marine said he rented the house from an ████████  Sweigert believed the name given to ████████ was fake.  ████████ then mentioned he was made renting the house through ████████ wife ████████  Sweigert noted that ████████ found a pile of blackberry cell phones and laptops with congressional markings on them.  Sweigert believed that they were stolen from congressional offices and that ████████ called the FBI about them.  NCIS and the Capitol Police also were involved in responding to the incident.

b6
b7C

Sweigert was asked about his sources and how he views them.  Sweigert said there are different levels of his sources.  The highest are official documents or the hand written reports he finds.  The next level are journalists.  He mentioned individuals such as ████████████ (sic) for the Washington Post.  And finally those individuals he talks to which give him information.

Sweigert was asked why he recently moved to Indiana.  Sweigert said he is unemployed and sold his houses to do his research.  Sweigert mentioned ████████████████████████ in New York, New York.  He also had one daughter in Oregon.

b6
b7C

Sweigert believes most of his financial problems started when he was involved in a protest in Portland, Oregon against Mr. McCabe.  It involved an investigation of ████████████  Sweigert's life has not been the same and he believed that things started to fall apart as a result of his protest involvement.  Sweigert stated that the Portland Christmas Tree Bomb Plot incident and subsequent protest was a turning point in his life.  Sweigert was ████████ in 1999.  He has a good relationship with is ████████  Her name is ████████  He believes she lives in Lake Grove, OR or Lake Oswego, OR.

Sweigert was asked why his sources report to him.  Sweigert said his sources had a distrust of the US Government.  The sources do not trust the authorities anymore.  Sweigert referenced former FBI Director Mueller

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of   (U) Interview of George Webb Sweigert   , On 06/15/2017 , Page 5 of 7

b3
b7E
b7A

giving immunity to McCabe and others.  Sweigert said he is a Bernie
Sanders fan, but believes people are railroading President Trump.

Sweigert was asked how long he had been investigating.  Sweigert said
he was on day 230 of his timeline.  He then said he first went to the FBI
in 2013 when he requested a FOIA.

Sweigert was asked why he was in Zanesville, Ohio.  Sweigert said he
was in Zanesville to meet a contact of his.  The contacts name is [redacted]
[redacted] is a former law enforcement member that then became a
[redacted] with the State of Ohio State Health Insurance.  [redacted] helped
Sweigert connect the dots in the past.  Sweigert then referenced he was
traveling around meeting with 20 of his investigators.  Sweigert said he
had 1,000 regular contributors.  Sweigert had traveled to Toronto,
Montreal, Minnesota, Wisconsin, and other states.

b6
b7C

Sweigert had announced on Youtube that he would be traveling to
Zanesville, Ohio.  At that time, a source contacted him requesting to
meet.  He mentioned he had received a note from a female the night of June
14, 2017 while in Zanesville, Ohio.  Sweigert was under the impression
that he would get information from the female and her husband which would
help solve the Pike County, Ohio murder of the Roden family.  He opined
that she could also be providing information about illegal cigarette
shipping by the Clinton County Sheriff's Office, but admittedly did not
know the nature of the information that would be provided.  He stated that
when [redacted] dropped him off at his hotel after dinner at "The Barn"
restaurant in Zanesville, he found a post it note on his car with
instructions to "follow me".  He followed a white Toyota Corolla or
similar vehicle and parked at a location signaled by the car's driver.  He
then waited for over an hour to meet his source, but was approached by
Zanesville Police before he could meet.

b6
b7C

Sweigert's goal is to uncover corruption and terrorism.  Sweigert does
not want information to be put into an FBI system and have nothing else
happen with the information.  Sweigert referenced "Doctrine of
Misprison."  Sweigert believes the doctrine follows the thinking of, If
the government does not act, then the people must act.

Sweigert mentioned he spoke with the United States Coast Guard three
times on the evening of June 14, 2017.  He spoke with the Coast Guard
after one of his followers had reported the info on the Maersk
Memphis.  The second call was from a Border Patrol agent which was doing
the sweep for bombs for the Coast Guard.  On the final call that Sweigert
received, he spoke with a group of individuals from a task force.  He said
he was on speaker phone and 35 people were asking him questions.

FD-302a (Rev. 05-08-10)

b3
b7E
b7A

Continuation of FD-302 of    (U) Interview of George Webb Sweigert    ,On  06/15/2017  ,Page  6 of 7

   Sweigert did not call the information on the Maersk Memphis in himself
because it was raw intelligence.  Sweigert did not want to incite
panic.  He said his information was real time similar to a news
room.  Sweigert said the information was put together by his followers and
himself to realize the dirty bomb was there.  It was put together like
1+1=2.  He thought the call might have been made by someone named
(sic), but was not sure.  Sweigert referenced a book written by Dr.
Jerome Corsi regarding dirty bombs as having  information that contributed
to their assessment.                                            b6
                                                                b7C

   Sweigert then referenced an article titled "what could go wrong?"
discussing "Gulftainer."  This is in reference to a corporation out of the
UAE which controls Port Canaveral.  This corporation is attempting to gain
control of 43 other ports.  The head of the corporation is the lead
scientist for the Pakistani Nuclear Program.  Sweigert asked people to
check the Bill of Lading on ships to and from Pakistan.

   Sweigert's six sources,                    and his five sources, reported an
attack was imminent.  Sweigert received a call from his source around 6:00
PM or 7:00 PM on June 14, 2017.  Sweigert was at the "Mother Trucker" gas
station in Zanesville, Ohio when he received the call. Sweigert verbally
agreed to let the interviewing agents search his phone for the  phone    b6
number of his source.  Sweigert refused to sign a consent form unless a  b7C
member of the FBI Joint Terrorism Task Force (JTTF) helped him with his
charges in Zanesville, Ohio.  Sweigert stated that he highly respects the
FBI and believed that he was helping law enforcement with his
investigative work.

   Sweigert knew about the        brothers and the      brothers shipping  b6
business and felt he had to say something. Sweigert did not tell his       b7C
followers to call the FBI, Coast Guard, or other law enforcement.  He
mentioned the Maersk Memphis was at the Port of Kareem in Pakistan one
month ago.  And the ship was later in Mumbai.

   Sweigert believes the      brothers are working with a              b6
         is a known drug dealer in Mumbai according to                 b7C
Sweigert.  Sweigert believes          is responsible for the Mumbai
bombings in 1993 and the Mumbai Hotel attack.  Sweigert said
intimidates border agents in order to smuggle his shipments.  Sweigert
believes the      brothers are the intelligence part of a partnership with
              is the logistics part of the partnership.

   Sweigert mentioned he is under surveillance by the FBI.  He has been
under surveillance since the McCabe protest.  Sweigert continually
referenced the JTTF and the Counter Intelligence field.  Sweigert believes
he has information which can help if the JTTF will help him.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of   (U) Interview of George Webb Sweigert                    , On   06/15/2017  , Page   7 of 7

b3
b7E
b7A

 

    Sweigert had no further questions or information.  He was thanked for his time and the interview was concluded.

    It should be noted as the interviewing agents exited the interview room Zanesville Police Department personnel had received a phone call.  The phone call was in regard to Sweigert and his criminal charges.  The caller identified their self as [          ] of the National Investigative Reporting Agency.  [          ] said he was Sweigert's boss.  The number [          ] used to call was [          ]

    It should also be noted copies of the Zanesville Police Department reports will be kept in an FD-340/1A envelope.

b6
b7C

**From:**
**To:**

**Subject:**
**Date:**                    Thursday, June 15, 2017 10:57:44 AM

ALCON,

This email is being forwarded to your attention for your situational awareness.

b6
b7C
b7E

-----Original Message-----

~~For Official Use Only~~

Good Morning MOTR Colleagues,

The following information is sent for your awareness only.  No MOTR action/coordination is requested.

**(EXHIBIT D)**

IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF VIRGINIA
Alexandria Division

ROBERT DAVID STEELE, et al.,     )
                                 )
         Plaintiffs,     )
                                 )
v.                                )     Civil Action No. 1:20-cv-01140(RDA/IDD)
                                 )
JASON GOODMAN,     )
                                 )
        Defendant.     )
_____     )

## **ORDER**

This MATTER is before the Court on non-party D. George Sweigert's Motion for Leave to Intervene Pursuant to Rule 24(a) [Dkt. No. 4] (hereinafter "Motion"). This matter can be resolved without oral argument, as such argument would not aid the decisional process. It is hereby

**ORDERED** that the Motion is **DENIED**. The Motion is denied because Intervenor-Applicant Sweigert failed to meet the requirements for both intervention of right and permissive intervention under Rule 24.

The Court must permit a person to intervene if a federal statute affords him the right unconditionally or if he claims an interest in the subject matter of the case and his interest would not be adequately represented by existing parties. *See* FED. R. CIV. P. 24(A). The movant cites no statute or legal authority that would provide him a cause of action as an intervenor. *See* Fed. R. Civ. P. 24(a)(1). The movant also lacks an interest in the subject matter of this case. On September 28, 2020, Plaintiffs Robert David Steele and his nonprofit filed a Complaint against Defendant Jason Goodman for, among other things, defamation and

1

unauthorized use of Steele's name and picture. Compl. at 1, Dkt. No. 1. Plaintiffs seek an injunction to permanently enjoin and order Goodman to cease and desist from any further use of Steele's name and picture and to remove such from Defendant's online videos, tweets, blogs and posts. Dkt. No. 7 ¶1. Sweigert claims to have an interest in the litigation because the complaint mentions him. Dkt. No. 4 ¶4. However, paragraph 50 of the Complaint, the only place where Sweigert is mentioned, describes a video Plaintiffs allege Defendant produced and the footnote to the paragraph merely identifies Sweigert as one of the people besides Steele whose photoshopped image was depicted in the video. Compl. ¶50. This is insufficient for Sweigert to establish an interest in the case. *See Steele v. Goodman*, 2019 U.S. Dist. LEXIS 124571, *18, 2019 WL 3366556 (E.D. Va. July 25, 2019) (a passing mention in the complaint does not establish a connection between the harm Plaintiffs allege and the harm Sweigert alleges). Sweigert has not established that he has an interest in the online posts targeted at Steele or in Steele's claims. Furthermore, a final judgment in Steele's action will not impair Sweigert's ability to pursue independent claims against Goodman.

The movant, likewise, fails to meet the requirements for permissive intervention. The Court may permit a person to intervene in an action if he has, pursuant to a federal statute, a conditional right to intervene or has a claim that overlaps with the action based on "common question of law or fact." *See* FED. R. CIV. P. 24(B). Like Steele, Sweigert claims that Defendant Goodman has defamed him through Internet videos and social media posts. Dkt. No. 4 at ¶i. Sweigert and Steele may have similar causes of action against Goodman, but that does not mean the movant may intervene in a case that is strictly about false and defamatory statements allegedly published by Goodman about Steele. "To the extent that Sweigert's claims seem 'identical' to Steele's, the claims relate to two distinct sets of conduct or statements: those

2

directed at Plaintiffs and those directed at Sweigert." *Steele*, 2019 U.S. Dist. LEXIS 124571, *18. The facts underlying both claims of defamation differ. *Id*. at *24. In their memorandum in opposition to the Motion, Plaintiffs argue that they have no relationship, business or personal, with Sweigert, and they have no knowledge or involvement with the defamation allegedly perpetrated by the Defendant against the movant. Dkt. No. 7 ¶5, footnote 1. Sweigert likewise argues there is no relationship between him and Plaintiffs. Dkt. 4, ¶5. Thus, movant fails to establish a common question of law or fact.

Sweigert notes that during previous litigation involving Steele and Goodman, Defendant defamed him over social media with claims that Sweigert is an operative of Steele's. Sweigert seeks status as a "limited plaintiff for the primary purposes of obtaining a legal determination from this Court that," since June 14, 2017, "the movant has had nothing to do with any business, litigation, operations, or any other such activity" with Plaintiffs. Dkt. No. 4 ¶5. No allegations have been made in this case that Sweigert is connected to Steele. Dkt. No. 7 ¶7. Movant essentially seeks an advisory opinion from the Court concerning his involvement in a previous case or an advisory opinion concerning claims that are not the subject of litigation and would thus have no effect. The Court will not provide an advisory opinion. "A federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them." *Ragan v. Vosburgh*, No. 96-2621, No. 96-2687, No. 96-2739, 1997 U.S. App. LEXIS 6626, at *13 (4th Cir. Apr. 10, 1997).

ENTERED this 5th day of November 2020.

/s/ Ivan D. Davis
Ivan D. Davis
United States Magistrate Judge

Alexandria, Virginia

3

**(EXHIBIT E)**

Redbubble.com
111 Sutter St, 17th fl
San Francisco, CA
94104 USA

November 28, 2018

**COUNTER NOTICE Re: Removal of Crowdsource the Truth Art**

Dear Redbubble.com,

I, Jason Goodman, am the owner of Crowdsource the Truth and the Redbubble.com account of
that same name.  I am writing in response to the recent removal of two items from the
Crowdsource the Truth Redbubble.com print on demand store.  The items in question are:

Deep State Dunces
https://www.redbubble.com/people/csthetruth/works/29102359-deep-state-dunces



Iran Contra Crazies
https://www.redbubble.com/people/csthetruth/works/29394927-iran-contra-crazies



I consider this a very serious matter as it deals directly with the first amendment right to freedom of speech, freedom of the press as well as important elements of the Digital Millennium Copyright Act and other laws including Fair Use and Parody. This complaint also seeks to circumvent matters currently under consideration by the U.S. District Court in the Southern District of New York in pending civil litigation.

**1:18-cv-08653-VEC** Sweigert v. Goodman
Valerie E. Caproni, presiding
**Date filed:** 09/21/2018
**Date of last filing:** 11/26/2018

Crowdsource the Truth is a U.S. based news, commentary, op-ed and information analysis education and entertainment multimedia network.

https://www.youtube.com/channel/UC8Cl9QaRtuW9CNjP7pP4BBQ?view_as=subscriber

Our video programs are frequently accompanied by political photo-cartoons and comedic photo collages which include depictions of the political figures, newsmakers, celebrities and individuals we discuss on the show. Our contributors include journalists, legal experts, criminal investigators, authors, commentators, political figures, celebrities and members of the general public.

The complainant, David Sweigert (aka D. George Sweigert, aka Dave Acton) has engaged in two separate frivolous civil suits specifically directed toward chilling the journalistic efforts of Jason Goodman, the owner of the Redbubble.com account in question.  Both of these civil suits have been stymied in court because they are based on meritless claims and are considered Strategic Lawsuits Against Public Participation (SLAPP lawsuits).  This is a dubious practice of bringing legal action in the form of civil lawsuits and filing claims to chill the free speech of the target of the complaint.  In one of the suits, an Anti SLAPP counterclaim has been filed.  Your legal department can view this on Pacer.gov  https://ecf.vaed.uscourts.gov/doc1/18918801049

**3:17-cv-00601-MHL** Steele et al v. Goodman et al
M. Hannah Lauck, presiding
**Date filed:** 09/01/2017
**Date of last filing:** 09/06/2018

In the other suit, the Plaintiff (Sweigert) has been ordered by the Federal District Court for the Southern District of New York to cease from entering further pleadings and is bound by an as yet unanswered Judge's Order to Show Cause.  His complaint to Redbubble.com has arrived coincidentally just after this order was issued and is an obvious attempt at further punitive action outside the court system.  It should be further noted that this complaint to Redbubble.com is a clear defiance of the spirit and intent of the Federal Judge's pending Order to Show Cause.  Remedying the complaint via removal of the artwork could in fact embroil Redbubble.com in the ongoing civil action in U.S. District Court in the Southern District of New York.

It should be further noted, despite the fact that this artwork has been present on Redbubble.com for nearly one year, Sweigert has only chosen to act AFTER the Judge's refusal to accept his complaint demanding a court order for the removal of items from Redbubble.com.  This is clearly an effort on Sweigert's part to circumvent the spirit and intention of the Judge's standing order.  One might infer that Sweigert was motivated to contact Redbubble.com to achieve this outcome now that it is becoming increasingly clear that Sweigert's baseless complaints are being rendered moot by the Federal Courts in which they are under consideration.

In further defiance of the spirit and intent of the order from the Federal Judge, on November 27, 2018, Sweigert published a video on YouTube in which he boasts of his plans to take further punitive action against Goodman and directly references Redbubble.com's compliance with his illicit demand.  I would reiterate that the removal of this artwork from Redbubble.com is a matter directly in question in the pending federal civil suit and it is very important that Redbubble.com not get involved in any arbitration or decision making in this matter until the suit is settled and a final order issued by the court.

On these grounds, I would humbly request Redbubble.com reinstate these graphic elements and return Jason Goodman's Redbubble.com account to its previous status, restoring the account to its condition prior to Sweigert's vindictive and unfounded demand.  Redbubble.com should ignore any communications from Sweigert absent a court order in the pending case.

Your legal department can refer to all of the 70 + pleadings in the case on Pacer.gov, via the link below, alternately I can provide all the documentation if required.

https://ecf.nysd.uscourts.gov/cgi-bin/HistDocQry.pl?461218112993504-L_1_0-1

The individuals depicted in each of these graphic images are clearly defined as limited purpose public figures. According to USlegal.com and other widely accepted legal definitions.xxx

Public Figure Law and Legal Definition

A public figure is a person of great public interest or fame, such as a politician, celebrity, or sports hero. The term usually used in the context of libel and defamation actions, where the standards of proof are higher if the party claiming defamation is a public figure and therefore has to prove disparaging remarks were made with actual malice.

A person may also be considered a "limited purpose" public figure by having thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. The determination is made on a case-by-case basis, taking the particular facts into account.

The individual who filed the grievance with Redbubble.com is David George Sweigert.  (aka D.George Sweigert, aka Dave Acton) Sweigert is a professional actor, and often appears under his stage name Dave Acton.

https://casting360.com/portfolio/?view=1108109
https://youtu.be/G3Q8KTIJPHc?t=1920



This individual has appeared on Television, in films and almost daily throughout the internet on social media channels including YouTube.  His YouTube channel Acton the Actor, currently redtitled "Prepper Kitty News" offers daily commentary on current events, politics, law, hoax "news" events and his as yet unresolved civil suit against Jason Goodman among other topics.

https://www.youtube.com/user/ActontheActor



One of his most recent video productions is a clip in which he boasts of his "victory" in the removal of the artwork from Redbubble.com and promises additional legal action in the state of Arizona (in defiance of the spirit and intent of the court order currently in full force and effect from the Federal Judge in the Southern District of New York). It is exceedingly important that Redbubble.com NOT intervene or otherwise interfere with the pending process of this civil suit.



Additionally, Sweigert has boldly interfered in criminal proceedings in the state of Arizona in the pending case of an individual name Michael J Barden. Barden has appeared on Crowdsource the Truth as an interview subject with regard to his criminal charges. Sweigert's interference in this criminal case is currently under investigation and Barden has stated his intention to enter a pleading requesting the court issue Sweigert yet another Order to Show Cause as to why he is contacting officers of the court and interfering in the criminal proceedings with which Sweigert has no direct involvment.

As a public figure in the political and social media sphere, Sweigert's permission is not needed for the creation of 1st amendment protected political parody or artistic commentary involving depictions of Sweigert as outlined in the Fair Use clause of the Digital Millennium Copyright Act.  The Fair Use clause of the DMCA states:

**Fair Use**

There is a doctrine in the United States copyright law called "Fair Use" which allows people to use your content without your permission. Fair Use is now widely accepted in most countries around the world. It allows the limited use of copyrighted material without requiring permission from the copyright owner. Items considered Fair Use would be commentary, criticism, news reporting, research, teaching or scholarship. It provides for the legal, non-licensed citation or incorporation of copyrighted material in another author's work under a four-factor balancing test. To read the US Copyright law section which specific references Fair Use **click here**
It references four factors to measure fair use. They are:
1. the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
2. the nature of the copyrighted work;
3. the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
4. the effect of the use upon the potential market for or value of the copyrighted work.

Since the use of the photographic image of Swiegert's face is a matter under consideration by the Federal District Court in the Southern District of New York, and since that matter remains undecided at present, Sweigert has no authority to demand the removal of this image from Redbubble.com and Redbubble.com should DENY his demands to comply with such a request.

It is of paramount importance that Redbubble.com remain out of the vindictive legal battle initialed by Sweigert and allow the court in the Southern District of New York to issue its order before any action is taken.

I would kindly and humbly request Redbuble.com restore the artwork to its previous state and insist that Sweigert's claims be backed by a court order from the court in which this proceeding is currently underway.  Any other action aside from restoration of the artwork, on the part of Redbubble.com would be wholly inappropriate while this matter is still pending adjudication.

Under penalty of perjury, I have a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled.  The complainant had no right to demand removal for the reasons detailed above.  I consent to the jurisdiction of the Federal District Court, San Francisco County, California, United States and I

will accept service of process from the person who provided notification described above or an agent of such person.

Thank you for your kind consideration and prompt cooperation.

Jason Goodman
252 7th Avenue #6s
New York, NY 10001
truth@crowdsourcethetruth.org
212-244-8585

**(EXHIBIT F)**

artist-sales-report-2021-01-23

| Order Date | Ship Date | Work | Order # | Product | Fulfilment Country | Destination Country | Destination State | Status | Quantity | Retail Price (USD) | Manufacturing Price (USD) | Artist Margin (USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 Dec 20 | 16 Dec 20 | Crowdsource The Truth Logo Gear | 41701071 | Mug | United States | United States | TX | to be paid | 1 | 18.45 | 14.51 | 3.94 |
| 9 Dec 20 | 16 Dec 20 | Podfather Logo | 41549571 | Mug | United Kingdom | United Kingdom | Kent | to be paid | 1 | 12.03 | 9.62 | 2.41 |
| 12 Nov 20 | 13 Nov 20 | Blind Justice CSTT | 40039977 | iPhone 11 Pro Max - Tough | United States | United States | CA | paid | 1 | 35.66 | 28.08 | 7.58 |
| 7 Sep 20 | 10 Sep 20 | Secret Policeman's Charity Ball | 38212584 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 7 Sep 20 | 9 Sep 20 | Fraudster Island | 38212584 | Magnet | United States | United States | CA | paid | 1 | 7.60 | 6.43 | 1.17 |
| 7 Sep 20 | 10 Sep 20 | The Big Liebowski | 38212584 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 3 Aug 20 | 14 Aug 20 | Podfather Logo | 37175557 | Macbook Pro 16" (2019) | United States | United States | MI | paid | 2 | 54.70 | 42.08 | 12.62 |
| 27 Jul 20 | 31 Jul 20 | Podfather Logo | 36947041 | Graphic T-Shirt | Australia | Australia | NSW | paid | 1 | 31.23 | 24.68 | 6.55 |
| 11 Jul 20 | 14 Jul 20 | Podfather Logo | 36458788 | Macbook Pro 15" (2014) | United States | United States | MI | paid | 2 | 54.70 | 42.08 | 12.62 |
| 18 Feb 20 | 20 Feb 20 | The Usual Suspects | 33420677 | Greeting Card | United Kingdom | United Kingdom | SCOTLAND | paid | 1 | 1.58 | 1.26 | 0.32 |
| 25 Nov 19 | 27 Nov 19 | The Big Liebowski | 31318617 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 25 Nov 19 | 27 Nov 19 | Willy Clinton and the Fraud Factory | 31318617 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 25 Oct 19 | 28 Oct 19 | Blind Justice CSTT | 30768137 | Classic T-Shirt | United Kingdom | United Kingdom | ENGLAND | paid | 1 | 20.36 | 16.29 | 4.07 |
| 11 Oct 19 | N/A | Podfather Logo | 30544318 | Graphic T-Shirt | United States | United States | IL | cancelled | 1 | 32.18 | 25.19 | 6.99 |
| 23 Sep 19 | 24 Sep 19 | The Russians Are Coming! The Russians Are Coming! | 30255308 | Classic T-Shirt | United States | United States | WI | paid | 1 | 16.69 | 13.04 | 3.65 |
| 9 Aug 19 | 11 Aug 19 | Crowdsource The Truth Logo Gear | 28554623 | Floor Pillow | United States | United States | IL | paid | 1 | 35.06 | 29.56 | 5.50 |

artist-sales-report-2021-01-23 (1)

| Order Date | Ship Date | Work | Order # | Product | Fulfilment Country | Destination Country | Destination State | Status | Quantity | Retail Price (USD) | Manufacturing Price (USD) | Artist Margin (USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 Dec 20 | 16 Dec 20 | Crowdsource The Truth Logo Gear | 41701071 | Mug | United States | United States | TX | to be paid | 1 | 18.45 | 14.51 | 3.94 |
| 9 Dec 20 | 16 Dec 20 | Podfather Logo | 41549571 | Mug | United Kingdom | United Kingdom | Kent | to be paid | 1 | 12.03 | 9.62 | 2.41 |
| 12 Nov 20 | 13 Nov 20 | Blind Justice CSTT | 40039977 | iPhone 11 Pro Max - Tough | United States | United States | CA | paid | 1 | 35.66 | 28.08 | 7.58 |
| 7 Sep 20 | 10 Sep 20 | Secret Policeman's Charity Ball | 38212584 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 7 Sep 20 | 9 Sep 20 | Fraudster Island | 38212584 | Magnet | United States | United States | CA | paid | 1 | 7.60 | 6.43 | 1.17 |
| 7 Sep 20 | 10 Sep 20 | The Big Liebowski | 38212584 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 3 Aug 20 | 14 Aug 20 | Podfather Logo | 37175557 | Macbook Pro 16" (2019) | United States | United States | MI | paid | 2 | 54.70 | 42.08 | 12.62 |
| 27 Jul 20 | 31 Jul 20 | Podfather Logo | 36947041 | Graphic T-Shirt | Australia | Australia | NSW | paid | 1 | 31.23 | 24.68 | 6.55 |
| 11 Jul 20 | 14 Jul 20 | Podfather Logo | 36458788 | Macbook Pro 15" (2014) | United States | United States | MI | paid | 2 | 54.70 | 42.08 | 12.62 |
| 18 Feb 20 | 20 Feb 20 | The Usual Suspects | 33420677 | Greeting Card | United Kingdom | United Kingdom | SCOTLAND | paid | 1 | 1.58 | 1.26 | 0.32 |
| 25 Nov 19 | 27 Nov 19 | The Big Liebowski | 31318617 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 25 Nov 19 | 27 Nov 19 | Willy Clinton and the Fraud Factory | 31318617 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 25 Oct 19 | 28 Oct 19 | Blind Justice CSTT | 30768137 | Classic T-Shirt | United Kingdom | United Kingdom | ENGLAND | paid | 1 | 20.36 | 16.29 | 4.07 |
| 11 Oct 19 | N/A | Podfather Logo | 30544318 | Graphic T-Shirt | United States | United States | IL | cancelled | 1 | 32.18 | 25.19 | 6.99 |
| 23 Sep 19 | 24 Sep 19 | The Russians Are Coming! The Russians Are Coming! | 30255308 | Classic T-Shirt | United States | United States | WI | paid | 1 | 16.69 | 13.04 | 3.65 |
| 9 Aug 19 | 11 Aug 19 | Crowdsource The Truth Logo Gear | 28554623 | Floor Pillow | United States | United States | IL | paid | 1 | 35.06 | 29.56 | 5.50 |

artist-sales-report-2021-01-23 (2)

| Order Date | Ship Date | Work | Order # | Product | Fulfilment Country | Destination Country | Destination State | Status | Quantity | Retail Price (USD) | Manufacturing Price (USD) | Artist Margin (USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 Dec 20 | 16 Dec 20 | Crowdsource The Truth Logo Gear | 41701071 | Mug | United States | United States | TX | to be paid | 1 | 18.45 | 14.51 | 3.94 |
| 9 Dec 20 | 16 Dec 20 | Podfather Logo | 41549571 | Mug | United Kingdom | United Kingdom | Kent | to be paid | 1 | 12.03 | 9.62 | 2.41 |
| 12 Nov 20 | 13 Nov 20 | Blind Justice CSTT | 40039977 | iPhone 11 Pro Max - Tough | United States | United States | CA | paid | 1 | 35.66 | 28.08 | 7.58 |
| 7 Sep 20 | 10 Sep 20 | Secret Policeman's Charity Ball | 38212584 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 7 Sep 20 | 9 Sep 20 | Fraudster Island | 38212584 | Magnet | United States | United States | CA | paid | 1 | 7.60 | 6.43 | 1.17 |
| 7 Sep 20 | 10 Sep 20 | The Big Liebowski | 38212584 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 3 Aug 20 | 14 Aug 20 | Podfather Logo | 37175557 | Macbook Pro 16" (2019) | United States | United States | MI | paid | 2 | 54.70 | 42.08 | 12.62 |
| 27 Jul 20 | 31 Jul 20 | Podfather Logo | 36947041 | Graphic T-Shirt | Australia | Australia | NSW | paid | 1 | 31.23 | 24.68 | 6.55 |
| 11 Jul 20 | 14 Jul 20 | Podfather Logo | 36458788 | Macbook Pro 15" (2014) | United States | United States | MI | paid | 2 | 54.70 | 42.08 | 12.62 |
| 18 Feb 20 | 20 Feb 20 | The Usual Suspects | 33420677 | Greeting Card | United Kingdom | United Kingdom | SCOTLAND | paid | 1 | 1.58 | 1.26 | 0.32 |
| 25 Nov 19 | 27 Nov 19 | The Big Liebowski | 31318617 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 25 Nov 19 | 27 Nov 19 | Willy Clinton and the Fraud Factory | 31318617 | Mug | United States | United States | CA | paid | 1 | 15.76 | 12.41 | 3.35 |
| 25 Oct 19 | 28 Oct 19 | Blind Justice CSTT | 30768137 | Classic T-Shirt | United Kingdom | United Kingdom | ENGLAND | paid | 1 | 20.36 | 16.29 | 4.07 |
| 11 Oct 19 | N/A | Podfather Logo | 30544318 | Graphic T-Shirt | United States | United States | IL | cancelled | 1 | 32.18 | 25.19 | 6.99 |
| 23 Sep 19 | 24 Sep 19 | The Russians Are Coming! The Russians Are Coming! | 30255308 | Classic T-Shirt | United States | United States | WI | paid | 1 | 16.69 | 13.04 | 3.65 |
| 9 Aug 19 | 11 Aug 19 | Crowdsource The Truth Logo Gear | 28554623 | Floor Pillow | United States | United States | IL | paid | 1 | 35.06 | 29.56 | 5.50 |

1