IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| D. GEORGE SWEIGERT<br><br>Plaintiff,<br><br>v.<br><br>JASON GOODMAN,<br><br>Defendant. | Case No.: 1:18-cv-08653-VEC-SDA<br><br>**RULE 56.1 STATEMENT OF UNDISPUTED FACTS** |

Defendant Jason Goodman submits this Statement of Undisputed Facts pursuant to Rule 56.1 of the Local Rules of this Court:

## Background

1.     Goodman is an independent investigative journalist who creates online news and entertainment content under the brand *Crowdsource the Truth*.  **Goodman Decl. ¶ 1.**

2.     Goodman started creating online content in late 2016. **Goodman Decl. ¶ 1.**

3.     Goodman has grown his YouTube channel from nothing to more than 140,000 subscribers. **Goodman Decl. ¶ 1.**

4.     Goodman generates revenue through sponsorship payments from viewers who find value in his work. **Goodman Decl. ¶ 1.**

5.     Goodman's guests have included U.S. Senator Marsha Blackburn, Former Acting U.S. Attorney General Matthew Whittaker, Retired NYPD Commissioner Bernard Kerik, Judge Jeanine Pirro, and Attorney Alan Dershowitz. **Goodman Decl. ¶ 2.**

6.     Goodman's more popular videos receive hundreds of thousands of views. **Goodman Decl. ¶ 2.**

**The Port of Charleston Dirty Bomb Hoax**

7.      In 2017, Goodman started working with a YouTube personality named George Webb ("Webb"), also known as George Webb Sweigert. **Goodman Decl. ¶ 4.**

8.      George Webb is Plaintiff David Sweigert's brother. **Goodman Decl. ¶ 4.**

9.      Webb and Goodman started to collaborate in 2017, making appearances on each other's another's social media channels. **Goodman Decl. ¶ 5.**

10.     In or about May 2017, Webb stayed as a guest at Goodman's home. **Goodman Decl. ¶ 6.**

11.     In or about May 2017, Webb introduced Goodman to an individual identified as Richard Stone.  **Goodman Decl. ¶ 7.**

12.     Richard Stone's real identity is Oakey Marshall Richards ("Richards"). **Goodman Decl. ¶ 8.**

13.     Richards was as an FBI informant in the 1990s. **Goodman Decl. ¶ 9.**

14.     Richards was an informant in a prosecution of a militia group in West Virginia that led to Floyd Raymond Looker being sentenced to 18 years in prison. **Goodman Decl. ¶ 10.**

15.     Webb and Richards corroborated each other's various statements to establish Richards' credentials as a Vietnam veteran and former contractor to US intelligence agencies. **Goodman Decl. ¶ 11.**

16.     Around this time, Richards instructed Goodman to obtain a non-smartphone and new unpublicized phone number for exclusive communication with him. **Goodman Decl. ¶ 12.**

17.     Richards also instructed Goodman to begin using a Proton mail encrypted email account.  **Goodman Decl. ¶ 12.**

18.     Richards told Goodman these precautions were required security measures due to the sensitive nature of communications he intended to share. **Goodman Decl. ¶ 13.**

19.     Around this time, Goodman had regular telephone conversations with Richards and received seemingly credible information from Richards that contributed to Goodman's daily broadcasts. **Goodman Decl. ¶ 14.**

20.     On a live broadcast published on or about June 14, 2017, in which Webb participated via Skype, Webb informed Goodman he had important information from a meeting with Richards in West Virginia. **Goodman Decl. ¶ 14.**

21.     Webb told Goodman that there could be radiological material on board a vessel that was about to dock in the Port of Charleston in South Carolina. **Goodman Decl. ¶ 16.**

22.     Webb further stated that a dirty bomb could be inside containers owned by the Awan Brothers shipping company. **Goodman Decl. ¶ 17.**

23.     Imran Awan, a central focus of Webb's investigative journalism, was the agent of record for the company. **Goodman Decl. ¶ 17.**

24.     Webb went on to warn that if there were a dirty bomb, it could be more deadly and destructive than 9/11. **Goodman Decl. ¶ 18.**

25.     Webb conveyed this information on-air, in real time, during Goodman's June 14, 2017 broadcast. **Goodman Decl. ¶ 19.**

26.     Two members of Goodman's audience called the Coast Guard and a shutdown of the Port and criminal investigation began. **Goodman Decl. ¶ 20.**

27.     Later that day or soon thereafter, Goodman received a communication from Robert David Steele, an individual associated with Webb, who purports to be a former CIA officer, saying

that Goodman was "about to be arrested by NYPD at request of USCG for filing a false report."

**Goodman Decl. ¶ 21.**

28.     Goodman never filed any report with the Coast Guard regarding the Port of

Charleston. **Goodman Decl. ¶ 22.**

29.     Webb and his associates, including Sweigert, maliciously used Goodman's show

to spread disinformation with the intent of discrediting Goodman. **Goodman Decl. ¶ 23.**

30.     At about 2:00 a.m. on June 15, 2017, hours after the broadcast, Webb passed out

drunk in his truck and was arrested by local police in Zanesville, Ohio. **Goodman Decl. ¶ 24;**

**Exhibit 11(C), Page 58.**

31.     After refusing the breathalyzer, Webb was kept in Zanesville jail overnight.

**Goodman Decl. ¶ 24; Exhibit 11(C), Page 58-59.**

32.     The next day, Webb was interviewed by the FBI. **Goodman Decl. ¶ 25; Exhibit**

**11(C), Page 65-71.**

33.     According to the FBI Form 302 memorializing the FBI's interview, "[Webb] was

asked specifically about communications he had with any of his sources for an incident in South

Carolina on June 14, 2017. [Webb] had received information from one of his sources. [Webb] did

not know his real name." **Goodman Decl. ¶ 26; Exhibit 11(C) at ECF page 66-67.**

34.     Webb's above-quoted statement to the FBI was false. **Goodman Decl. ¶ 27.**

35.     Webb knew that the source of his information about the purported "dirty bomb"

was Oakey Marshall Richards. **Goodman Decl. ¶ 27.**

36.     On June 16, 2017, the shutdown of the Port of Charleston became international

news. **Goodman Decl. ¶ 28; Exhibits 20-23**.

37.     Shortly thereafter, Goodman ended his collaboration with Webb and shortly after that Goodman ended communication with Steele, Richards and other Webb associates. **Goodman Decl. ¶ 29.**

### Sweigert's Scorched Earth Tactics

38.     After Goodman ended the relationship, Webb and his associates became intensely hostile, launching a multi-year campaign of lawsuits and smear campaigns. **Goodman Decl. ¶ 30.**

39.     Steele filed a lawsuit against Goodman in 2017, which was dismissed in September 2020. **Goodman Decl. ¶ 30; Exhibits 23-24.**

40.     In July 2019, the Court denied Sweigert's motion to intervene in *Steele v. Goodman* and struck some twenty (20) ECF filings that Sweigert had uploaded to the docket, stating that the Court "will not consider future filings by Sweigert." **Goodman Decl. ¶ 41; Exhibit 12.**

41.     Sweigert again requested to intervene in *Steele v. Goodman* on October 19, 2020, which was denied on November 5, 2020. **Goodman Decl. ¶ 42; Exhibit 13.**

42.     In June 2018, Sweigert commenced the instant lawsuit in the District of South Carolina, which was transferred to the Southern District of New York. **Goodman Decl. ¶ 30.**

43.     In court filings, Plaintiff has falsely accused Goodman of being a clandestine Russian agent (Docket No. 262, ¶¶ 5, 8). **Goodman Decl. ¶ 35; Exhibit 7.**

44.     In October 2020, when public furor over QAnon was at its peak, Sweigert made false publications suggesting that Goodman was somehow responsible for or otherwise associated with the QAnon phenomenon. **Goodman Decl. ¶ 36; Exhibit 11(B) at pp. 45-47.**

45.     In fact, Goodman never promoted QAnon. **Goodman Decl. ¶ 36.**

46.     On or about January 10, 2021, Sweigert emailed Patreon a draft complaint naming Patreon as a defendant. **Goodman Decl. ¶ 37.**

47.     In sending the draft complaint, Sweigert intended to sow discord between Goodman and Patreon. **Goodman Decl. ¶ 37; Exhibit 11(A) at pp. 24-44.**

48.     In early May 2021, Sweigert sent a mass email to dozens of officials at the New York Attorney General's office, the Federal Trade Commission, and various attorney disciplinary officials.  **Goodman Decl. ¶ 38; Exhibit 17.**

49.     In the email, Sweigert makes false and reckless accusations against my lawyer. **Goodman Decl. ¶ 38; Exhibit 17.**

50.     On May 19, 2021, Sweigert sent a letter to Judge Caproni requesting to intervene in the matter of the *National Academy for Television Arts and Science v. Multimedia System Design Inc.*, No. 20-7269.  **Goodman Decl. ¶ 43; Exhibit 14.**

51.     Plaintiff Sweigert published a video about Judge Caproni which includes the following words:

> Everybody it's Dave. Oh, this is the judge in New York Southern District. So what happened your honor? You let everything sit for six months. You didn't do anything for six months. I mean, it's your motion you filed your motion on your own volition your own initiative so you would know what the outcome of that motion should be. Does it take you six months to figure it out?
>
> You know, this can be considered misconduct. Violation of the canon of judicial conduct. Really kind of a sad blemish but I guess the judge here – let's just call her Val. Val, the deal with Val here is she was at the FBI for eight years as Chief Counsel and one of her little sticky points one of her controversies was illegal wiretaps. Exigent search warrants so I don't know John Conyers who was running the investigation in the House of Representatives said that Robert Mueller who appointed her should fire her.  Wow, wow. And then she became general counsel or something for Raytheon or Lockheed – I think Raytheon some gigantic defense contractor.
>
> You know she must be part of the Deep State, Jason, if she was appointed by Robert Mueller and eight years at the FBI's general counsel. And I

> think she worked at Raytheon or some Fortune 10 corporation like that.
> Hey, he's probably going to call this this Clary Layman special prosecutor.
> We're going to convene a citizen's grand jury and we're going to issue a
> writ, writ under the All-Writs Act against this Judge Val because we're
> citizens grand jury.[1]

**Goodman Decl. ¶ 39.**

### Plaintiff Cannot Prove Special Damages

52.     Plaintiff's "Corrected Notice of Special Damages" (Docket No. 276) includes no

evidence of prior employment, lost wages, lost contracts or lost opportunities.  **Goodman Decl. ¶**

**47; Exhibit 16.**

53.     With respect to Plaintiff's first theory of damages, set forth in Exhibit 16, Plaintiff

submits no evidence that Mt. Shasta had a job opening for which Sweigert was qualified. **Exhibit**

**16.**

54.     With respect to Plaintiff's first theory of damages, set forth in Exhibit 16, Plaintiff

submits no evidence that Sweigert applied for any job. **Exhibit 16.**

55.     With respect to Plaintiff's first theory of damages, set forth in Exhibit 16, Plaintiff

submits no evidence that Mt. Shasta denied Sweigert's job application. **Exhibit 16.**

56.     With respect to Plaintiff's first theory of damages, set forth in Exhibit 16, Plaintiff

submits no evidence as to why Mt. Shasta denied such job application. **Exhibit 16.**

---

[1]     A true and correct copy of Plaintiff's original video has been preserved by Defendant after
Plaintiff first removed it from his own YouTube channel, then separately forced its removal
from Defendant's evidence preservation Bitchute channel via a false copyright complaint
to Bitchute.  Defendant has created yet another Bitchute channel to preserve this exhibit
(https://www.bitchute.com/video/ACb6PeHrb0SC/)

57.      With respect to Plaintiff's first theory of damages, set forth in Exhibit 16, Plaintiff submits no proof that Goodman's alleged statements played any role in any hiring decision relating to Sweigert. **Exhibit 16.**

58.      With respect to Plaintiff's first theory of damages, set forth in Exhibit 16, Plaintiff submits no proof of any other efforts by Sweigert to obtain employment. **Exhibit 16.**

59.      With respect to Plaintiff's third theory of damages, set forth in Exhibit 16, Plaintiff submits no evidence that Goodman forced Plaintiff to stop selling his online manual. **Exhibit 16.**

60.      With respect to Plaintiff's fourth theory of damages, set forth in Exhibit 16, Plaintiff submits no evidence that Sweigert ever applied for a position in the "critical infrastructure protection" field. **Exhibit 16.**

61.      With respect to Plaintiff's fourth theory of damages, set forth in Exhibit 16, Plaintiff submits no evidence that Sweigert ever applied for a position in the "critical infrastructure protection" field. **Exhibit 16.**

62.      With respect to Plaintiff's fourth theory of damages, set forth in Exhibit 16, Plaintiff submits no evidence that Sweigert was denied a position in the "critical infrastructure protection" field. **Exhibit 16.**

63.      With respect to Plaintiff's fourth theory of damages, set forth in Exhibit 16, Plaintiff submits no evidence that Goodman's statements played a role in any adverse employment decision. **Exhibit 16.**

<u>**Sweigert's Books**</u>

64.      Plaintiff is the author of a manuscript entitled "Port of Charleston Dirty Bomb Hoax and Social Media Liability." **Goodman Decl. ¶ 77; Exhibit 19.**

65.     Plaintiff is the author of *Ethical Hacker's Field Operations Guide*. **Goodman Decl.**

**¶ 47; Exhibit 16.**

66.     The back cover of *Ethical Hacker's Field Operations Guide* contains the following

text:

> Volume One of the Ethical Hacker's Field Operations Guide (FOG)
> addresses network sniffing, protocol basics, social engineering, and other
> preliminary pre-enumeration phase topics.  Many colleges use this text as a
> summer boot camp to prepare students for a full semester ethical hacking
> course.

**Goodman Decl. ¶ 77; Exhibit 19.**

## The 12 Challenged Statements

67.     On April 30, 2021, Plaintiff filed Docket No. 267 in response to the Court's order

that Sweigert identify "every statement made by Defendant that Plaintiff claims was defamatory

toward Plaintiff and, for each such statement, provide a citation to a specific source." **Exhibit 8.**

68.     In his April 30, 2021 submission, Plaintiff identifies 12 Challenged Statements.

**Exhibit 8.**

69.     At the time Goodman made Statement #1, he was in contact with the FBI regarding

Sweigert and Webb. **Goodman Decl. ¶ 51.**

70.     Statement #1 was a true statement. **Goodman Decl. ¶ 51.**

71.     At the time Goodman made Statement #2, Sweigert and his brother had doxed

Goodman's home address and we're spreading false information about him, including falsely

attributing to Goodman racist statements that exposed him to serious physical danger on the streets

of New York. **Goodman Decl. ¶ 51.**

72.     Statement #2 is an accurate statement of Goodman's opinion based upon his

understanding that harassment is against the law. **Goodman Decl. ¶ 51.**

9

73.      At the time Goodman made Statement #3, he was in contact with the FBI regarding Sweigert and Webb. **Goodman Decl. ¶ 51.**

74.      Statement #3 was a true statement. **Goodman Decl. ¶ 51.**

75.      At the time Goodman made Statement #4, Sweigert was in a regular practice of making taunting videos, contacting local law enforcement, contacting Goodman's business associates, and otherwise harassing Goodman.  **Goodman Decl. ¶ 51.**

76.      Statement #4 is an accurate statement of Goodman's opinion. **Goodman Decl. ¶ 51.**

77.      At the time Goodman made Statement #5, Sweigert was abusing the postal service in Mesa, Arizona. Specifically, Sweigert used an address owned by an individual named Mari Rapp. The U.S. Postal Service confirmed that they would not deliver to Sweigert at that address. **Goodman Decl. ¶ 51.**

78.      Statement #5 accurately states Goodman's opinion that Sweigert has committed fraud on the court with this bad faith lawsuit, and that Sweigert's improper use of the U.S. Post Office box in furtherance of the fraud would be mail fraud, a Federal offense. **Goodman Decl. ¶ 51.**

79.      When Goodman made Statement #6, he was referring to statements made by Sweigert about Judge Caproni on his YouTube channel. Among other things, Sweigert accused Judge Caproni of violating "the canon of judicial conduct," accused her of participating in "illegal wiretaps" while at the FBI, and threatened to "convene a citizen's grand jury . . . under the All Writs Act against this Judge Val." **Goodman Decl. ¶ 51.**

80.      Statement #6 is a fair interpretation of Sweigert's words.[2] **Goodman Decl. ¶ 51.**

81.      Statement #7 contains no statement of fact. **Goodman Decl. ¶ 51.**

82.      Statement #7 is an accurate statement of Goodman's opinion that Sweigert is engaged in illegal harassment. **Goodman Decl. ¶ 51.**

83.      When Goodman made Statement #8, he was commenting on Sweigert contacting the attorney representing an individual named Michael Barden in a criminal matter in Phoenix, AZ to create discord between lawyer and client. **Goodman Decl. ¶ 51.**

84.      Statement #8 contains no defamatory statement. **Goodman Decl. ¶ 51.**

85.      Statement #9 is true. Sweigert regularly issues threats, including threatening Judge Caproni. **Goodman Decl. ¶ 51.**

86.      Statement #10 is virtually identical to Statement #1 and 3 and arose in the same context. **Goodman Decl. ¶ 51.**

87.      Statement #10 was a true statement, as Goodman was in contact with the FBI at this time. **Goodman Decl. ¶ 51.**

88.      Statement #11 and 12 were both made on the basis of information provided by Corean Stoughton. **Goodman Decl. ¶ 51.**

89.      Plaintiff Sweigert has a son named Jimmy. **Goodman Decl. ¶ 51.**

90.      Plaintiff Sweigert told Corean Stoughton that his greatest regret was abandoning his son Jimmy. **Goodman Decl. ¶ 51.**

---

[2]      A true and correct copy of Plaintiff's original video has been preserved by Defendant after Plaintiff first removed it from his own YouTube channel, then separately forced its removal from Defendant's evidence preservation Bitchute channel via a false copyright complaint to Bitchute.  Defendant has created yet another Bitchute channel to preserve this exhibit (https://www.bitchute.com/video/ACb6PeHrb0SC/)

91.     At the time Goodman made Statements 11 and 12, Goodman believed that Corean Stoughton's information was reliable. **Goodman Decl. ¶ 51.**

### **Plaintiff's Claim Under §§ 50-51 of the Civil Rights Law**

92.     Sweigert is a published author and public figure in the field of cybersecurity and ethical hacking. **Goodman Decl. ¶ 52; Exhibit 19.**

93.     Sweigert holds himself out to be a credentialed authority, as illustrated by his damages statement. **Goodman Decl. ¶ 52; Exhibit 16.**

94.     Goodman created an illustration entitled "Deep State Dunces," which features an image of Sweigert wearing a dunce cap. **Goodman Decl. ¶ 55.**

*"Deep State Dunces"*



95.    Goodman sold a total of 7 such mugs generating $23 in revenue. **Goodman Decl.**

**¶ 55; Exhibit 11(F).**

96.    "Deep State Dunces" was a joke about Sweigert's hilarious sense of self-

importance coupled with his fanciful claims to be affiliated with the FBI. **Goodman Decl. ¶ 54.**

97.    In the realm of parody and caricature, publishing an image of an adversary wearing

a dunce cap is among the oldest jokes in the book. **Goodman Decl. ¶ 56.**

98.    A quick Google search shows that our last three elected presidents were portrayed

by their opponents as wearing dunce caps:



| *Trump* | *Obama* | *Bush* |
|---|---|---|

**Goodman Decl. ¶ 56.**

99.    "Deep State Dunces" stung because it was true. Sweigert and Webb, and their

cronies, are a bunch of holster sniffers who like to pretend to be FBI agents. Yet, when the Sweigert

brothers put their brains together and tried to frame Goodman for a bomb hoax, Webb ended up in

a Zanesville jail and the subject of worldwide mockery. **Goodman Decl. ¶ 57.**

Dated:    New York, New York
           May 31, 2021

                                    Jason Goodman
                                    Pro Se Defendant