**U.S. DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| SWEIGERT | CIVIL CASE #: |
|---|---|
| V. | 1:18-CV-08653-VEC |
| GOODMAN | JUDGE VALERIE E. CAPRONI |

<u>**AFFIDAVIT OF D. GEORGE SWEIGERT**</u>

<u>**IN SUPPORT OF OPPOSITION TO DEFENDANT GOODMAN'S**</u>

<u>**MOTION FOR SUMMARY JUDGMENT (ECF 279/280)**</u>

**EXHIBITS IN SEPARATE DOCUMENT**

1.      The undersigned makes this statement as D. George Sweigert under the penalties of

perjury.  At the onset, the undersigned apologizes for the length of this document, but as the

Defendant has made dozens of allegations, based on this subject matter, it cannot be avoided.

2.      As a preliminary matter, the undersigned takes offense to the term "*holster sniffer*" to

describe the Plaintiff's non-profit volunteer support of local agencies by the Defendant and the

ghost writer attorney that assisted with the pleading papers presently under review (**ECF**

**279/280**).  The Court should understand that this is the equivalent of using the N word in the

undersigned's opinion.  Part of this affidavit summarizes the lack of decorum by the Defendant

that has ever been present in this litigation.

3.      The undersigned is primarily interested in retaining his reputation in the fields of critical

infrastructure protection and emergency management, which took a lifetime to build, from the

Defendant.  This document describes the undersigned's motivation, to address what the

undersigned avers are false statements made about the Plaintiff that have harmed the Plaintiff and his technical, ethical and professional reputation.

4.      The undersigned avers, based on his training and experience, that the Defendant and his associates were prototyping, whether wittingly or unwittingly, blended cyber-attacks on soft infrastructure targets in the United States (as articulated in the original complaint filed in this action, June 14, 2017).

5.      The undersigned avers that the Plaintiff appeared on the Alex Jones show as a guest of Linda West in 2012 in the same role as a licensed Emergency Medical Technician (currently licensed in California for the past eight (8) years) offering disaster preparedness advice, not in the role of a "investigative journalist" as in Mr. Goodman's numerous appearances on the same network. [**Exhibit A - 1**]  (Affidavit – 1) See "*Powerful Linda West & Dave Acton on How2Survive & Prepare! - September 5th, 2012*".

6.      The undersigned has observed Linda West's introduction at time-mark, she states, "Tonight we have Dave Acton will be joining us.  He has inside knowledge that he is going to be sharing with us on disaster preparedness.  Dave has worked with many government agencies, fire fighters and E.M.T.s.  And he is here tonight to help you prepare in case there is a crisis in your hometown."

7.      This video broadcast by Linda West highlight the Dave Acton YouTube channel named "Common Sense Prepping and Survival".  [**Exhibit A - 1**].  The video titles displayed within the Alex Jones broadcast depict the undersigned's YouTube channel.  The titles for podcasts shown on this the "Common Sense Prepping and Survival" are: (1) Breaking 7.9 EQ hits Costa Rica, [EQ = earthquake], (2) How will you hydrate in SHTF? [sh_t hits the fan], (3) Deer searching for food and water, (4) Emergency first aid sling, etc.

8.      The undersigned affirms that the Plaintiff, interviewed by Linda West, spent five years as a volunteer in disaster communications planning, as part of Los Angeles County Disaster Communications Service (L.A.C.D.C.S.) that qualified the undersigned to speak to issues of response and recovery to massive earthquakes in Los Angeles County.  In this regard, the undersigned affirms that he participated in disaster simulation tabletop exercises (T.T.X.).

9.      These T.T.X. activities follow a structed format published by the Federal Emergency Management Agency (F.E.M.A.).  During this period the undersigned was active in attempting to achieve the designation Master Exercise Practitioner as part of the Homeland Security Exercise and Evaluation Program (H.S.E.E.P.)  The undersigned has completed 95% of the requirements for the M.E.P. designation.

10.     Shortly before the seminal event of the Port of Charleston "dirty bomb incident" of June 14th, 2017, the undersigned observed George Webb Sweigert, former social media sidekick of the Defendant and Plaintiff's brother.  Mr. George Webb and the Defendant began building a social media audience with an independent murder investigation of the **Seth Rich murder**, the purported leaker of clandestine e-mail messages from the Democratic National Committee to **Wikileaks and Julian Assange**.

11.     The undersigned avers that the Internet transmission of electronic files (Seth Rich files) contained the personally identifiable information (P.I.I.) of high-level Democratic Party financial donors, and became known as "**The Seth Rich files**".

12.     The undersigned avers that the invitations by George Webb and the Defendant to have their audience download copies of these clandestine files raised the Plaintiff's alarm two weeks prior to the Port of Charleston.  This "**Seth Rich files**" meme became a YouTube sensation for a

week or two which spotlighted Webb-Sweigert/Goodman.  See video podcast of June 3, 2017 "Who Is Spoofing The Seth Rich Files", [**Exhibit A -2**]

13.     The undersigned avers that at the time the undersigned was not following George Webb-Sweigert or Jason Goodman.  The undersigned became aware of George Webb on YouTube with the narrative related to the Seth Rich files.  **[Exhibit A-2]**

14.     The undersigned avers that it was the transmission of these electronic files ("**Seth Rich files**") containing P.I.I. by Mr. Webb-Sweigert and Mr. Goodman that worried the Plaintiff, who is trained in electronic information security and the privacy laws and regulations thereof.  During this time, Plaintiff formed the opinion that Mr. Goodman was manipulating his brother to engage in criminal behavior on the Internet via invitations to download the Seth Rich files to drive his subscriber base and popularity.  The undersigned avers that the Plaintiff then believed he would have to make a public announcement concerning the mental state of his brother, which the undersigned did so public four (4) days prior to the Port incident on June 10, 2017.

15.     In July 2017, a month after the Port of Charleston, the undersigned observed that the **Seth Rich murder** investigation and the "Seth Rich files" placed Webb-Sweigert and Mr. Goodman at the center of events that orbited retired Washington, D.C. homicide investigator and FOX NEWS contributor Rod Wheeler, hired to investigate the Seth Rich "murder".  These events lasted well into August 2017 (two months following the Port incident).  [**Exhibit A - 3**]

16.     **Exhibit A-3** displays George Webb-Sweigert and Jason Goodman talking with Rod Wheeler sometime in August 2017.

17.     Three (3) weeks before the "dirty bomb incident" of 6/14/2017, both Mr. Webb-Sweigert and Mr. Goodman recorded a video on May 27th, 2017, entitled, "*George Webb Continues the Deep Dive Into Pakistanti ISI - NATO Rat Line*".  that discusses the motor vessel M/V

MEMPHIS MAERSK (the container ship at the center of the "dirty bomb incident") and the need to track it's whereabouts as it may be related to carrying cargo of depleted uranium.

**[Exhibit A-4]**

18.    As the undersigned listened at time-mark 3:28 in "*George Webb Continues the Deep Dive Into Pakistanti ISI - NATO Rat Line*" the voice of Jason Goodman can be heard saying "George let me ask you this because of the Tom Hanks movie about Somalian pirates, gang up on the MAERSK.  Is there anything there?"  The undersigned then heard George Webb say, "You mean the Captain Phillips movie?".  Then the undesigned heard the voice of Jason Goodman, "Ya".  Movie poster for Captain Roberts shown in **Exhibit A-5** with a photo of the MAERSK ALABAMA featured in the movie.

19.    At time-mark 2:50 in the video "*George Webb Continues the Deep Dive Into Pakistanti ISI - NATO Rat Line*" the undersigned heard George Webb tell Jason Goodman, "There is also going to be a ship involved.  It is going to be MAERSK shipping lines, M A E R S K.  And the special focus is going to be the MEMPHIS.  MEMPHIS, the ship the MEMPHIS."  [**Exhibit A-4**].

20.    At time-mark 3:15 in the video video "*George Webb Continues the Deep Dive Into Pakistanti ISI - NATO Rat Line*" the undersigned heard George Webb say "We want to track the MEMPHIS MAERSK every day".   George Webb uses a box of SWEET-N-LOW and Splenda sweetener to show the ship's movements. [**Exhibit A-6**]

**21.**    According to the affidavit of Manuel Chavez, III [**Exhibit A-7**], three (3) weeks prior to the 6/14/2017 port incident, Webb-Sweigert and Goodman enlisted the help of an information technology technician named **Manuel Chavez, III** (a resident of Arizona at the time) to examine

what is commonly known as files on a USB jump drive, known as the "**Seth Rich files**" see affidavit of **Manuel Chavez, III.**

22.     The undersigned avers that as shown in **Exhibit A-8** the undersigned has read the following statement, "The "Seth Rich files" that were "spoofed" according to Crowdsource the Truth were actually the Guccifer 2 files. They were handed to Patricia Negron aka "Trish the Dish" on a USB stick. One source told me this handover went down theatrically in a forest near Boston. It's quite possible that Trish, Jason and George really thought they were getting some super-secret hacker intel from Seth Rich, rather than being led into a LARP. [Live Action Role Play] It's also possible that all the characters involved with this were well aware of what they were doing, why, and for whom. I find it hard to believe that every single character in this story was an innocent, unwitting patsy, and everything just happened to them by coincidence."

23.     The undersigned avers that **four (4) days** prior to the Port of Charleston incident (6/14/2017) the undersigned appeared on the DEFANGO show (aka Manuel Chavez, III of Carson City, Nevada).  On that show, with a livestream audience of 2,000 viewers, the undersigned warned the Internet community that his brother George was at times delusional and paranoid and should not be taken seriously.  The Port of Charleston was preventable, if only the Defendant had not amplified and incited the audience that day and heeded to words of George Webb's brother.

24.     The undersigned avers that **two (2) days prior** to the Port of Charleston incident, in a broadcast with Webb-Sweigert, the Defendant began publicly name calling the Plaintiff (see "joker in the deck") in retaliation for the Plaintiff's publicized "mentally unstable" warning about George Webb.  Mr. Goodman acknowledges these warnings; however, the Defendant had a financial interest in his "pet show dog" Webb as Mr. Goodman's YouTube subscriber count

was dramatically increasing by the hundreds while featuring George Webb in a series of Internet hoaxes.

25.     The Plaintiff believes that the Defendant was emotionally manipulating the apparent susceptibility of his brother to conspiracy theories.  In short, the Plaintiff wanted the Defendant out of his brother's life two days prior to the Port of Charleston MEMPHIS MAERSK incident.

26.     Prior to the Port of Charleston incident, the undersigned had spoken with his brother perhaps two or three times in the prior three years preceding the incident.  The same is true post-incident.  The undersigned has only recently, beginning in January 2021, include the email of George Webb in various e-mail messaging.  There is no contact between the undersigned and his brother.  The undersigned is not "working with" his brother.  The undersigned has no association with his brother.

27.     Based upon the foregoing, the Plaintiff believed at the time that the Port of Charleston "dirty bomb hoax" represented in what could be considered a blended social media attack on critical infrastructure and released a white paper on this matter, entitled "Port of Charleston evacuation case study: The cognitive threat of conspiracy theorists," dated June 18, 2017, presently with 3,355 views at https://www.slideshare.net/dgsweigert/port-of-charleston-evacuation-case-study-the-cognitive-threat-of-conspiracy-theorists?qid=15d2f407-26d7-4695-ab4b-740ad88a4017&v=&b=&from_search=1  [**Exhibit A-8**]

28.     The undersigned avers that this white paper, published June 18, 2017, contains the phrase, "*Examination of the Port of Charleston emergency evacuation and closure deliberately caused by anti-government social media "conspiracy theorists" is a harbinger of things to come. Role planning games that weaponize sensationalized "crowd-sourced" information represent a*

*new emerging threat to critical infrastructure operators.  Note: this paper is scholarly research and distributed for discussion purposes only*." [**Exhibit A-8**]

29.     The undersigned avers that about one month after the Port of Charleston incident the undersigned was contacted by Coreen Elizabeth Stoughton of Hanover, Maryland.  Ms. Stoughton informed the undersigned that she had taken a firearm and drove to try and intercept George Webb at a hotel in Laurel, Maryland the evening following the public announcement that warned people that George Webb was mentally unstable in the area of conspiracy theories.

30.     The undersigned believes without reservation or doubt that George Webb apparently became popular through the promotion of "journalist" and social engineer Sy Hersh.  These events were unknown to the undersigned at the time, but hindsight indicates to the undersigned that George Webb became popular speaking about the disappearance of Eric Braveman on social media following the November 2016 presidential election.  George Webb appeared on the John B. Wells Show on June 9, 2017 (the apparent coordinator of Operation Classified held October 2018).  [**Exhibit A-25**]

31.     The undersigned can recall that the Defendant and a *CrowdSource The Truth* sidekick (Patricia Negron of Cambridge, Massachusetts who was a co-defendant with the Defendant in *Steele v. Goodman*, Eastern District of Virginia) traveled to London, England in an attempt to locate Eric Braverman.  The undersigned has observed the following text on the Internet, "A few days after the Port of Charleston hoax incident, Jason Goodman and Patricia Negron showed up in London, England, hoping to personally view an announcement that was going to be made by Julian Assange.  On June 21, 2017, The Daily Webb on Facebook, provided a full transcript of a conversation which Jason Goodman and Patricia Negron had with Craig Murray, the former

British Ambassador to Uzbekistan, as they stood outside the Ecuadorian Embassy in London. Julian Assange became a No Show, canceling his appearance based on legal advice." And

32.     "Note in the following short excerpt from the Crowdsource the Truth interview of Craig Murray, that Patricia Negron attempts to gloss over the accountability issue of how the Port of Charleston hoax went down in real time." And

33.     "Patricia Negron:  Yes!  George is in the United States right now working on the part of the story that led us down the path to a potential dirty bomb that may have come in on one of the cargo ships to the Port of Charleston, South Carolina.  In the meantime, we came here because we wanted to find Eric Braverman, CEO of the Clinton Foundation, who had gone missing….". https://trackingmeroz.wordpress.com/tag/patricia-negron/  [**Exhibit A-26**]

34.     The undersigned avers that after reading the above Internet posting the undersigned observed another posting, which is the documentary that featured the Defendant as "Jason Goodman, YouTuber" see *After Truth: Disinformation and the Cost of Fake News* , a video broadcast on Home Box Office (HBO)

https://en.wikipedia.org/wiki/After_Truth:_Disinformation_and_the_Cost_of_Fake_News

 [**Exhibit A-27**]

35.     The undersigned avers that he has watched this documentary, *After Truth: Disinformation and the Cost of Fake News*, and has observed an appearance by Dr. Jerome Corsi, PhD at time-mark 29:00 [**Exhibit A-30**].  https://www.youtube.com/watch?v=dIFlbRirqlg  At time mark 30:30 the undersigned observed the appearance of Jason Goodman, YouTuber.  [**Exhibit A-30**]. The undersigned heard the Defendant state in the video, "I didn't look at C.N.N. and say 'I wanna do that'.  I didn't go to FOX news and say 'Here is my resume, I wanna put on a suit and after Tucker Carslon I wanna sit there an read my news'.  I didn't say that.  I didn't go to the

New York Times and say I wanna write stories for you.  I looked at all those things and said you guys are all fucked up.  Whatever it is that you think is journalism I think is fucked up."

https://www.youtube.com/watch?v=dIFlbRirqlg  [**Exhibit A-31**] And

36.     "I find it intriguing that even investigating it, and questioning it, and becoming a forensic examiner of the evidence you get ridiculed.  You are a conspiracy theorist." [**Exhibit A-32**] Commencing at time mark 31:10.  At time-mark 31:18 the undersigned observes Jerome Corsi in a plit screen podcast with Jason Goodman in a video entitled, "*Press Conference Offers Newe Evidence in the Seth Rich Murders with Special Guest Dr. Jerome Corsi*".  [**Exhibit A-33**].

37.     The undersigned observed an Internet blog post that also included a screen shot of the Defendant in the podcast "*Press Conference Offers New Evidence in the Seth Rich Murders with Special Guest Dr. Jerome Corsi*" https://www.sdny.info/post/alert-the-mysterious-death-of-jenny-marie-moore-and-the-jason-goodman-connection  [**Exhibit A-34**]

38.     In the above article [**Exhibit A-34**] the undersigned takes note of the photograph of Dr. Joshua K. Sweigert.  The undersigned recalls a telephone discussion with Corean Elizabeth Stoughton (Hanover, Maryland) concerning her meeting with Dr. Sweigert in New York City with George Webb (who she had driven to New York City in her car from Capitol Heights, Maryland).  Ms. Stoughton informed the undersigned that she explained to Dr. Sweigert that George Webb needed to be committed to a psychiatric hospital for observation on a 72-hour hold.

39.     The undersigned avers that Ms. Stoughton (Meier) apparently pleaded with Dr. Sweigert (son) to act in this manner and help with a 72-hour hold.  To this the son of George Webb apparently displayed a cavalier attitude to Ms. Stoughton (Meier) and decided not to become involved.

40.     The undersigned avers that it was for these exact same reasons that the Plaintiff became frustrated with Dr. Sweigert in the week of the Port of Charleston "dirty bomb hoax" for not taking an active role in the treatment of George Webb and Dr. Sweigert's failure to perform any kind of intervention.

41.     The Plaintiff avers that it was for these reasons that the Plaintiff became upset with the Defendant during the week of the Port of Charleston "dirty bomb hoax" for bailing out George Webb from the Zanesville, Ohio jail.  At the time, the undersigned avers that he thought it was the prudent action to have George Webb remain in the Zanesville jail while hospital treatment and observation could be arranged.  This was the desire of the Plaintiff, to have his brother remain in jail until a facility could be located and arrangements could be made for a custodial transfer for observation and testing. [**Exhibit A-34**]

42.     Against the undersigned's wishes, the Defendant bailed out George Webb with $4,000.00 and took George Webb back to New York City, only to publish podcasts in August 2017, that the Plaintiff witness and heard, that George Webb was an alcoholic and had mental problems.  The undersigned avers that this was essentially the same message the Plaintiff published June 10, 2017 about George Webb.

43.     In an Internet news article by the newspaper serving Zanesville, Ohio, the undersigned observed the following, "In a video posted by Jason Goodman to YouTube, Sweigert discusses calling the Coast Guard to report a possible bomb based on information from sources "within a five-hour driving area of West Virginia."  In another video posted by Jason Goodman, titled "Getting the Dirty Bomb Story Straight," Sweigert said he was interviewed by FBI agents and had been detained in the Zanesville City Jail."

https://www.zanesvilletimesrecorder.com/story/news/local/2017/06/16/man-who-allegedly-reported-dirty-bomb-charleston-arrested-zanesville/403032001/   [**Exhibit A-35**]

44.     After reading the above Internet article the Plaintiff observed podcast film that displays George Webb, the Defendant and Jerome Corsi all sitting in the home office of "Dr." Corsi at time-mark 39:00 discussing the Seth Rich murder investigation.

https://www.youtube.com/watch?v=dIFlbRirqlg  [**Exhibit A-36**]

45.     The undersigned avers that he recalled the Defendant text Jerome Corsi during the Port of Charleston "dirty bomb hoax" video livestream on June 14, 2017.

46.     At time mark 40:55 in the above-described documentary the Plaintiff observed the alignment and interconnection of the names Rod Wheeler, Malia Zimmerman, Jerome Corsi and Jason Goodman [**Exhibit A-36**].  At time-mark 42:22 the undersigned observes a close-up of a Twitter tweet from Cassandra Fairbanks "Brother of Seth Rich works as Government Contractor for Cyber Defense".  [**Exhibit A-37**].  At time-mark 43:02 the undersigned observed a close-up of a FOX NEWS retraction of a Seth Rich murder investigation story.  [**Exhibit A-37**].  At time-mark 1:02.02 the undersigned observed an NBC News report that addressed false sexual misconduct smears against Robert S. Mueller, III, special counsel.  [**Exhibit A-37**]

47.     The undersigned avers that he has reviewed the Internet posting, which is an analysis of "fake news" by Yale Law School.

https://law.yale.edu/sites/default/files/area/center/isp/documents/fighting_fake_news_-_workshop_report.pdf  [**Exhibit A-28**]

48.     Regarding the Defendant's witness Corean Elizabeth Stoughton (Meier).  Ms. Stoughton, born 1X/1X/1966, and the undersigned had off again, on again phone conversations about George Webb and some of the players associated with the Defendant and his partner Dr. Jerome

Corsi of New Jersey.  The gist of the calls was to try and figure out ways to get George Webb into some kind of treatment program such as Alcoholics Anonymous or substance abuse counseling.

49.     The undersigned avers that prior to the Port of Charleston incident, the undersigned had no knowledge of Robert David Steele and Jerome Corsi.  Prior to the Seth Rich files incident the undersigned had no knowledge of the Defendant or Manuel Chavez, III.  Ms. Stoughton expressed to me that it was her opinion that Jerome Corsi and the Defendant had coordinated the Port of Charleston incident and had worked together to bring about the incident.

50.     The undersigned learned in hindsight, while Ms. Stoughton lived with George Webb in an on-again, off-again lifestyle, that she had entered all of George Webb's electronic messaging media – such as e-mail, YouTube, Twitter, etc.  According to Ms. Stoughton George Webb wanted her to act as a quasi-system administrator to manage George Webb's social media presence – such as Twitter, Facebook, YouTube.  According to Ms. Stoughton she accomplished this by using George Webb's username and password credentials.  She apparently remained George Webb's lover and/or driver and/or escort between May 2018 to July 2019.  She apparently used a code name alias DEEP NSA [**Exhibit A-29**]

51.     The undersigned avers that Ms. Stoughton's father is a very wealthy former contractor of the U.S. national Security Agency named Ron Stoughton.

52.     The undersigned had no knowledge of the Port of Charleston prior to the "dirty bomb incident".  The undersigned had no knowledge of Tyron Simpson, aka Frank Bacon prior to the "dirty bomb" incident.

53.     As stated in several declarations filed by the undersigned in *Steele v. Goodman* in Maty 2018, the undersigned had no knowledge of any coordinated attempt to harm the Defendant by

Manuel Chavez, III, Frank Bacon, Robert David Steele, Steven S. Biss, esq., or others Tanya Cornwell.

54.     As stated in the declaration filed by the undersigned in *Steele v. Goodman* in May 2018, the undersigned was not associated with the above-named people, was not communicating with the above-named people, was not in an association with the above-named people.  This assertations can be confirmed by Corean Elizabeth Stoughton who had off again and on-again telephone calls with the undersigned, e-mail message exchanges and cell phone texts.  Ms. Stoughton can also confirm that while she lived with George Webb Sweigert between May 2018 and July 2019 and during that time there were no such communications between the undersigned and George Webb Sweigert except for one or two phone calls related to family issues.

55.     During these conversations Ms. Stoughton, daughter of Ron Stoughton, informed the undersigned that she had a cousin that was a senior agent with the Alcohol Tobacco and Firearms (A.T.F.) agency and that she had spoken to her cousin after the Port of Charleston incident and that she had received a call from the U.S. Coast Guard about the Port of Charleston incident but never answered the call and she spotted the number and agency identification on her caller ID on her cell phone.

56.     Ms. Stoughton also informed the undersigned that she had a "gay" brother who was the lover of the personal trainer to U.S. Supreme Court jurist Ruth Bader Ginsberg.  Ms. Stoughton informed the undersigned that she was going to be communicating with her family government connections to try to get to the bottom of the entire Port of Charleston affair.  Ms. Stoughton displayed what appeared to the undersigned to be an insatiable interest in the players involved, especially Manuel Chavez, III, Trevor Fitzgibbon, the Defendant and Jerome Corsi.  Ms.

Stoughton expressed to the undersigned the opinion that Jerome Corsi may have been the architect and engineer behind the Port of Charleston affair.

57.     The undersigned avers that while Ms. Stoughton was sleeping and spending the weekend with George Webb Sweigert at his hotel room in Capitol Heights, Maryland (near Andrews Air Force Base) she became aware of the death of Jenny Marie Moore, aka Task Force, on Monday, August 13, 2018.  Ms. Stoughton had driven George Webb Sweigert to Annapolis, Maryland to buy a globe for a George Webb video and the Internet connection at the hotel in Capitol Heights, Maryland was not working.  At about 10:00 am she drove George Webb to an urban transit train so that George Webb could travel to the Navy Memorial and perform YouTube podcasts. During this time hotel staff called Ms. Stoughton and informed her that Jenny Marie Moore, Task Force, was dead and that her body was found in her hotel room, down the hall from the George Webb hotel room where she had stayed.  Ms. Stoughton called the undersigned shortly after she received this notification.

58.     In December 2017 the undersigned notified the Sergeant of Arms for the U.S. Capitol that George Webb and Jenny Maria Moore (aka "Task Force") were seen sitting immediately behind F.B.I. director Christopher Wray in a U.S. House of Representees committee hearing. The undersigned's report included information that Ms. Moore had displayed law enforcement badges from her previous experiences with the Tracy (California) police department on camera with George Webb.

59.     The undersigned avers that the next day three representatives of the Joint Terrorism Task Force surrounded (JTTF) made contact George Webb Sweigert while he had breakfast at the hotel in Capitol Heights, Maryland.  According to George Webb's video accounts, the JTTF asked him questions for thirty (30) minutes about his dealings with Andrew McCabb, who

George Webb had accused of running a "gangs stalking" operation to follow and surveil Webb. The following day, according to video accounts, the JTTF officers returned the following day and searched the room of Ms. Moore searching for the law enforcement badges.

60.     The undersigned avers that the Defendant has taken an interest in himself, his father, his brother, his ex-wife, his son, his former social acquaintance in Maryland and others.  The undersigned has watched video podcasts published by the Defendant that discuss the Plaintiff, his brother and his father.

61.     The undersigned avers that the Defendant has chosen to publish almost ten (10) videos -- related directly or indirectly -- to the undersigned's father.  It seems to the undersigned that this discussion about George Harry Sweigert (senior) has been deemed pertinent by the Defendant. George Harry Sweigert is the father of George Webb Sweigert (Mr. Goodman's former roommate) and the undersigned.

62.     The undersigned observed an article on the Internet that is a news story published by the newspaper the Journal-Gazette of Fort Wayne, Indiana, which states, "Tuesday, June 20, 2017 1:00 am, False claims lead to real problems, Conspiracy theory shuts down port. … In the end, Webb, whose actual name is George Sweigert and who graduated from North Side High School in 1978, had managed to get the terminal evacuated where the container ship was located.  The Coast Guard inspected the ship and found nothing. It was another synthetic crisis. But it shows you what the internet can be used for.  That upsets a man named David Sweigert, who happens to be "George Webb's" brother and who graduated from North Side in 1977." [**Exhibit A-12**] and

63.     "It's the result of what Sweigert, who is involved in infrastructure protection and computer security, says can happen when the internet is what he calls "weaponized." Crowdsourcing sites that operate like games get fans to go online and solve mysteries and

conspiracy theories, David Sweigert said in a paper he prepared after the event.  Participants are told of a threat, creating a call to action, and soon fans start calling authorities about the imminent threat, he said.  In the case of Charleston, the seaport had to be shut down.""

64.     In view of the above the Plaintiff is bewildered and perplexed by statements by the Defendant in **ECF 279/280** such as "when the Sweigert brothers put their heads together."  The undersigned has not been involved in the planning, coordination, arranging or facilitating of anything with his brother, George Webb, for at least two decades, not even ordering a pizza, much less shutting down the Port of Charleston.

65.     The undersigned avers that the Defendant has introduced subject matter into the public domain through his published podcasts about the cordless telephone invention of the undersigned's father.  The father of the undersigned invented the household cordless telephone device (via patent issued by the U.S. patent and Trademark Office) in June 1969.  The inventor was also a radio amateur (ham radio operator) holding the highest class (Amateur Extra) radio license issued by the Federal Communications Commission (F.C.C.). [**Exhibit A-13**]

66.     The undersigned avers that a tactical radio communications environment is an officially sanctioned sport by a national accreditation agency, the American Radio Relay League, or A.R.R.L.  [**Exhibit A-14**]  The undersigned first became a member of the A.R.R.L. in 1973, the same year the undersigned received his first Federal Communications Commission (F.C.C.) license, a Commercial Third Class Radiotelephone Operator's Permit.  Such a license is required for any radio operator in a commercial aircraft, commercial ship, or other serious vessel.

67.     The undersigned believes that the A.R.R.L. (www.arrl.org) is the equivalent to the U.S. Sailing Association.  In fact, Walter Cronkite obtained similar licenses to those held by the undersigned and his father for his yacht while sailing.  An annual nationwide emergency radio

test in austere field conditions is conducted every year, known as FIELD DAY.  The undersigned

enjoyed a father-son relationship that orbited ham radio and the A.R.R.L.

68.     The undersigned observed the following entry about FIELD DAY on the Internet, "Field

Day stresses emergency preparedness. Frequently, entire radio clubs get involved and assemble a

portable radio station in a field or park. Some might use quickly deployable portable antennas

while other might erect more elaborate radio masts and towers supporting several antennas.

Generators or solar power provide electricity to amateur radio transceivers, which may be

located in tents, cars, recreational vehicles, or other portable shelters." [**Exhibit A-15**]

69.     The undersigned avers that such portable radio configurations are lifesaving links of

communications in ravaged areas of tornados, hurricanes, wildland fires, etc.  This was an area

of interest of the undersigned in his teenage and high school years.  During this time the

undersigned upgraded through several classes of ham radio license to obtain his ADVANCED

radio license.

70.     The undersigned and his father were both volunteer ham radio operators that supported

the Fort Wayne, Indiana chapter of the American Radio Cross.  In April 1974 both were

dispatched to Monticello, Indiana to provide auxiliary emergency communications

(AUXCOMM) to the local government in Monticello, as regular communications hand been

disrupted (in what is called a "communications black out").  To this end both individuals were

issued Auxiliary Communications (AUXCOMM) credentials by the Indiana State Police as the

county in the disaster area was under operating under a curfew and martial law.  Father and son

provided AUXCOMM operations for a 72-hour period in an austere environment.

71.     The undersigned was active in Boy Scouting and obtained the rank of Eagle Scout.  The

undersigned also received adult leadership training and served as a Junior Assistant Scoutmaster

in the oldest serving scout troop in Fort Wayne, Indiana. The undersigned joined an electronics and ham radio explorer post sponsored by MAGNAVOX corporation between 1975 and 1977. The explorer post focused on emergency ham radio communications. To this end the undersigned participated in three annual FIELD DAY competitions of emergency ham radio operators participating in a national preparedness drill in the third weekend of June. The undersigned received the electronics, first aid, ham radio and emergency preparedness merit badges in this regard.

72.    To that end the undersigned worked as an Eagle Scout volunteer on the national ham radio exhibit staff for the 1977 National Scout Jamboree at Fort A.P. Hill, Virginia. In 1981, traveling under special orders from the U.S. Air Force, the undersigned participated on the national ham radio staff for the 1981 National Scout Jamboree at Fort A.P. Hill, Virginia as a military representative to recruit scouts into Air Force communications.

73.    Between 1975 and 1977 (while in high school) the undersigned was a volunteer AUXCOMM operator for the Allen County (Indiana) Sheriff's Department. In this capacity he served on crews to deliver insulin to diabetic shut-ins during snow blizzards and other emergencies (see blizzard of 1978). The Sheriff (Charles "Bud" Meeks) personally presented the undersigned with his Eagle Scott award at the Eagle Scout court of honor.

74.    The undersigned avers that during this time George Webb Sweigert was attending basketball camps, sporting practices, organized events in basketball and track and field. Much of this activity was under the tutelage of an older brother that acted as a de facto sports manager for George Webb. This older brother was very active in marketing George Webb to various universities for an athletic scholarship in basketball.

75.     In sum, the undersigned avers that during the formative teenage years the undersigned followed in his father's ham radio footsteps, while George Webb Sweigert (Mr. Goodman's former roommate) split off his interests and extracurricular time into sports activities.

76.     Thus, the undersigned avers, during the teenage and high school years the undersigned interfaced with his father in the realm of radio communications in an operation tactical environment.  Meanwhile, George Webb Sweigert attended to baseball practice, basketball games, etc.  George Webb graduated high school in 1978, the undersigned 1977.

77.     This separation in vocational activities became more acute when the undersigned left for active-duty service in the U.S. Air Force (May 1979 to May 1983 Honorable Discharge).  This was the period that George Webb played basketball at Miami University in Oxford, Ohio.

78.     Meanwhile, the undersigned was involved in activities such as Air Force Military Auxiliary Radio System (MARS) (https://www.airforce.com/en).  The undersigned's father also participated in A.F. MARS.  As an example, the undersigned once had a two-way radio exchange on military aeronautical shortwave radio frequencies controlled by MARS with his father from an in-flight helicopter in Honduras.  The undersigned's father monitored emergency aeronautical distress frequencies (Search and Rescue [SAR]) as part of the MARS program.  The undersigned believes there is the honor associated with this type of technical non-profit volunteerism.

79.     As the Defendant has introduced the subject matter of the undersigned's family having an issue with alleged "mental illness" the Plaintiff avers that George Harry Sweigert was a Staff Sergeant in the 145th Headquarters Company of the 37th Infantry Division.  This military service began approximately four months prior to Pearl Harbor in August 1941 when the father enlisted in the Ohio National Guard.  This service ended July 5, 1945.  The undersigned avers that his

father told him that he joined the Ohio National Guard so that he would be able to learn the International Morse Code and obtain his ham radio license.  The father completed several combat tours on Guadalcanal, Bougainville, the Fiji Islands, Luzon Islands, Philippines, etc.  In fact, the undersigned's father was instrumental in establish a tactical radio network during the liberation of the Philippines which quite possibly saved hundreds of lives.

80.     The undersigned avers that his father told him that while in combat in the South Pacific he was a group of several victims of an air raid attack by an enemy Japanese dive bomber on the 145th Command Staff and that a very large ariel bomb exploded near the group, creating several causalities.  The undersigned avers that his father told him that some soldiers of the 37th Infantry Division had their throats slit in the middle of the night in fox holes, allowing others to find their comrade dead in the morning.  The undersigned avers that his father told him that often times the Japanese would whisper confusing and demoralizing verbal signals in English during night raids to U.S. troops near the front line.

81.     The undersigned avers that these whispers were a form of psychological harassment in the father's opinion.  Then undersigned avers that his father described approximately the viewing 4,000 corpses and remains of Japanese soldiers that had washed ashore on Guadalcanal after the sinking of a Japanese troop transport ship.  The undersigned submits that military personnel in World War II that suffered traumatic experiences such as these were typically labeled and classified as suffers of "battle fatigue" or being "Shell Shocked".

82.     The undersigned avers that during this time George Webb's older brother "sports agent" continued to shepherd George in collegiate athletics.  To the regret of the undersigned the Plaintiff once admired this brother and placed him in a paramount position of respect.  However, as the undersigned's involvement in the U.S. military commenced the undersigned detected a

more anti-War rhetoric from this brother.  The undersigned assumes that while the Plaintiff

operated radio systems in Latin American that George Webb and the older brother focused on

collegiate sporting events in the Midwestern United States.

83.     To this day the undersigned has watched video podcasts of George Webb which are

essentially a product of anti-War rhetoric.  George Webb has a tremendous outspoken theme that

orbits corruption in military organizations such as the North Atlantic Treaty Organization

(N.A.T.O.) that has been observed by the Plaintiff.

84.     The undersigned has heard George Webb podcasts that discuss his criticism of F.B.I.

counterterrorism and the operation of Joint Terrorism Task Forces (J.T.T.F.).  The undersigned

avers that George Webb made dozens of videos regarding Andrew McCabe an assistant director

at the F.B.I.  According to the videos published by George Webb, many which included the

Defendant, Andrew McCabe had a personal interest in retribution against George Webb for

Webb's public defense of the Portland, Oregon Christmas Tree Bomber in 2010. [**Exhibit A-16**]

85.     The undersigned observed that an Internet web site contained the following, "George

Webb Was Setup – Suing The FBI (Andrew McCabe) – False Reports In CNN And NEW

YORK TIMES And Other Publications Defamed Him – **Asking Larry Klayman To Be His**

**Attorney**." And

86.     "I knew this was going to happen sooner or later, and I hope **Larry Klayman** will take

this lawsuit for George Webb and shoot to the moon with it.  George Webb is an investigator and

journalist I have been following for at least a year now.  I trust him and the work he is doing.  In

the following video he explains much of what occurred to bring about this $100M Defamation

Lawsuit Versus Andrew McCabe of the FBI.  George is also including other plaintiffs associated

with his work and investigations in this lawsuit."[**Exhibit A-17**]

87.     The undersigned avers that remarks by former Special Agent Robyn Gritz, a long time

associate of the Defendant, on the Internet stated, "I believe I have a unique inside view of the

mannerisms surrounding **Andrew McCabe**, other FBI Executive Management and Former

Director Mueller, as well as the unethical and coercive tactics they use, not to seek the truth, but

to coerce pleas or admissions to end the pain, as I call it. They destroy lives for their own

agendas instead of seeking the truth for the American people. Candor is something that should be

encouraged and used by leadership to have necessary and continued improvement.  Under

Mueller, it was seen as a threat and viciously opposed by those he pulled up in the chain of

command." [**Exhibit A-18**][**emphasis added**]

88.     The undersigned avers that he has seen evidence that Robyn Gritz and Larry Klayman

have appeared on the Defendant's *CrowdSource The Truth* show.  [**Exhibit A-19**]  The

undersign avers that Robyn Gritz appeared on a podcast show with Sidney Powell, defense

attorney to Lt. Ge. Michael A. Flynn, U.S.A. (ret.) organized by the Defendant.  [**Exhibit A-20**].

89.     As stated in the undersigned's declarations in Steele v. Goodman (May 2018), concerning

Defendant's allegations of involvement with IRAN-CONTRA drug smuggling.  While in U.S.

Air Force radio technical school assigned to Keesler Air Force Base, Mississippi in 1979, the

undersigned supported AUXCOMM for the base facility as communications had been disrupted.

The undersigned re-established antenna systems, re-established contact with the National

Hurricane Center (N.H.C.) and maintained posted radio watch during a period of 72 hours.  For

this activity, the undersigned was awarded the U.S. Air Force Humanitarian Service Medal.

90.     As stated in the undersigned's declarations in Steele v. Goodman (May 2018), in 1980

the undersigned was assigned to the 1978 Communications Group at Howard Air Force Base,

Republic of Panama and was assigned to a Tactical Communications Element which supported

AUXCOMM requirements in Latin American.  In this role the Plaintiff was deployed to

Honduras for extended periods (six to eight weeks) to provide flight following radio operations

for U.S. military aircraft designated as peacekeeper observers.  [**Exhibit A-38**]

91.     As stated in the undersigned's declarations in Steele v. Goodman (May 2018), in 1981

the undersigned supported an AUXCOMM requirement for the Organization of American States

(O.A.S.) in Tegucigalpa, Honduras.  While a passenger on U.S. Army helicopter (tail number

20212) traveling from Panama to Tegucigalpa the helicopter experienced a flashing hydrologic

failure light.

92.     As stated in the undersigned's declarations in Steele v. Goodman (May 2018), the

Plaintiff was not involved with the Central Intelligence Agency (C.I.A.), or C.I.A. convert

operations.  The Plaintiff was limited in scope to operating and maintaining shortwave air-to-

ground radio equipment to support O.A.S.  The Plaintiff had no knowledge of covert or

paramilitary operations.  The undersigned has read **Exhibit A-38** and observed these words,

"August 15, 1980 Leftists rebels took 12 hostages at the Organization of American States

(OAS)  in Tegucigalpa in protest of the alleged genocide by Honduran Army against Salvadoran

civilians fleeing El Salvador in May. "

93.     As stated in the undersigned's declarations in Steele v. Goodman (May 2018), said

helicopter made an emergency landing at Managua Airport, Nicaragua.  Although the helicopter

crew and the undersigned held O.A.S. peace keeping credential the Sandinista security forces

detained the group for approximately 48 hours under armed guard.  Under normal military

custom the Plaintiff would have been considered a "prisoner of war" that was detained by

opposing forces (this area was not certified for armed conflict and hostile fire designations until

many years later [Hostile Fire or Imminently Danger]).  The Plaintiff found it particularly

offensive that a photograph collage [**Exhibit A-40**] would present the Plaintiff as if held in humiliation by opposing forces with a straight jacket and "dunce cap". [**Exhibit A-39**]

94.     Prior to this time a ham radio operator in Argentina was kidnapped by terrorists of guerrilla group and was threatened with execution.  During the holding of the crew the Sandinista security forces identified the undersigned as an expert in AUXCOMM apart from the aircraft crew.  The undersigned's primary worry, while being detained, was that the aircraft crew would be released and that the undersigned would be held.

95.     As stated in the undersigned's declarations in *Steele v. Goodman* (May 2018), upon completion of honorable service, the undersigned enter college in Southern Texas, precisely at the same time the Defendant accused the Plaintiff of working as a C.I.A. contractor as part of an IRAN-CONTRA drug smuggling operation.  The Plaintiff completed his service at the 1978 Communications Group and departed the Republic of Panama in January 1982 as part of a military transfer to the State of Texas.

96.     By this time George Webb had already completed college in 1982 and then obtained employment in the State of Illinois.  The undersigned cannot recall many interactions while George Webb began his employment in Illinois.

97.     Shortly after graduation the undersigned obtained employment at Aeronautical Radio, Inc. which maintained an aircraft messaging system.  This type of employment was a natural transition from college studies and aeronautical radio operations in Latin America.  This employment required a military security clearance.

98.     After a few years, the undersigned began working at the Naval Air Test Center at Patuxent River Naval Air Station, Maryland.  This work involved computer automation operations to supply the air components of sea going U.S. Navy with parts and supplies for

aircraft.  Again, this required a military security clearance.  To that end the undersigned avers

that he was a technical lead for the first installation of a commercial maritime radiotelephone

earth station on a military warship (U.S.S. RANGER, CVN-61) using an INMARSAT link prior

to the commence of hostilities in DESERT SHIELD/STORM.  [**Exhibit A-21**].

99.      The undersigned avers that as part of the INMARSAT project the undersigned had to

brief Vice Admiral Jerry O. Tuttle, U.S.N. (Joint Chiefs of Staff, Director for J-6) and the

command staff of AIR PACIFIC in San Diego, California.  The undersigned avers he was

processed for a military security clearance to perform the above INMARSAT activities, as well

as the Naval Air Test Center,

100.     More recently, the undersigned has a record of five (5) years of volunteer service to the

Los Angeles County Disaster Communications Service (L.A.C.D.C.S.) under the operational

control of the Los Angeles County Sheriff's Department (L.A.S.D.) in the position of Radio

Operator and Observer (RADO).  The undersigned affirms this was a AUXCOMM group that

worked directly with sheriff sub-stations and the undersigned was assigned to the sheriff sub-

station at West Hollywood, California.

101.     The undersigned avers that this position twice required a law enforcement background

check and swearing in ceremony where the undersigned had to pledge to uphold the

Constitutions of the United States and California.  These volunteer communications positions are

not taken lightly in an earthquake prone area.  This volunteer assessment captured the

undersigned's interest in tactical operational environments such a s FIELD DAY.

102.      In this position supported command and control communications at three (3) Type 3

wildland fire fires.  The tempo of operations is broadly described in the undersigned's

publication "Wireless Mobility Guide" for the support of fire staging areas.  This document

published May 29, 2015, has presently been viewed 589 times at URL:

https://www.slideshare.net/dgsweigert/sweigert-cnt67finaldoc

103.    On June 24, 2013, the undersigned released a scholarly white paper, viewed 1,317 times,

entitled, "*Moving toward a flexible, standards-based response protocol for CIKR cyber*

*incidents*" (CIKR = critical infrastructure, key resources), URL:

https://www.slideshare.net/dgsweigert/incident-response-23425780

104.    The undersigned has also received an infrastructure protection certification (Certified

Homeland Protection Associate – Level III) from the National Sheriff's Association.  This

required a peer-review of the undersigned's academic credentials, coursework, and experience.

105.    The undersigned has twice completed the Penal Code 832, Powers of Arrest (40 hours)

and Firearms (24 hours) course required for basic law enforcement positions as certified by the

Commission on Police Officers and Training (P.O.S.T.).  The course is described by P.O.S.T.

*"the minimum training standard for California peace officers"*.  Both of these courses required

the undersigned to undergo a firearm handling background investigation by the California

Highway Patrol.

106.    The undersigned has been licensed as an Emergency Medical Technician (E.M.T.) for

which he had to undergo a criminal background investigation.  The undersigned has been

licensed as an E.M.T. for eight (8) years as part of volunteer service in federally sponsored

Disaster Medical Assistance Teams (DMATs), which required another criminal background

investigation.  The undersigned is an active member of the California Disaster Healthcare

Volunteer (D.H.V.) and Medical Reserve Corps (M.R.C.) as well as the Livermore-Pleasanton

Fire Department, California, all which required criminal background investigations.

107.    The undersigned is also a certified Wildland Fire Fighter (F.F.), S-190 as designated by the U.S. Fire Administration (U.S.F.A.).  The undersigned is also a qualified E.M.T./F.F. as designated by the U.S.F.A.

108.    The undersigned holds two master's degrees, a bachelor's degree and three associate in science degrees.

109.    The undersigned has also completed the U.S. Fire Academy training as a Communications Unit Leader (C.O.M.L.) for a Type 3 Incident Management Team (I.M.T.).

110.    The State of California has recognized the undersigned as a Certified Emergency Management Specialist (California Office of Emergency Services).  The Federal Emergency Management Agency has recognized the undersigned with Advanced Professional Series and Professional Development Series designations.

111.    The undersigned has read an article on a blog site "TRACKING THE LEOPARD MEROZ" that state, "Three years ago, I looked up Dave Sweigert's federal lawsuits on PACER and came across the docket of his 1992 *qui tam* lawsuit.  Because that case is now 28 years old, the actual documents cannot be accessed electronically," and

112.    "However, Justicia.com displays a 1996 *U. S. Court of Appeals for the Sixth Circuit Opinion,* that explained upon review, that "Sweigert's complaint was filed as a qui tam action under the False Claims Act. 31 U. S. C. §§3730-3733.  Sweigert named Electronic Systems Associates, Inc. (ESA) and its president, Lemuel Kinney, accusing Kinney, through his corporation, of willfully misrepresenting material facts to the government, resulting in mischarges on certain federal contracts in violation of the False Claims Act.  Sweigert was terminated from employment at ESA in November of 1991." And

113.    "Prior to his lawsuit, Sweigert was working for Electronic Systems Associates at the U.

S. Special Operations Command (USSOCOM) at MacDill AFB, supporting classified network

operations and messaging systems that were used as part of communications support to troops

deployed during Desert Shield and Desert Storm." And

114.    "As noted in this <u>Google book</u>, documenting the nomination of Natalia M. Combs

Greene by the U. S. Congress, Senate, Committee on Governmental Affairs, she recalled that

during May 1990-December 1994, she was a Senior Counsel, Trial Attorney for the U. S.

Department of Justice, Fraud Section, Criminal Division.  In that capacity she recalled working

on these cases: *United States vs. Joseph Romello, CR No. 92-00418A and United States v.*

*Lemuel Kinney and Electronic Systems & Associates, Inc., CR No.94-00057A."* and

115.    "A New York Times article by the Associated Press printed October 4, 1992, *Ex-*

*Employee Admits He Bilked the C. I. A,* stated, "A former employee of the Central Intelligence

Agency has pleaded guilty to two felony counts for his role in defrauding the intelligence agency

and the Federal Government of more than $1.2 million, Government officials said."  SEE

https://trackingmeroz.wordpress.com/2020/08/19/david-sweigert-white-knight-of-the-order-of-

qui-tam-in-the-name-of-the-king/

116.    In 1987 George Webb was married in Portland, Oregon, an event attended by the

undersigned.  The undersigned believes that Gorge and his wife then traveled to Australia where

George worked in computer sales.  The undersigned had no contact with George during his four

years in Australia.

117.    During the period of the late 1980s and early 1990s both George Webb and his mentor

older brother lived in Portland, Oregon.  George Webb's association with the defense of the

Portland Christmas Tree bomber in 2010 via letters to the editors was an apparent event for

George Webb.  Unfortunately, the undersigned believes that in 1995 or 1996 the older mentor brother moved back to the Midwest from Portland, Oregon.  It was also noteworthy that George Webb went through a martial divorce at this approximate time.

118.    The undersigned avers that regarding Mr. Goodman's accusations concerning being a "dead beat dad".  The undersigned has never missed a payment in child support – ever.  The undersigned was never the subject of any court orders regarding child support.  The undersigned was never arrested or cited for failure to pay child support.  During the undersigned's formative years the Plaintiff routinely spent at least one week-end a month with his son at great expense in air fare and lodging.

119.    The undersigned avers that regarding Mr. Goodman's allegations of "wife swapping" [**Exhibit A-9**], regrettably the undersigned's wife apparently had a so-called "one night stand" with George Webb, who acted as the employment supervisor for the woman in question.  This was a one-time occurrence that the undersigned discovered years later.  This situation only fuels the animosity between the undersigned and George Webb.  Nevertheless, the Plaintiff recalls seeing dozens of Twitter tweets by Mr. Goodman stating that the Plaintiff was a dead-beat dad based on conversations with George Webb's girl-friend Corean Elizabeth Stoughton of Hanover, Maryland (daughter of Ron Stoughton). [**Exhibit A-10, A-15**]

**120.**    The undersigned avers that several e-mail messages were exchanged between Ms. Stoughton and the Defendant as depicted in **Exhibit A-23 and Exhibit A-24.**

121.    The undersigned has read the words at para. **88, ECF 280** when Defendant states, "Statement #11 and 12 were both made on the basis of information provided by Corean Stoughton. Goodman Decl. ¶ 51.".  However, the undersigned points out as noted in [**Exhibit A-**

**10**], Ms. Stoughton's text message (**05/03/2021**) to Mr. Goodman, she never said those words or attempted to convey that impression "I DID NOT SAY THOSE WORDS".

122.    The undersigned can state without uncertainty or doubt that in fact, Ms. Stoughton lauded the Plaintiff for his overly generous financial contributions to his ex-wife and son.  The undersigned has read these words by Ms. Stoughton in [**Exhibit A-10**] "In most people's opinion that would be the opposite of a "dead beat Dad".

123.    The undersigned has reviewed an Internet article that states, " A federal judge in California dismissed conservative lawyer and self-appointed government watchdog Larry Klayman's fraud and racketeering action against his ex-wife and her lawyers – none of whom live or work the Golden State." And

124.    "An Ohio court, however, found Klayman in contempt of the couple's divorce agreement and also awarded Deluca $320,000 in attorneys' fees. When Klayman didn't pay, Baker Hostetler filed a motion to show cause and the Ohio court issued subpoenas which the firm and Deluca served on PayPal in an effort to get Klayman's financial records." (https://www.courthousenews.com/ca-not-golden-for-klayman-scuffle-with-ex-wife/ )

125.    More recently, the undersigned published an article of January 4, 2018 (five months prior to filing initial complaint in this action), expressed the undersigned's concern, based on the totality of my training and experience, that the TYLER cult, promoted by the Defendant and his sidekick Quinn Michaels,  may represent a threat to critical infrastructure to justify social media surveillance of such statements and activities on the *CrowdSource The Truth* show (https://www.slideshare.net/dgsweigert/the-hacking-methods-of-the-singularity-event-doomsday-cult-tyler-ai ).

126.     The undersigned has observed that the above cited article states, " Promoting the TYLER cult Michaels attained near Messianic popularity with his followers when he suffered a collapsed lung in Roswell, New Mexico, which was attributed to an assassination attempt using directed energy weapons by a subversive rogue paramilitary element trying to silence Micheals. This notion is actively promoted by the YouTube conspiracy channel known as "Crowd Source The Truth" (CSTT) starring Jason Goodman. CSTT star Goodman was also a central figure in the emergency evacuation of the Port of Charleston, South Carolina on June 14, 2017 for a "dirty bomb hoax"". [**Exhibit A-11**]

127.     The undersigned states that he has never recalled hearing, or reading, any information, of any kind, regarding any credential, of any nature, from any organization, that has been bestowed on the Defendant.

128.     The undersigned has never received a retraction of any kind from the Defendant Jason Goodman, *CrowdSource The Truth*, about any publication of information.

129.     The undersigned has never suggested, in any form, that the Defendant was a "MOSSAD" operative.  The Plaintiff has never remarked, commented, endorsed, or suggested the idea that the Defendant was a "MOSSAD" agent, or an agent of "BLACK CUBE".  The undersigned avers, as demonstrated in Steele v. Goodman pleadings, that Matt Couch of Arkansas was the source of this information which was rebroadcast by Manuel Chavez, III.

**130.**     Prior to the Port of Charleston "dirty bomb hoax" of June 14, 2017, the Plaintiff was a YouTube personality known as "Dave Acton" that produced video podcast content, about five minutes long on average episode, about California disaster preparation.  These videos included topics on emergency ham radio, emergency medical procedures (Plaintiff is a licensed E.M.T.),

protection from hazardous materials (Plaintiff is a certified HAZ-MAT incident commander),

etc.

**The undersigned hereby attests under penalties of perjury that the above statements are true and correct to the best of the undersigned's knowledge and memory on this eleventh day of July (7/11), two thousand and twenty-one (2021).  A certificate of service is provided on the last page.**

*D. GEORGE SWEIGERT*
*Pro Se Non-Attorney*
*GENERAL DELIVERY*
*NEVADA CITY, CA 95959*

## CERTIFICATE OF SERVICE

**The undersigned hereby attests under penalties of perjury that copies of this communication have been transmitted via electronic mail message to the following parties on the eleventh day of July (7/11), two thousand and twenty-one (2021).**

| Clerk of the Court, Room 200 temporary_pro_se_filing@nysd.uscourts.gov | Jason Goodman, CEO truth@crowdsourcethetruth.org |
|---|---|

*D. GEORGE SWEIGERT*
*Pro Se Non-Attorney*
*GENERAL DELIVERY*
*NEVADA CITY, CA 95959*