**U.S. DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| SWEIGERT | CIVIL CASE #: |
|---|---|
| V. | 1:18-CV-08653-VEC |
| GOODMAN | JUDGE VALERIE E. CAPRONI |

### PLAINTIFF'S FIRST NOTICE OF SUPPLEMENTAL AUTHORITY

In connection with the Court's consideration of the Defendant's motions for summary judgment, the Plaintiff provides this notice of a recent decision by District Judge Valerie E. Caproni rejecting identical arguments for the application of New York's Anti-SLAPP law (see Civil Rights Section 70-a).

\*   \*   \*   \*   \*

**The undersigned hereby attests under penalties of perjury that the above statements are true and correct to the best of the undersigned's knowledge and memory on this twenty seventh day of August (8/27), two thousand and twenty-one (2021).  A certificate of service is provided on the last page.**

*D. GEORGE SWEIGERT*
*Pro Se Non-Attorney*
*GENERAL DELIVERY*
*NEVADA CITY, CA 95959*

## CERTIFICATE OF SERVICE

**The undersigned hereby attests under penalties of perjury that copies of this communication have been transmitted via electronic mail message to the following parties on this twenty seventh day of August (8/27), two thousand and twenty-one (2021).**

| Clerk of the Court, Room 200<br>temporary_pro_se_filing@nysd.uscourts.gov | Jason Goodman, CEO<br>truth@crowdsourcethetruth.org |
|---|---|

*D. GEORGE SWEIGERT*
*Pro Se Non-Attorney*
*GENERAL DELIVERY*
*NEVADA CITY, CA 95959*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/30/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

THE NATIONAL ACADEMY OF TELEVISION :
ARTS AND SCIENCES, INC. and ACADEMY :
OF TELEVISION ARTS & SCIENCES, :
                                     :
                      Plaintiffs, :        20-CV-7269 (VEC)
                                       :
           -against-               :      OPINION AND ORDER
                                       :
MULTIMEDIA SYSTEM DESIGN, INC. :
d/b/a "CROWDSOURCE THE TRUTH", :
                                       :
                      Defendant. :
-------------------------------------------------------------X
MULTIMEDIA SYSTEM DESIGN, INC. :
d/b/a "CROWDSOURCE THE TRUTH", and :
JASON GOODMAN :
                                       :
            Counterclaim Plaintiffs, :
                                       :
           -against-               :
                                       :
THE NATIONAL ACADEMY OF TELEVISION :
ARTS AND SCIENCES, INC. and ACADEMY :
OF TELEVISION ARTS & SCIENCES, :
                                       :
                                       :
           Counterclaim Defendants :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      Multimedia System Design, Inc. d/b/a "Crowdsource the Truth" ("MSDI") produces

video content that, *inter alia*, traffics in wild conspiracy theories.  In June 2020, MSDI used an

image of the Emmy Award Statuette holding a model of the COVID-19 virus as part of a video

honoring countries that downplayed the seriousness of the COVID-19 pandemic.  Plaintiffs, The

National Academy of Television Arts and Sciences, Inc. ("NATAS") and Academy of Television

Arts & Sciences ("ATAS") (collectively, the "Television Academies"), owners of the Emmy

1

Statuette design, took exception and sued.  Am. Compl., Dkt. 62 ("Am. Compl.").  MSDI and its

owner, Counterclaimant Jason Goodman ("Mr. Goodman") (collectively, "Counterclaimants"),

apparently believing the best defense is a poorly thought out offense, asserted counterclaims for

declaratory relief, violation of New York's anti-SLAPP law, and abuse of the Digital Millennium

Copyright Act ("DMCA").  Am. Answer, Dkt. 45. ("Am. Answer").  The parties have filed

cross-motions to dismiss.  Dkts. 24, 38.  For the following reasons, Defendant's partial motion to

dismiss the Amended Complaint is DENIED.[1]  Plaintiffs' motion to dismiss the counterclaims is

GRANTED.

---

[1]     George Sweigert, with whom Jason Goodman has an on-going dispute that festers on social media, *see Sweigert v. Goodman*, No. 18-CV-8653 (VEC), moved to intervene in this case after Mr. Goodman suggested that Mr. Sweigert was responsible for Defendant's inability to produce some requested discovery in this case.  Tr., Dkt. 69 at 61; Dkt. 84.

Mr. Sweigert's motion to intervene, or in the alternative, to appear as *amicus curiae* is denied.  To intervene as of right under Federal Rule of Civil Procedure 24(a), a party must have a "direct, substantial, and legally protectable" interest in the subject matter of the action.  *United States v. City of New York*, 198 F.3d 360, 365 (2d Cir. 1999).  Mr. Sweigert has no protectable legal interest in this case, which concerns Defendant's use of the Emmy Statuette image.  *See New York News, Inc. v. Kheel*, 972 F.2d 482, 486–87 (2d Cir. 1992) (denying non-party's motion to intervene to strike allegedly false portions of plaintiff's complaint because the non-party failed to identify a "protectable interest in the action").

To intervene permissively under Rule 24(b), a party must have "a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  Intervention, however, cannot be used to "inject collateral issues into an existing action," and the Court has broad discretion to deny an applicant's motion for permissive intervention.  *Kheel*, 972 F.2d at 486–87.  As noted *supra*, Mr. Sweigert has not identified any legally protectable interest in this case, and the Court will not allow Mr. Sweigert to inject his unrelated ongoing disputes with Mr. Goodman into this case.

# BACKGROUND[2]

Since 1949, the Television Academies have presented the Emmy Award to members of television casts, crews, and executives at annual award shows in recognition of excellence and achievement in television programming.  Am. Compl. ¶¶ 2, 10.  The Emmy Award is a gold statuette molded in the shape of a winged figure holding an atom (the "Emmy Statuette").  *Id.* ¶ 11.  The Television Academies co-own valid and subsisting trademarks and registered copyrights for the Emmy Statuette.  *Id.* ¶¶ 18, 22.

MSDI is a corporation owned by Mr. Goodman.  *Id.* ¶¶ 7, 26.  MSDI produces and disseminates social and political commentary through its video series "Crowdsource the Truth," as well as through various social media accounts.  *Id.* ¶ 25.  MSDI syndicates paid content through Patreon.com and SubscribeStar.com, and advertises, markets, and promotes that content through its social media accounts.  *Id.* ¶ 27.

On June 12, 2020, Defendant posted a nine-minute-long video (the "Video") on YouTube and other platforms as part of its so-called "Crony Awards," an award show that honored countries that downplayed the COVID-19 pandemic.  *Id.* ¶ 29.  As shown in the image below, the Video displays an image of the Emmy Statuette holding an illustration of the COVID-19

---

[2]  For purposes of this Opinion, the Court accepts well-pled, non-conclusory factual allegations in the Complaint and Counterclaims as true.  The Court also takes judicial notice of the two tweets and two videos attached as Exhibits 1-4 to Plaintiffs' motion for judicial notice because the tweets and videos are publicly available.  *See* Pls.' Motion for Judicial Notice, Dkt. 37-1 at 2–5; *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (courts may take judicial notice of "information publicly announced on certain non-governmental websites"); *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411 (S.D.N.Y. 2011) ("[I]t is well-established that courts may take judicial notice of publicly available documents on a motion to dismiss.").  Exhibit 2 is the video at issue in this case and can be found at https://www.bitchute.com/video/MQ2xH7Z3584/ (the "Video"); *see* Am. Compl. ¶ 33.

In its amended answer, Defendant admits using the Crony Graphic in a second video.  Am. Answer at 25 ¶¶ 19-20 (citing https://youtu.be/Ey73TgziOLg).  The Court has not considered the second video for purposes of this Opinion because the video is not referenced in Plaintiffs' amended complaint, Plaintiffs' motion for judicial notice, or Defendant's original answer.  The Court notes, however, that its analysis or conclusions would not be altered in any way if it also considered the second video.

virus (the "Crony Graphic").  *Id.* ¶ 30.  The Crony Graphic appears for the opening ten seconds

of the Video, and it is used as the Video's YouTube thumbnail image.  *See* Video at 00:00 to

00:10.  Defendant also used the Crony Graphic in social media posts promoting its Crony

Awards.  Am. Compl. ¶ 30; Pls.' Motion for Judicial Notice, Dkt. 37-1, Ex. 1.



On July 28, 2020, someone reported Defendant's Video to the Television Academies.

Am. Compl. ¶ 33.  Plaintiffs promptly submitted a DMCA takedown notice to YouTube, and

YouTube removed the video.  *Id.* ¶¶ 34-35.  Upon learning of the takedown notice, Mr.

Goodman contacted Adam Sharp ("Mr. Sharp"), President and CEO of NATAS, to object to the

takedown notice.  *Id.* ¶¶ 36-38.  On August 25, 2020, Defendant submitted a DMCA counter

notice challenging the removal of its video and asserting that its use of the Emmy Statuette was

fair use.  *Id.* ¶ 40.  Defendant also tweeted and posted a YouTube video accusing Mr. Sharp of

being a "political operative" and declaring that Mr. Sharp and his father's careers were the

products of "nepotism, corruption, and CIA-led propaganda campaigns."[3]  *Id.* ¶¶ 41-43.

---

[3]        The allegedly defamatory video is currently inaccessible.  Am. Compl. ¶ 43 (citing
youtube.com/watch?v=3heNmyUlZj8).

Plaintiffs assert claims for: (1) copyright infringement under 17 U.S.C. § 101 *et seq.*; (2) trademark dilution under Section 43(c) of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c); (3) trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (4) trademark infringement, false designation of origin, passing off, and unfair competition under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (5) trademark infringement under New York common law; (6) trademark dilution under N.Y. Gen. Bus. Law § 360-l; and (7) libel per se and/or libel per quod under New York common law.  Am. Compl. ¶¶ 51-80.  Defendant MSDI and Counterclaimant Mr. Goodman assert counterclaims for declaratory relief, violation of New York's anti-SLAPP law, and abuse of DMCA under 17 U.S.C. § 512(f).[4]  Am. Answer at 41–48 ¶¶ 74-98, 104-107.

## DISCUSSION

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  A complaint need not "contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level."  *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014).  On a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the light most favorable to the plaintiffs.  *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).  The Court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

---

[4]      Counterclaimants voluntarily withdrew their first, second, and sixth counterclaims for tortious interference and malicious prosecution/abuse of process.  Def. Opp., Dkt. 50 at 10.

## I.     Defendant's Partial Motion to Dismiss is Denied[5]

### A.     Copyright Infringement Claim

To prevail on a claim of copyright infringement, "a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of [the] plaintiff's." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (citation omitted).  To establish substantial similarity, a plaintiff must show, *inter alia*, that the copying is "more than *de minimis*." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003).

Defendant does not dispute that the Television Academies have valid copyrights for the Emmy Statuette or that Defendant copied the Emmy Statuette.  Def. Opp., Dkt. 50 at 2.  Instead, Defendant argues that its use of the Emmy Statuette is not actionable because the use was either *de minimis* or fair use.  The Court disagrees.

### 1.     Defendant's Infringement Was Not *De Minimis*

To establish that the infringement of a copyright is *de minimis*, a defendant must show that its copying of protected material is "so trivial" as to "fall below the quantitative threshold of substantial similarity."  *Ringgold v. Black Ent. Television, Inc.*, 126 F.3d 70, 74 (2d Cir. 1997).  In cases involving visual works, such as the instant case, whether the defendant's copying is *de minimis* depends on the "observability" of the copied work, including "the length of time the copied work is observable in the allegedly infringing work and such factors as focus, lighting,

---

[5]     At certain points in its opening brief, Defendant indicates that it is simultaneously moving for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See, e.g.*, Def. Mem. of Law, Dkt. 25 at 5.  Because the "standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim," the Court's analysis would not change if considering Defendant's motion under Rule 12(c). *Patel v. Contemp. Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir. 2001).

camera angles, and prominence." *Id.* at 75. The assessment is to be made from the viewpoint of an "average lay observer." *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 218 (2d Cir. 1998).

Here, the Crony Graphic appears prominently for the opening ten seconds of Defendant's Video. The Crony Graphic is in clear focus in the foreground of the Video and occupies much of the screen. *See* Video at 00:00 to 00:10. The Crony Graphic is also used as the thumbnail image for the Video, making the Crony Graphic perpetually visible even before a user plays the video. *See* Video at 00:00; Am. Answer at 3 ¶ 4. Accordingly, Defendant's infringement was not *de minimis*. *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 173 (2d Cir. 2001) (holding that defendant's infringement was not *de minimis* because the infringing item was "highly noticeable" and appeared "at the center" of the advertisement); *Hirsch v. CBS Broad. Inc.*, No. 17-CV-1860, 2017 WL 3393845, at *5 (S.D.N.Y. Aug. 4, 2017) (holding that defendant's infringement was not *de minimis* because defendant "display[ed] a substantial proportion" of the allegedly infringing photo, "occup[ying] much, although not all, of the screen"); *Dyer v. V.P. Recs. Retail Outlet, Inc.*, No. 05-CV-6583, 2008 WL 2876494, at *4 (S.D.N.Y. July 24, 2008) (holding that defendant's infringement was not *de minimis* because the offending images "[took] up most of the screen" for "almost three seconds of the one-minute video"); *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 155 F. Supp. 2d 1, 46 (S.D.N.Y. 2001), *remanded on other grounds*, 277 F.3d 253 (2d Cir. 2002) (rejecting defendant's argument that its use was *de minimis* because the copied clips "appear[ed] prominently and [were] plainly observable to the lay viewer").[6]

---

[6]     Defendant's cited cases are inapposite. *See* Def. Mem. of Law, Dkt. 25 at 6–8. For example, in *Gayle v. Home Box Off., Inc.*, No. 17-CV-5867, 2018 WL 2059657, at *3 (S.D.N.Y. May 1, 2018), defendant's use was *de minimis* because the allegedly infringing image was "barely visible" and appeared "in the background of a single scene." Similarly, in *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 632 (S.D.N.Y. 2008),

## 2. Defendant's Use of the Emmy Statuette Is Not Fair Use

Fair use is a statutory exception to copyright infringement. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006). As codified in the Copyright Act, "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. To determine whether a particular use is fair use, courts engage in a case-by-case evaluation using four statutory factors in light of the purposes of copyright. *Bill Graham*, 448 F.3d at 608. The factors include: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. Although a court must weigh all the factors, the first—in particular a use's "transformativeness"—is most important and "has a significant impact on the remainder of the fair use inquiry." *Graham v. Prince*, 265 F. Supp. 3d 366, 380 (S.D.N.Y. 2017). Because fair use is a "mixed question of fact and law" and requires "an open-ended and context-sensitive inquiry," courts generally wait until the summary judgment phase to address fair use. *Id.* at 376–77. Nevertheless, dismissal of a copyright infringement claim is warranted at the pleadings stage where fair use is clearly established on the face of the complaint. *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016).

---

defendant's use was found to be *de minimis* because the allegedly infringing material was "always in the background," "never appear[ed] by itself or in a close-up," was either "out of focus or obscured," and displayed only for "a few seconds at a time."

### a.      Purpose and Character of the Use

The heart of the fair use inquiry is the purpose and character of the use.  *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).  This includes two considerations: (i) the transformative nature of the work, and (ii) whether the "use is of a commercial nature or is for nonprofit educational purposes."  *Bill Graham*, 448 F.3d at 608 (citing 17 U.S.C. § 107(1)).

### i.      Transformative Use

To determine whether a secondary use is transformative, the Court must consider "whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message."  *Bill Graham*, 448 F.3d at 608 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).  To be transformative, "the secondary work itself must reasonably be perceived as embodying an entirely distinct artistic purpose, one that conveys a 'new meaning or message' *entirely separate* from its source material."  *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 992 F.3d 99, 113 (2d Cir. 2021) (emphasis added).  Put differently, although the primary work may still be recognizable within the secondary work, "the secondary work's use of its source material" must be "in service of a 'fundamentally different and new' artistic purpose and character, such that the secondary work stands apart from the 'raw material' used to create it."  *Id.* at 114.  Paradigmatic examples of transformative uses include parody, criticism, comment, news reporting, teaching, scholarship, and research.  *Id.* at 110.

Defendant argues that its use of the Emmy Statuette is transformative because the Crony Graphic changed the Emmy Statuette's meaning "by having a symbol of the television industry holding up a depiction of the COVID virus," resulting in "a unique and startling image that invites interpretation."  Def. Mem. of Law, Dkt. 25 at 10.  The Court disagrees.  Defendant has

9

made no substantial alterations to the Emmy Statuette; the Crony Graphic is identical to the
Emmy Statuette save the replacement of the atom with an image of the COVID-19 virus. Put
differently, a simple side-by-side comparison of the Emmy Statuette and the Crony Graphic
confirms that the Crony Graphic retains the dominant and essential aesthetic elements of the
Emmy Statuette. *Cariou v. Prince*, 714 F.3d 694, 711 (2d Cir. 2013) (finding that secondary
works that made only "minimal alterations," so that the secondary works remained "similar [to
the original] in key aesthetic ways," were not transformative). The Crony Graphic is nothing
more than the "imposition of another artist's style on the primary work such that the secondary
work remains both recognizably deriving from, and retaining the essential elements of, its source
material." *Warhol*, 992 F.3d at 114. Accordingly, Defendant's use of the Emmy Statuette is not
transformative. *See Graham v. Prince*, 265 F. Supp. 3d at 381 (rejecting fair use defense where
the secondary work "simply reproduce[d] the entirety of [the original]" so that the "unobstructed
and unaltered" original remained "the dominant image in [the secondary work]"); *N. Jersey
Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 615 (S.D.N.Y. 2015) (finding that a secondary
work, which juxtaposed the plaintiff's work with an iconic World War II photograph, was not
transformative because the plaintiff's work remained "the clearly predominant feature of the
[c]ombined [i]mage").

Defendant's assertion that the Crony Graphic was created "to promote a serious
discussion" of the COVID-19 pandemic is insufficient to establish transformativeness. Def.
Mem. of Law, Dkt. 25 at 10. At the outset, whether a secondary work is transformative does not
turn on the stated or perceived intent of its creator. *See Warhol*, 992 F.3d at 113 (noting that
"where a secondary work does not obviously comment on or relate back to the original or use the
original for a purpose other than that for which it was created, the bare assertion of a 'higher or

10

different artistic use' is insufficient to render a work transformative"). Instead, as noted *supra*, the Court must examine whether the "secondary work's use of its source material is in service of a 'fundamentally different and new' artistic purpose and character, such that the secondary work stands apart from the 'raw material' used to create it." *Id.* at 114. Here, the Crony Graphic appeared in videos and social media posts promoting Defendant's Crony Awards, an award show that honored countries and people who minimized the COVID-19 pandemic.[7] As such, the Crony Graphic does not have a "fundamentally different and new artistic purpose and character," from the Emmy Statuette. Instead, both images represent awards and were used to promote the parties' respective award shows. *See TCA Television Corp.*, 839 F.3d at 180–83 (rejecting fair use defense where the secondary work did not "imbue [the original] with a character[ ] different from that for which it was created").

Finally, Defendant's argument that its use of the Emmy Statuette constitutes parody is unavailing. *See* Am. Answer at 26–28 ¶¶ 22, 24, 27. "To constitute a parody, a work must be directed, at least in part, at the original, and its 'commentary [must have] critical bearing on the substance or style of the original.'" *Abilene Music, Inc. v. Sony Music Ent., Inc.*, 320 F. Supp. 2d 84, 91 (S.D.N.Y. 2003) (quoting *Campbell*, 510 U.S. at 580–81; *see also Warhol*, 992 F.3d at 110 (noting that "parody [ ] needs to mimic an original to make its point"). A secondary work that simply appropriates material from an existing work without directing its criticism at the copied work itself is not parody. *Abilene Music, Inc.*, 320 F. Supp. 2d at 91. Defendant admits that "[n]either the Emmy statuette nor the Television Academies were mentioned in the broadcast." Def. Mem. of Law, Dkt. 25 at 7; *see also* Pls.' Motion for Judicial Notice, Dkt. 37-1,

---

[7] While Defendant claims that "[t]he broadcast was not actually an award show," Defendant's Video, for which the Crony Graphic is used as the thumbnail image, is titled "John Cullen Presents The Crony Awards for International Excellence in Covid-19 Response." *See* Am. Answer at 3–4 ¶ 4.

Ex. 4, at 10:30 to 11:00 (stating that the Television Academies "narcissistically think [the Crony Awards] was referring to them"). Accordingly, the Crony Graphic is not parody.

### ii. Commercial Use

In evaluating the purpose and character of the use, the Court must also consider "whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The more transformative the new work, however, "the less will be the significance of other factors, like commercialism." *Campbell*, 510 U.S. at 579; *Cariou*, 714 F.3d at 708.

Defendant argues that its use of the Emmy Statuette is not commercial because Mr. Goodman derives no income from his YouTube broadcasts. Def. Mem. of Law, Dkt. 25 at 11. While Defendant may not derive direct income from its YouTube content, Defendant's Video included links to Patreon and SubscribeStar, through which consumers pay for Defendant's content.[8] Accordingly, Plaintiffs have adequately alleged that the Crony Graphic was used commercially. *See Hirsch v. Complex Media, Inc.*, No. 18-CV-5488, 2018 WL 6985227, at *6 (S.D.N.Y. Dec. 10, 2018) (finding that defendant's copying "for commercial purposes . . . adjacent to advertisements" gave rise to "inferences of commercial use and bad faith").

In sum, the first factor weighs against a finding of fair use.

### b. Nature of the Copyrighted Work

The second fair use factor considers: "(1) whether the work is expressive or creative, . . . with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Cariou*, 714 F.3d at 709–10.

---

[8] *See* Video at 01:25 to 01:55, 03:15 to 03:25, 06:32 to 06:55, 08:37 to 08:44.

Because Defendant concedes that the Emmy Statuette is "arguably creative," Def. Mem. of Law, Dkt. 25 at 11, this factor weighs against a finding of fair use.

### c.       Amount and Substantiality of the Portion Used

The third fair use factor considers whether "the quantity and value of the materials used[ ] are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. In general, "the more of a copyrighted work that is taken, the less likely the use is to be fair." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 89 (2d Cir. 2014).

As noted *supra*, the Crony Graphic copies nearly all of the Emmy Statuette; the two images are identical other than the replacement of the atom with the COVID-19 virus. *See Hirsch v. CBS Broad. Inc.*, 2017 WL 3393845, at *7 (rejecting fair use defense where the defendant "simply reproduced a substantial proportion of the [original]" and then "insert[ed] it into a broadcast"). Moreover, the Court agrees with Plaintiffs that Defendant's use of the Emmy Statuette was unreasonable in relation to its purpose. Even assuming that Defendant needed to use an image of an award to promote its Crony Awards, Defendant has not shown that it was necessary to use the Emmy Statuette. *See TCA Television Corp.,* 839 F.3d at 185 (finding that wholesale borrowing of copyrighted comedy routine was not reasonable where "defendants offer[ed] no persuasive justification" for its use).

Accordingly, the third factor weighs against a finding of fair use.

### d.       Effect of the Use Upon the Market for or Value of the Original

The final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential

13

purchasers may opt to acquire the copy in preference to the original." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015). In assessing market harm, the Court must consider "not whether the second work would damage the market for the first (by, for example, devaluing it through parody or criticism), but whether it usurps the market for the first by offering a competing substitute." *Warhol*, 992 F.3d at 120. The more transformative the secondary use, "the less likelihood that the secondary use substitutes for the original." *Graham v. Prince*, 265 F. Supp. 3d at 384 (citation omitted); *see also Warhol*, 992 F.3d at 120 (noting that the first and fourth factors are closely linked because "the more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original").

The Court agrees with Defendant that the primary markets for the Emmy Awards and Defendant's video series do not meaningfully overlap. Nevertheless, Plaintiffs have adequately alleged that they suffered actual and reputational harm through Defendant's association of the Emmy Statuette with dangerous misinformation about the COVID-19 pandemic. *See* Am. Compl. ¶¶ 31, 49, 58, 61. Defendant has alleged no facts to support its conclusory assertion that its use of the Crony Graphic had "[no] impact whatsoever" upon the market value of the Emmy Statuette. *See Campbell*, 510 U.S. at 590 ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets.").

In sum, this factor weighs slightly against a finding of fair use.

### e. Balance of the Factors

For the foregoing reasons, the Court concludes that the balance of the fair use factors weighs against a finding of fair use at this stage. Therefore, Defendant's motion to dismiss

14

Plaintiffs' copyright infringement claim is denied because Defendant's use was not, as a matter

of law, either *de minimis* or fair use.

## B.    Trademark Dilution Claims

To allege a trademark dilution claim under federal law, a plaintiff must prove (1) that the

trademark is truly distinctive or has acquired secondary meaning, and (2) a likelihood of dilution

as a result of blurring or tarnishment.  15 U.S.C. § 1125(c)(1); *see also Tiffany (NJ) Inc. v. eBay*

*Inc.*, 600 F.3d 93, 110–11 (2d Cir. 2010); *Ergowerx Int'l, LLC v. Maxell Corp. of Am.*, 18 F.

Supp. 3d 430, 451 (S.D.N.Y. 2014).[9]

Dilution by blurring is an "association arising from the similarity between a mark or trade

name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. §

1125(c)(2)(B); *see also Tiffany (NJ) Inc.*, 600 F.3d at 111 (blurring refers to "the whittling away

of the established trademark's selling power through its unauthorized use by others").  In

determining whether a mark is likely to cause dilution by blurring, courts consider: (1) the degree

of similarity between the mark or trade name and the famous mark; (2) the degree of inherent or

acquired distinctiveness of the famous mark; (3) the extent to which the owner of the famous

mark is engaging in substantially exclusive use of the mark; (4) the degree of recognition of the

famous mark; (5) whether the user of the mark intended to create an association with the famous

mark; and (6) any actual association between the mark or trade name and the famous mark.  15

U.S.C. § 1125(c)(2)(B)(i-vi).

Dilution by tarnishment is an "association arising from the similarity between a mark or

trade name and a famous mark that harms the reputation of the famous mark."  15 U.S.C. §

---

[9]      New York law is similar but does not require proof that the plaintiff's mark is famous.  New York's anti-
dilution statute provides: "Likelihood of injury to business reputation or of dilution of the distinctive quality of a
mark or trade name shall be a ground for injunctive relief . . .  notwithstanding the absence of competition between
the parties or the absence of confusion as to the source of goods or services."  N.Y. Gen. Bus. Law § 360-l.

1125(c)(2)(C). "Tarnishment generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *Deere & Co. v. MTD Prod., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994) (internal quotation marks omitted).

Like the Copyright Act, the Trademark Dilution Act includes a fair use exception, which provides that certain types of uses are not actionable as dilution by blurring or dilution by tarnishment, including:

> Any fair use . . . of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with . . . identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

15 U.S.C. § 1125(c)(3).[10]

Here, Defendant argues that the fair use exception applies because its use of the Crony Graphic was parody or social commentary. The Court disagrees. The parody exception does not apply when the purported parody "makes no comment" on the original mark, and "simply uses it somewhat humorously to promote [its] own products and services." *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 813 (2d Cir. 1999). As noted *supra*, Defendant concedes that its Video does not mention either the Emmy Statuette or the Television Academies, *see* Def. Mem. of Law, Dkt. 25 at 7, and nothing about its use of the Crony Graphic pokes fun at or comments on the Television Academies. Accordingly, the parody exception does not apply. *Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*, No. 10-CV-1611, 2012 WL 1022247, at *19 (S.D.N.Y. Mar. 22, 2012) (finding parody exception inapplicable when defendant acknowledged its

---

[10]     Although New York law does not include an analogous "fair use" exception, New York's anti-dilution law is "substantively similar" to federal law, such that claims under the two laws "may be analyzed together." *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 434 n.3 (S.D.N.Y. 2016), *aff'd*, 674 F. App'x 16 (2d Cir. 2016) (citing *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 523 (S.D.N.Y. 2008)).

"overall intent was not to comment directly on [the trademark holder]").  Similarly, although

Defendant argues that its use of the Crony Graphic "qualifies as social commentary on the

television industry and its role in creating public perceptions," Def. Mem. of Law, Dkt. 25 at 14,

the fair use exception does not apply to "expansive social criticism, as opposed to a targeted

comment or parody of the original."  *Hyundai Motor Am.*, 2012 WL 1022247, at *19.

In sum, the fair use exception does not, as a matter of law, defeat Plaintiffs' trademark

dilution claims.[11]

## C.    Trademark Infringement Claims

To state a claim for trademark infringement under the Lanham Act, a plaintiff must allege

sufficient facts to establish: (1) that the plaintiff's mark is entitled to protection, and (2) that the

defendant's "use of its mark is likely to cause consumers confusion as to the origin or

sponsorship of [its] goods."  *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d

Cir. 2016).[12]  A certificate of registration with the Patent and Trademark Office is *prima facie*

evidence that the mark is entitled to protection.  *Id.*

"Likelihood of confusion includes confusion of any kind, including confusion as to

source, sponsorship, affiliation, connection, or identification."  *Star Indus., Inc. v. Bacardi &

Co.*, 412 F.3d 373, 383 (2d Cir. 2005) (citation omitted).  In assessing whether a likelihood of

confusion exists, courts apply the well-known eight-factor balancing test announced in *Polaroid*

---

[11]    The Court also notes that because Defendant used the Crony Graphic to market its own "services," namely the Crony Awards, Defendant's use falls outside the fair use exception.  *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 112 (2d Cir. 2009) (rejecting parody exception where defendant used "Charbucks" mark as a designation of source for its own line of coffee); *My Other Bag, Inc.*, 156 F. Supp. 3d at 437 ("Section 1125(c)(3), by its terms, protects "[a]ny fair use . . . of a famous mark by another person *other than as a designation of source for the person's own goods or services*." (emphasis in original)).

[12]    The elements necessary to prevail on a trademark infringement claim under New York law mirror the Lanham Act.  *OffWhite Prods., LLC v. Off-White LLC*, No. 19-CV-6267, 2020 WL 4895362, at *4 (S.D.N.Y. Aug. 20, 2020).

*Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). The eight factors include: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) the sophistication of consumers in the relevant market. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009). The application of the *Polaroid* test is not "mechanical," and no single factor is dispositive. *Guthrie Healthcare Sys.*, 826 F.3d at 37. Rather, a court must focus on whether the plaintiff has plausibly alleged a "probability of confusion." *Id.*; *see also Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir. 1993).

Defendant does not dispute that Plaintiffs' mark is registered and entitled to protection. Instead, Defendant argues that its use of Plaintiffs' mark was unlikely to cause consumer confusion.

### 1. Strength of Trademark

"A mark's strength is a function of its distinctiveness, whether inherent or whether acquired in the marketplace." *Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 442 (S.D.N.Y. 2016). Because Defendant concedes that the Emmy Statuette is a strong trademark, Def. Mem. of Law, Dkt. 25 at 16, the first factor weighs in favor of the Television Academies. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 503 (2d Cir. 1996) ("[A]n undeniably strong mark [is] a factor favoring the trademark plaintiff.").

## 2. Similarity of the Marks

"In applying this factor, courts consider whether the similarity of the marks is likely to cause confusion among potential customers." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 394 (2d Cir. 1995). "The more unusual and distinctive the design of a trademark logo, the greater the likelihood that such an astonishing degree of similarity will evoke an assumption that the senior and junior user are affiliated." *Guthrie Healthcare Sys.*, 826 F.3d at 38.

As noted *supra*, the Emmy Statuette and the Crony Graphic are nearly identical; the Crony Graphic depicts the same winged figure holding a globe-shaped object in the same dimensions, proportions, and colors as the Emmy Statuette. Indeed, Defendant admits to using "the entire" Emmy Statuette in the Crony Graphic. Def. Mem. of Law, Dkt. 25 at 12. As such, the second factor favors the Plaintiffs.

## 3. Proximity and Competitiveness of Products

"The proximity inquiry asks to what extent the two products compete with each other." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004). The purpose of the inquiry, which considers both market proximity and geographic proximity, is "to determine whether the two products have an overlapping client base that creates a potential for confusion." *Id*. In considering commercial proximity, courts also consider how "the respective products are marketed" and made available to consumers. *Star Indus., Inc.*, 412 F.3d at 387.

Here, the parties are engaged in distinct commercial activities. The Television Academies present the Emmy Awards while Defendant produces and disseminates "political and social commentary" on YouTube and other social media platforms. Nonetheless, Defendant also hosts and promotes at least one award show; as noted *supra*, the title of Defendant's Video explicitly references its "Crony Awards." Accordingly, Plaintiffs have adequately alleged that

19

the Crony Graphic is used in a similar way to the Emmy Statuette such that there is some

potential for confusion. As such, on balance, at the motion to dismiss stage, the third factor is

neutral or weighs slightly in favor of the Plaintiffs.

### 4. Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's

market in the future, or that consumers will perceive the senior user as likely to do so." *Star

Indus., Inc.*, 412 F.3d at 387.

Plaintiffs allege no facts to support the inference that they have any intention of entering

Defendant's market or that consumers would reasonably believe that the Television Academies

would be likely to engage with Defendant's YouTube platform. Accordingly, the fourth factor

favors the Defendant.

### 5. Actual Confusion

"It is black letter law that actual confusion need not be shown to prevail on a trademark

infringement claim, since actual confusion is very difficult to prove." *Guthrie Healthcare Sys.*,

826 F.3d at 45 (citation omitted). Accordingly, Plaintiffs need only show "a likelihood of

confusion."

Plaintiffs have adequately alleged that, based on the Crony Graphic's striking similarity

to the Emmy Statuette and its use in connection with Defendant's Crony Awards, the Crony

Graphic is "likely to cause confusion, mistake, and deception as to the source or origin of the

Television Academies' products and services" and may "falsely suggest a sponsorship,

connection, or association between Defendant, its products, its services, and/or its commercial

activities with the Television Academies and/or their corporate identity." Am. Compl. ¶¶ 48, 65,

67.

Accordingly, the fourth factor favors the Plaintiffs.

### 6. Bad Faith

In determining whether a defendant acted in bad faith, the Court "considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 460 (2d Cir. 2004) (citation and internal alterations omitted). A presumption of bad faith may arise where a defendant intentionally copies a plaintiff's mark for its own purposes. *Heritage of Pride, Inc. v. Matinee NYC, Inc.*, No. 14-CV-4165, 2014 WL 12783866, at *11 (S.D.N.Y. June 20, 2014) (citing *Paddington Corp.*, 996 F.2d at 586 ("Where a second-comer acts in bad faith and intentionally copies a trademark . . . a presumption arises that the copier has succeeded in causing confusion.")); *see also Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987) ("Intentional copying gives rise to a presumption of a likelihood of confusion.").

Because Defendant does not dispute that it copied the entire Emmy Statuette to create the Crony Graphic, *see* Def. Mem. of Law, Dkt. 25 at 12, the Court finds a presumption of bad faith to be appropriate here. *See Paddington Corp.*, 996 F. 2d at 587 ("Where [actual knowledge of the prior user's mark] is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld findings of bad faith.").

The sixth factor favors the Plaintiffs.

### 7. Differences in Relative Quality

Differences in relative quality between a senior and a junior user's goods or services can harm the senior user's reputation and affect the likelihood of consumer confusion. *Guthrie Healthcare Sys.*, 826 F.3d at 44. Because Plaintiffs have not alleged what, if any, quality

differences exist between the two images, the Court is unable to draw any conclusions as to the respective quality of the products. Accordingly, this factor is neutral.

### 8. Consumer Sophistication

The more sophisticated the consumers of a product are, "the less likely it is that similarities in . . . trade marks will result in confusion concerning the source or sponsorship of the product." *Paddington Corp.*, 996 F.2d at 587 (citation omitted). Where potential consumers lack a sophisticated knowledge of the overall market, however, "the likelihood is higher that similarity of trademarks may lead them to believe that a junior user's activities are affiliated with those of the senior user." *Guthrie Healthcare Sys.,* 826 F.3d at 43.

Although Defendant claims that its audience is "highly intelligent and sophisticated" and would therefore not confuse the Crony Graphic with the Emmy Statuette, Def. Mem. of Law, Dkt. 25 at 16, at this stage, Plaintiffs have adequately alleged that a member of the general online public "might see the EMMY Statuette Design as used by Defendant and mistakenly believe that there is a link between Plaintiffs and Defendant or find the association offensive, thus tarnishing the mark." Pls.' Opp., Dkt. 37 at 24; *see also* Am. Compl. ¶¶ 48, 67, 69. Accordingly, the eighth factor favors Plaintiffs.

In sum, considering the eight *Polaroid* factors together, the Court concludes that Plaintiffs have plausibly alleged a probability of confusion. Accordingly, Defendant's motion to dismiss the trademark infringement claims is denied.

II.     **Plaintiffs' Motion to Dismiss the Counterclaims is Granted**

A.     **Declaratory Judgment Claims**

Counterclaimants seek a declaratory judgment that the Crony Graphic was fair use and that Mr. Goodman's commentary about Mr. Sharp and his father was not defamatory.[13]  Neither is an appropriate basis for a declaratory judgment.

"The Declaratory Judgment Act . . . vests a district court with discretion to exercise jurisdiction over a declaratory action."  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (citing 28 U.S.C. § 2201(a)).  To decide whether to entertain an action for declaratory judgment, a district court must consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  *Id*.  A counterclaim seeking a declaratory judgment may be dismissed if it is duplicative of the counterclaimants' affirmative defenses, does not broaden the scope of the dispute, or would not present a live controversy once the plaintiffs' claims have been resolved on the merits.  *See Arista Recs. LLC v. Usenet.com., Inc.*, No. 07-CV-8822, 2008 WL 4974823, at *4–5 (S.D.N.Y. Nov. 24, 2008).

Counterclaimants' request for a declaration that the Crony Graphic was fair use, Am. Answer at 43–44 ¶¶ 74-83, is entirely duplicative of Defendant's affirmative defense of fair use.  *See, e.g.*, *Arista Recs. LLC*, 2008 WL 4974823, at *5 (dismissing counterclaims seeking a declaration of non-infringement that "serve no purpose because they mirror the issues raised in Plaintiffs' Complaint, constitute no affirmative cause of action, and are duplicative of [Defendant's] affirmative defenses").  Counterclaimants' claim seeking a declaration that Mr.

---

[13]     The Complaint includes a claim of libel that Defendant did not move to dismiss, opting instead to assert (with Mr. Goodman) a counterclaim for a declaratory judgment that Mr. Goodman's statements were not defamatory.  The strategic or tactical reason for so proceeding is a mystery.

Goodman's commentary regarding the Sharps was non-libelous protected speech, Am. Answer at 45 ¶¶ 84-89, is similarly duplicative of Defendant's affirmative defense and mirrors Plaintiffs' libel claim.

Because both requests are improper, the counterclaims for declaratory judgments are dismissed.[14]  *See, e.g.*, *Gorfinkel v. Ralf Vayntrub, Invar Consulting Ltd.*, No. 11-CV-5802, 2014 WL 4175914, at *6 (E.D.N.Y. Aug. 20, 2014) (holding that "where a declaratory judgment claim is redundant of a primary claim raised by a party to a lawsuit, it is properly dismissed as duplicative"); *Interscope Recs. v. Kimmel*, No. 307-CV-0108, 2007 WL 1756383, at *5 (N.D.N.Y. June 18, 2007) (stating that when a counterclaim is merely a "mirror image" of the complaint, the counterclaim serves no purpose and may be dismissed).

### B.   Anti-SLAPP Claim

New York State, like many other states, has enacted legislation designed to combat so-called Strategic Lawsuits Against Public Participation ("SLAPP").  New York's law, commonly known as an "anti-SLAPP" law is "aimed at broadening the protection of citizens facing litigation arising from their public petition and participation."  *Mable Assets, LLC v. Rachmanov*, 192 A.D.3d 998 (2d Dep't 2021).

On November 10, 2020, New York amended its existing anti-SLAPP law "to broaden the scope of the law and provide greater protections to defendants."  *Sweigert v. Goodman*, No. 18-CV-08653, 2021 WL 1578097, at *1 (S.D.N.Y. Apr. 22, 2021) (citing N.Y. Civil Rights Law ("NYCRL") §§ 70-a, 76-a; N.Y. C.P.L.R. ("CPLR") 3211(g), 1312(h)).  Under § 70-a of New York's amended anti-SLAPP law, a defendant may recover "damages, including costs and

---

[14]     To the extent that Plaintiffs' claims are not resolved on the merits and Counterclaimants continue to have an interest in a ruling on the fair use or libel issues, Counterclaimants may seek to re-plead a declaratory action counterclaim at that point.

attorney's fees," by bringing a special motion to dismiss pursuant to CPLR 3211(g). Such a motion to dismiss "shall be granted" unless the plaintiff demonstrates "that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law." NYCRL § 70-a (citing CPLR 3211(g)).[15]

Plaintiffs argue, *inter alia*, that § 70-a of New York's anti-SLAPP law is inapplicable in federal court because the law's "substantial basis" standard conflicts with the pleading standard articulated in Federal Rule of Civil Procedure 12(b)(6).[16] The Court agrees.

Pursuant to the *Erie* doctrine, if a Federal Rule of Civil Procedure answers the same question as a state law, the Federal Rule governs in federal court, unless the rule at issue violates the Rules Enabling Act. *La Liberte v. Reid*, 966 F.3d 79, 87 (2d Cir. 2020); *see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–99 (2010); *Hanna v. Plumer*, 380 U.S. 460, 463–64 (1965). Circuits around the country have grappled with whether various states' anti-SLAPP laws apply in federal court.[17] The Second Circuit's recent decision in *Reid* all but resolves the question presented in this case. In *Reid*, the Circuit considered whether the special motion-to-strike provision of California's anti-SLAPP statute, which requires

---

[15] A defendant in a purported SLAPP action may also bring a special motion for summary judgment pursuant to CPLR 3212(h). Such a motion "shall be granted unless the party responding to the motion demonstrates that the action, claim, cross claim or counterclaim has a substantial basis in fact and law or is supported by a substantial argument for an extension, modification or reversal of existing law." CPLR 3212(h).

[16] Counterclaimants argue that the Court can apply New York's anti-SLAPP law because § 70-a is a substantive provision rather than a procedural one. The Court disagrees. Counterclaimants' argument rests almost entirely on Judge Rakoff's decision in *Palin v. New York Times Co.*, No. 17-CV-4853, 2020 WL 7711593, at *3 (S.D.N.Y. Dec. 29, 2020). In *Palin*, the district court held that NYCRL § 76-a, an entirely different provision of the law than is at issue in this case, was substantive and therefore applicable in federal court. *Id.* The court in *Palin* expressly declined to consider the applicability of § 70-a in federal court. *Id.* at *2 n.2 ("Defendants do not ask the Court to apply § 70-a in this action, nor do they contend that the provision would even apply in federal court.").

[17] The Fifth, Eleventh, and D.C. Circuits have held that certain provisions of anti-SLAPP laws are inapplicable in federal court when they conflict with Federal Rules of Civil Procedure 12 and 56. *See Klocke v. Watson*, 936 F.3d 240, 242 (5th Cir. 2019); *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018); *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1335 (D.C. Cir. 2015). The First and Ninth Circuits have concluded otherwise. *See Godin v. Schencks*, 629 F.3d 79, 86–87 (1st Cir. 2010); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972 (9th Cir. 1999).

outright dismissal unless the plaintiff can "establish[ ] a probability that he or she will prevail on the claim," could apply in federal court. *Reid*, 966 F.3d at 87. The Circuit held that the statute could not apply in federal court because the provision's "probability of success" standard conflicts with Rules 12 and 56 of the Federal Rules of Civil Procedure. *Id.* The Circuit explained that the statute sought to "establish the circumstances under which a court must dismiss a plaintiff's claim before trial, a question that is already answered (differently) by Federal Rules 12 and 56." *Id.*

Applying the Second Circuit's reasoning in *Reid*, the Court concludes that the "substantial basis" standard articulated in New York's anti-SLAPP law similarly conflicts with the standards under Federal Rules of Civil Procedure 12 and 56. As noted *supra*, under New York's law, a motion to dismiss must be granted unless, at the pleading stage, the plaintiff can "demonstrate[ ] that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law." CPLR 3211(g). Under Federal Rule of Civil Procedure 12, however, a plaintiff at the pleadings stage need only allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Put differently, New York's anti-SLAPP law imposes a different, and higher, burden on the plaintiff at the pleading stage than the Federal Rules of Civil Procedure.[18] *See Ginx, Inc. v. Soho All.*, 720 F. Supp. 2d 342, 366 (S.D.N.Y. 2010), *as corrected* (Aug. 19, 2010) ("New York's legislature may have adopted the Anti-SLAPP law to elevate a plaintiff's burden at the pleading stage above 'plausibility' . . . to 'substantial basis,' but the United States Congress has thus far declined to follow suit."). As such, § 70-a is inapplicable in federal court. *Reid*, 966 F.3d at 87;

---

[18] The law's provisions similarly conflict with Federal Rule of Civil Procedure 56(a). Rule 56(a) permits summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law;" the anti-SLAPP law reverses the burden and requires the plaintiff to prove "a substantial basis in fact and law" for the claim. CPLR 3212(h).

*see also Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1333–34 (D.C. Cir. 2015) (holding that the D.C. anti-SLAPP Act was inapplicable in federal court because it required a plaintiff to meet a higher burden at the pre-trial stage by showing a "likelihood of success on the merits").

In sum, because Federal Rules of Civil Procedure 12 and 56 answer the same question as New York's anti-SLAPP provision, they "govern . . . in federal court, unless Rules 12 and 56 violate the Rules Enabling Act." *Reid*, 966 F.3d at 88. Because is undisputed that Rules 12 and 56 comply with the Rules Enabling Act, *id.*, § 70-a of New York's anti-SLAPP law is inapplicable in federal court.[19] Accordingly, the counterclaim premised on New York's anti-SLAPP law must be dismissed.

## C. Abuse of the Digital Millennium Copyright Act ("DMCA")

The DMCA governs the means by which copyright holders can notify online service providers that their sites are hosting or providing access to allegedly infringing material. *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 43 (S.D.N.Y. 2017). As is relevant here, § 512(f) of the DMCA prohibits "any person" from "knowingly materially misrepresent[ing] . . . that material or activity is infringing." 17 U.S.C. § 512(f)(1). When copyright holders request that an allegedly infringing video be removed, they are "not liable for misrepresentation under the DMCA if they subjectively believe the identified material infringes their copyright, even if that belief is ultimately mistaken." *Hosseinzadeh*, 276 F. Supp. 3d at 44. A copyright holder "must have *actual knowledge* that it is making a misrepresentation of fact" to be liable under § 512(f). *Cabell v. Zimmerman*, No. 09-CV-10134, 2010 WL 996007, at *4 (S.D.N.Y. Mar. 12, 2010) (emphasis in original); *see also Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1005

---

[19] Because the Court finds that § 70-a does not apply in federal court, the Court need not consider Plaintiffs' alternative arguments for dismissal of the anti-SLAPP counterclaim. *See* Pls.' Reply, Dkt. 53 at 2–8.

(9th Cir. 2004) ("[T]here must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner.").

Plaintiffs argue that Counterclaimants have failed to allege any facts to support an inference that the Television Academies *knowingly* made any misrepresentation to YouTube. The Court agrees. Counterclaimants' allegations that "Mr. Sharp and the Television Academies misrepresented to YouTube that Defendant's Crony Graphic was infringing," and that "Mr. Sharp and the Television Academies had actual knowledge, or with reasonable diligence could have obtained knowledge, that his complaint to YouTube had no merit," Am. Answer at 41 ¶ 58, 48 ¶ 106, are conclusory and insufficient to state a claim under § 512(f). Even if Plaintiffs should have known that they were making a misrepresentation (and there are no facts alleged in the counterclaim from which the Court could reasonably infer that), "negligence is not the standard for liability under section 512(f)." *Cabell*, 2010 WL 996007, at *4; *see also Rossi*, 391 F.3d at 1005 ("A copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake.").

In short, Counterclaimants fail to allege any facts from which the Court can reasonably infer that the Television Academies made a knowing and material misrepresentation as required by the DMCA. Accordingly, Counterclaimants have not stated a claim for abuse of DMCA.

## CONCLUSION

For the foregoing reasons, Defendant's partial motion to dismiss or in the alternative for judgment on the pleadings is DENIED. Defendant's request for an order declaring that Defendant's use of the Crony Graphic was *de minimis* or fair use is also DENIED. Plaintiffs'

motion to dismiss the counterclaims is GRANTED.[20]  George Sweigert's motion to intervene is DENIED.

No later than **September 3, 2021**, the parties must submit a joint letter on the status of discovery.

The Clerk of Court is respectfully directed to close the open motions at docket entries 11, 24, 46, 84.


**SO ORDERED.**


**Date:  July 30, 2021**                                         **VALERIE CAPRONI**
       **New York, New York**                            **United States District Judge**

---

[20]        Leave to amend is denied because amendment would be futile.  *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000) (leave to amend may be denied if there is "substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility.").